# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# EASTERN DIVISION

| | |
|---|---|
| **IN RE: AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION** | MDL Docket No. 1:22-md-03035-STA-jay<br><br>ALL CASES<br><br>Honorable S. Thomas Anderson |

### PLAINTIFFS' REPORT ON ANY SETTLEMENT OR AGREEMENT TO RESOLVE CLAIMS IN RESPONSE TO THE COURT'S DECEMBER 11, 2024 ORDER

On December 11, 2024, the Court ordered Plaintiffs to file a report with the Court disclosing any settlement or out-of-court agreement, oral or in writing, to resolve any or all claims that Plaintiff had or may have had against any party or other person or entity related to the subject matter of the MDL. [ECF No. 618]. This order followed Defendant Symetra's Opposition [ECF No. 608] to Plaintiffs' and the AMEC Defendants' Joint Motion to Dismiss Plaintiffs' Claims Against Defendants Davis and Green [ECF No. 586]. In response to the Court's Order, Plaintiffs detail the Settlement Agreement with the AME Defendants and a Cooperation Agreement with Jarrod Erwin and his brother Ryan Erwin and offer additional context regarding the formation and substance of the Cooperation Agreement that Plaintiffs' counsel believes is imperative to understanding the nature of the Cooperation Agreement.

**Agreement No. 1: Settlement Agreement with AME Defendants**

Plaintiffs filed for preliminary approval of a settlement reached with the AME Defendants on December 13, 2024. [ECF Nos. 627, 628]. Plaintiffs summarize the terms of that Settlement below and direct the Court to [ECF No. 628-1] for a true and accurate copy of the Settlement

1

Agreement executed between Plaintiffs and the AME Defendants.

1. **Name of party, person, or entity:** Defendants African Methodist Episcopal Church ("AME Church"), AMEC Ministerial Retirement Annuity Plan (the "Plan"), AMEC Department of Retirement Services, AMEC General Board, and AMEC Council of Bishops (collectively, the "AME Defendants")

2. **Date of the settlement:** The Memorandum of Understanding memorializing the material terms of an agreement between Plaintiffs and the AME Defendants was signed on August 24, 2024. The long-form Class Action Settlement Agreement and Release was signed on November 27, 2024.

3. **Terms of the settlement:**

The AME Defendants agreed to provide and do the following as part of the Settlement Agreement with Plaintiffs:

a. Monetary value or consideration: $20,000,000 (present value of August 2, 2024), which will not be funded in any way through assessments and/or budget raises to any local churches, annual conferences, or district conferences at any point in time.

b. Non-monetary value or consideration: Business practice changes to the operation and management of the AME Church's retirement fund for its pastors, including:

   i. The formal wind down of the AMEC Department of Retirement Services by July 31, 2028;

   ii. The transfer of all Plan funds remaining at Symetra to the recently established Qualified Trust;

   iii. The cessation of any and all administrative, managerial, or other fees assessed or accepted by any person or body in the AME Church for the

administration or management of the Plan;

iv. Agreement that the Plan is governed by the principles of ERISA as of August 2, 2024.

v. Assurance that the monetary contributions received from local churches for the new employee retirement fund being held and administered by Wespath (the entity managing the separate retirement plan established by the AME Church in the wake of the catastrophic losses to the Plan) are transferred to Wespath as quickly, efficiently, and directly as possible.

The Plaintiffs agreed to provide and do the following as part of the Settlement Agreement with Plaintiffs:

a. Plaintiffs agreed to release any and all claims in the MDL or relating to the allegations in the MDL, including any and all currently unknown claims that could possibly exist, against the AME Defendants in return for the value and consideration detailed above.

b. Plaintiffs agreed to dismiss Bishop James Davis and Bishop Samuel L. Green, Sr. from the MDL.

4. **Any value or consideration received by Plaintiffs as part of the settlement:**

a. To date, the AME Defendants have transferred the first of two $10,000,000 installment payments to the interest-bearing Qualified Settlement Fund established to hold the settlement proceeds until transfer to the Qualified Trust.

b. As of August 24, 2024, the AME Defendants ceased all administrative fees associated with the Plan being assessed by any person or body in the AME Church.

3

5. **Any promises or other consideration given in return by Plaintiffs as part of the settlement:** Plaintiffs joined in the AME Defendants' Motion to Dismiss Bishops Davis and Green from the MDL without prejudice, which the AME Defendants filed on November 25, 2024.

**Agreement No. 2: Cooperation Agreement with Jarrod Erwin and Ryan Erwin**

In March of 2024, Plaintiffs' counsel signed a cooperation agreement with counsel for Jarrod Erwin, who was a named defendant in the MDL at the time, and his brother Ryan Erwin, who was not a named defendant in the MDL. [ECF No. 608-3]. For clarification and reference purposes, Plaintiffs have been involved in three proceedings with Jarrod Erwin to date: first, by naming him as a defendant in this MDL (also referred to as the "TN Litigation" in the Cooperation Agreement); second, by seeking relief and discovery in the bankruptcy proceedings as parties in interest (*see In re Jarrod Reed Erwin*, No. 23-31315-H5-13 (Bankr. S.D. Tex.) (hereinafter referred to as the "Bankruptcy")); and third, by initiating an adversary proceeding related to the Bankruptcy to determine the dischargeability of debt against Jarrod Erwin (*see Alexander et al. v. Erwin*, Adversary No. 23-03148 (Bankr. S.D. Tex.) (hereinafter referred to as the "Adversary Proceeding")). Ryan Erwin has never been a party to any of these three proceedings, although he was a non-debtor witness in a FRBP Rule 2004 examination.

1. **Name of party, person, or entity:** Jarrod Erwin and Ryan Erwin

2. **Date of the agreement:** The Cooperation Agreement was signed by Plaintiffs' Co-Lead Counsel, Matthew Lee, and Jarrod and Ryan's counsel, David Berg, on March 6, 2024.

3. **Terms of the agreement:** The Cooperation Agreement obligated the Erwins to provide certain information and data to the Plaintiffs and be available to answer any questions about the facts underlying the Plaintiffs' claims in the MDL. Plaintiffs agreed to sever or dismiss

4

Jarrod Erwin from the MDL and dismiss their Adversary Proceeding against him. Plaintiffs also agreed to refrain from adding Ryan Erwin as a named defendant in the MDL. Ryan Erwin had testified that he would likely file for bankruptcy if claims were brought against him in the MDL or in any other court; indeed, he retained his own separate bankruptcy attorney to represent him at his FRBP Rule 2004 examination. The Cooperation Agreement also obligated the Erwins to effectuate the transfer of an 11% ownership interest in Day and Night Solar, LLC (Defendant Bob Eaton's solar energy company) believed to be owned by Motorskill Asia Ventures 1, Inc. and/or Lifeline Energy USA, Inc. (the "11% DNS interest") to the Plan.

4. **Any value or consideration received by Plaintiffs as part of the agreement:** As detailed more fully below, to date Plaintiffs have only received information, data,[1] and answers to questions from the Cooperation Agreement, because the 11% DNS interest has not yet been transferred to the Plan, as detailed below.

5. **Any promises or other consideration given in return by Plaintiffs as part of the agreement:** Plaintiffs removed Jarrod Erwin as a named defendant from their Second Consolidated Amended Complaint in this MDL (to which Symetra did not object) and dismissed their Adversary Proceeding against him. Importantly, no class member or named plaintiff is providing a release to Jarrod or Ryan Erwin. Therefore, the cooperation agreement is not a settlement or compromise within the meaning of Rule 23(e). *See Moreland v. Rucker Pharmacal Co., Inc.*, 63 F.R.D. 611, 614 (W.D. La. 1974) (agreement not covered by Rule 23(e) when "[t]here was no bargaining with alleged class members to relinquish their claims").

---

[1] The Erwins both testified at their recent depositions that they have not produced anything to Plaintiffs that they have not also produced in response to Symetra's subpoenas in the bankruptcy court.

5

**The Context of the Cooperation Agreement**[2]

Defendant Symetra misconstrues the Cooperation Agreement in their Opposition to the dismissal of Bishops Davis and Green from the MDL [ECF No. 608, p. 3-5]. First, Plaintiffs' counsel does not believe that the Cooperation Agreement is a settlement agreement, voluntary dismissal, or compromise requiring presentation to the Court pursuant to Rule 23 of the Federal Rules of Civil Procedure for two important reasons: (1) nothing about the Cooperation Agreement binds Class Members with respect to their rights for relief and recovery from the opposing parties to the agreement, Jarrod and Ryan Erwin individually—Plaintiffs did not agree to dismiss their claims against Jarrod in the MDL with prejudice, did not promise never to refile their claims against Jarrod or never bring claims against Ryan, and did not agree to provide a release of any kind to either Jarrod or Ryan; and (2) the only item of (potential) monetary value in the Cooperation Agreement is the 11% DNS interest. If the transfer of the 11% DNS interest means that the Cooperation Agreement warrants scrutiny of the Court pursuant to Rule 23, then the Cooperation Agreement is not yet ripe for presentation before the Court because Plaintiffs' counsel has not finally concluded if and how the 11% DNS interest can be transferred to the Plan. For their part, the Erwins' counsel has confirmed that they will perform if and when the Court has granted approval for the transfer, as needed.

Ultimately, Plaintiffs, and any other parties who participated, learned in the Bankruptcy that Jarrod Erwin, individually, has no significant assets. What he does have is information. Given that Dr. Harris and Randall "Doc" Erwin both passed away during this litigation before being deposed, Jarrod and Ryan's open, truthful, and candid information about the operations of these

---

[2] In providing the foregoing details about this Cooperation Agreement, Plaintiffs' counsel does not waive any applicable privileges relating to the Agreement or the circumstances surrounding it.

6

deceased individuals could be invaluable. Plaintiffs' counsel learned through their efforts that Jarrod and Ryan were willing to cooperate to provide that information, partially out of sympathy for the plight of the AME Church pastors and, more pragmatically, because Plaintiffs' counsel (only) had become a thorn in their side in the Bankruptcy.

Given Symetra's characterization of the Cooperation Agreement in its Opposition, Plaintiffs offer to the Court the following details to explain the circumstances and timing of the Cooperation Agreement. These details demonstrate that currently Plaintiffs' counsel does not know if and when the 11% DNS interest can be transferred to the Plan.[3] Therefore, Plaintiffs' agreement with the Erwins is only a cooperation agreement rather than a settlement agreement or compromise warranting the Court's scrutiny pursuant to Rule 23.

### A. Plaintiffs Learned in the Bankruptcy that Jarrod Erwin Had No Real Assets, and the Bankruptcy Court Has Been Satisfied of the Same.

As this Court is aware, Jarrod Erwin filed for bankruptcy on April 7, 2023. [ECF No. 205, *Defendant Jarrod Erwin's Suggestion of Bankruptcy*]. Because Jarrod had already forecast a significant document production in the MDL before filing for bankruptcy, Plaintiffs entered the Bankruptcy as parties in interest to pursue relief from the automatic stay. [ECF No. 260, *June 2023 Status Report*], [Bankruptcy ECF No. 10, *Emergency Motion Filed by Interested Parties*]. Rather than lifting the automatic stay, the Bankruptcy Court instead permitted Plaintiffs to conduct discovery in the Bankruptcy itself, ordering Jarrod to produce documents (what turned out to be the 60 bankers' boxes of documents) and appear for a Rule 2004 examination, which is referred to as a "fishing expedition" in bankruptcy proceedings. [Bankruptcy ECF No. 20, *Order Abating Ruling on Motion for Relief from Stay*]. That motion and ruling marked the beginning of significant

---

[3] But they have secured a commitment to do so at the proper time and with the proper authority.

engagement by Plaintiffs in the Bankruptcy. [*See* ECF Nos. 260, 283, and 313 for the August, September, and December of 2023 Status Reports in which Plaintiffs detailed their discovery and litigation efforts in the Bankruptcy].

At first, Plaintiffs were highly skeptical of Jarrod's assertion of bankruptcy, given the nature of the catastrophic loss to the Plan and the reality that over $37 million of Plan assets had been transferred to the Motorskill entities over a ten-plus-year period. As Jarrod had worked for his father, Randall "Doc" Erwin, who was the fundraising arm of the Motorskill entities, Plaintiffs believed that Jarrod must have undisclosed assets resulting from his employment at Motorskill. At the initial and continued sessions of the Section 341(a) Meeting of Creditors, the presiding Trustee—in addition to himself asking Jarrod (under oath) the standard creditors' meeting questions about a debtor's conduct, property, liabilities, and financial condition—permitted Plaintiffs' counsel to question Jarrod Erwin about his purported assets and liabilities. [Bankruptcy ECF No. 49, *Meeting of Creditors Held*]. Plaintiffs then conducted a Rule 2004 examination of Jarrod Erwin focusing on his financial status as well as his employment with Motorskill and his knowledge of the Plan's investments and Doc Erwin's relationship with Dr. Harris and Bob Eaton. [Bankruptcy ECF No. 55, *Courtroom Minutes*]. Plaintiffs also conducted a Rule 2004 examination of Ryan Erwin and explored the same topics. [Bankruptcy ECF No. 114, *Notice of 2004 Examination of Ryan Erwin*], [Bankruptcy ECF No. 118, *Order Denying Emergency Motion to Quash*]. Through Jarrod's Rule 2004 examination, Plaintiffs uncovered Doc Erwin's Last Will and Testament and learned that while Doc had few remaining assets at the time of his death, he had established a revocable trust to be used partially for the legal defense of Jarrod and Ryan should any claims be filed against them relating to Doc's prior business ventures. [Bankruptcy ECF No. 60-1, *Randall Erwin Will*] [Bankruptcy ECF No. 60-2, *Randall Erwin Trust Agreement*]. Ryan

8

Erwin was the executor of the Doc's will and was paying the majority of Jarrod's legal fees in the Bankruptcy out of the trust (although those funds had started to dwindle by the end of October). [Bankruptcy Nos. 9, 27, 75, 127, *Disclosures of Compensation*] [Bankruptcy No. 134, *Amended A/B Schedules*].

On August 8, 2023, Plaintiffs initiated an Adversary Proceeding to determine whether the potential debt arising from their claims against Jarrod Erwin individually in the MDL were dischargeable in the Bankruptcy. [Adversary Proceeding ECF No. 1, *Complaint*]. Such a proceeding is essentially required for a party like the Plaintiffs in bankruptcy proceedings and the deadline to file such a complaint is established by the Bankruptcy Court. Jarrod moved to dismiss the Adversary Proceeding on September 11, 2023. [Adversary Proceeding ECF No. 8, *Motion to Dismiss*]. By October of 2023, through their discovery efforts in the Bankruptcy, Plaintiffs had begun to conclude that Jarrod had no significant assets and that there was no evidence that Jarrod had somehow funneled money away from the Motorskill entities. [Bankruptcy No. 134, *Amended A/B Schedules*].[4]

Plaintiffs had been unrelenting in litigating their interests in the Bankruptcy, and therefore it came as no surprise to Plaintiffs' counsel when Jarrod's attorneys reached out to discuss a possible resolution or avenue for relief. Over the next several months, and with an abundance of

---

[4] Plaintiffs moved to sever and stay the claims against Jarrod in the MDL on October 4, 2023. [ECF No. 284]. Plaintiffs did so at that time because discovery efforts in the MDL had largely stalled out because of the Bankruptcy and Plaintiffs wanted to get efforts moving again. A potential cooperation agreement or resolution with Jarrod Erwin was not the impetus. After conferring with the Court at the December 2023 status conference about the Motion to Sever, Plaintiffs instead brokered an agreement with Jarrod Erwin, the Bankruptcy Trustee, and the AME Defendants to seek clarification on the scope of the automatic stay, which they did, and the Bankruptcy Court clarified on January 17, 2024, that all discovery matters in the MDL could move forward except those pertaining to Jarrod Erwin. [ECF No. 328, *Plaintiffs' Updated Notice Regarding the Erwin Bankruptcy's Impact on this Action*] [ECF No. 334, *February Status Update*].

9

both caution and skepticism, Plaintiffs' counsel conferred with David Berg, an outside litigation counsel for Jarrod and Ryan. [Bankruptcy ECF No. 166, *Application to Employ Attorney as Special Counsel for Litigation (David Berg)*]. While they were negotiating, Plaintiffs continued to prosecute the Adversary Proceeding but noted to the Bankruptcy Court at the beginning of December of 2023 that the parties were discussing a possible resolution of the case. [Adversary Proceeding ECF No. 20, *Amended Pretrial Statement*]. After holding a pretrial conference, the Bankruptcy Court set the Adversary Proceeding for trial in October of 2024. [Adversary Proceeding ECF No. 23, *Order Scheduling Trial*]. Then, on January 18, 2024, the Bankruptcy Court confirmed Jarrod's Chapter 13 plan after significant testing from the Trustee [Bankruptcy ECF No. 163, *Order Confirming Chapter 13 Plan and Valuing Collateral Pursuant to 11 U.S.C. § 506*]. The confirmation of Jarrod's bankruptcy plan affirmed for Plaintiffs' counsel their assessment of Jarrod's financial position.

### B. The Cooperation Agreement Does Not Finally Bind Class Members, But Aids in Their Recovery Efforts.

Plaintiffs' counsel recognized the limited possibility of financial recovery from the brothers as individual defendants in the MDL and determined that continuing to litigate against Jarrod in the Bankruptcy and the Adversary Proceeding could be an unproductive distraction. With discovery efforts in the MDL resuming in earnest at the end of January and important depositions coming up, information about how Dr. Harris, Bob Eaton, Doc Erwin, the Motorskill entities, and others worked together could go a long way towards understanding who is responsible for the loss.

At its core, the Cooperation Agreement memorializes an offer by Jarrod and Ryan to provide certain information and data to Plaintiffs and to facilitate the transfer of the 11% DNS interest to the Plan. (As explained further below, Dr. Harris and Bob Eaton had tried to get the 11% DNS interest transferred to the Plan in 2021, and likely back in 2019, but a proposed Transfer

10

Agreement was never executed because Motorskill wanted a *complete release* from Dr. Harris and the AME Church for itself and all related entities.) If Jarrod and Ryan did all these things to the satisfaction of Plaintiffs' counsel, including the transfer of the 11% DNS interest, then the offer would be accepted, and an agreement would be formed. Only then would Plaintiffs be contractually obligated under the Cooperation Agreement.

Crucially, as it relates to the MDL, Plaintiffs only agreed to "[s]ever or dismiss all claims against Jarrod Erwin in the pending TN Litigation." The Cooperation Agreement is not, and was never intended to be, a final resolution of Plaintiffs' claims against Jarrod Erwin individually, and the fact that the Plaintiffs and Jarrod Erwin agreed that Plaintiffs could elect to move again to sever claims against Jarrod Erwin is proof of the same. Plaintiffs recognized the strategic value of cooperating with Jarrod, but did not foreclose the possibility of continuing to litigate against Jarrod (or Ryan) individually if their estimation of Jarrod's financial position, and that of the Bankruptcy Court's, proved to be incorrect or incomplete. Plaintiffs did not dismiss their claims against Jarrod with prejudice, and they did not agree to provide a release of any kind.

Following execution of the Cooperation Agreement, Jarrod and Ryan began proffering the categories of information delineated in the Agreement. Likewise, Ryan undertook to restore the correct owners of the 11% DNS interest to good standing in order for the transfer to be completed lawfully, which proved to be an arduous process that was only completed about six months later in the Fall of 2024. By that time, however, Plaintiffs had named Day and Night Solar, LLC as a defendant and asserted claims against it in the Second Consolidated Amended Complaint and Bob Eaton had been deposed. [ECF No. 493]. That catalyzed an even closer look at the 11% DNS interest, and as detailed below, Plaintiffs' counsel started to have questions about the mechanics of

11

any potential transfer of the 11% DNS interest and how to ensure that the transfer to the Plan is completed lawfully such that the Plan would receive good title of the 11% interest.

### C. Dr. Harris and Bob Eaton Tried to Have the 11% DNS Interest Transferred, and Plaintiffs are Now Trying to Ensure that the Transfer is Completed Lawfully.

Plaintiffs first learned about the 11% DNS interest through various document productions in the MDL, including from Dr. Harris, Bob Eaton, and the AME Defendants. To be clear, Jarrod Erwin never personally owned the 11% DNS interest (or any interest in DNS), rather one of the Motorskill entities, Motorskill Asia Ventures 1, Inc., originally acquired a 9% membership interest in DNS in 2015. [**Exhibit A**, *Depo. Ex. 465*]. Jarrod Erwin signed the subscription agreement for the purchased stock as President of Motorskill Asia Ventures 1, Inc. but did so at the direction of Doc Erwin. [**Exhibit B**, *Depo Ex. 464*]. The membership interest was almost certainly purchased using Plan assets. *Id*. An additional 2% in membership interest was later given as consideration for a loan by Motorskill to DNS, bringing the total Motorskill membership interest in DNS to 11% by the end of 2018. [**Exhibit C**, *Depo. Ex. 462*]. In October of 2019, because of a business dispute between Bob Eaton/DNS and the Erwins/Motorskill related to the solar energy enterprises that both groups were involved in, Bob Eaton suggested to Dr. Harris that they try and repurchase the 11% DNS interest from Motorskill. [**Exhibit D,** *Depo. Ex. 466*]. It appears that Dr. Harris and Bob Eaton took no further steps to have the interest transferred or purchased until 2021.

In June of 2021, on the eve of Dr. Harris's retirement, Dr. Harris and Bob Eaton tried to initiate a transfer of the 11% DNS interest "to avoid any possible confusion and misunderstanding by the person elected to succeed" Dr. Harris, requesting the transfer via letter and sending Jarrod Erwin a draft Membership Interest Purchase/Transfer Agreement on June 8, 2021. [**Exhibit E**, *Depo. Ex. 470*]. On June 11, 2021, Vince Mouer, a wind down attorney for the Motorskill entities, sent Dr. Harris a reply letter stating that there was "nothing of any meaningful value remaining"

12

in the Motorskill Ventures 1, LP fund and that the only possible disbursement was "an eleven (11%) membership interest … in Day and Night Solar, LLC". [**Exhibit F**, *Depo Ex. 440*]. Mr. Mouer acknowledged that Dr. Harris had already expressed "a desire to have this interest transferred to AMEC." From Plaintiffs' review of the documents, it appears that Dr. Harris and Bob Eaton continued to try and have the 11% DNS interest transferred to the Plan over the next couple of months but were unsuccessful because of the demand for a release.

By including provisions in the Cooperation Agreement requiring Jarrod and Ryan to facilitate the transfer of the 11% DNS interest, Plaintiffs have revived the process to have that asset returned to the Plan and, this time, without a release of any kind. Those provisions do not constitute a financial settlement with Jarrod individually, rather they require Jarrod to refrain from standing in the way of transferring an asset purchased with Plan funds back to the Plan. The 11% DNS interest, along with the Symetra contracts, the Key Marco properties, and the other outstanding loan payments, are all legacy assets of the Plan, and Plaintiffs are attempting to ensure that the Plan owns them legally and without doubt. Significantly, Plaintiffs secured Jarrod and Ryan's cooperation in making the transfer *without* agreeing to release any claims against the Motorskill defendants or Jarrod and Ryan individually. The proposed transfer has become complicated, however, by Bob Eaton's contentions about the ownership of the 11% DNS interest and questions about transferring the interest in accordance with DNS governing documents, which Eaton raised at his deposition.

Defendant Bob Eaton was deposed on June 26 and July 2, 2024. Although he largely took the Fifth Amendment to questions about the 11% DNS interest, he did introduce confusion about the 11% DNS interest by testifying that Motorskill was not a voting member of Day and Night Solar, LLC because it failed to complete certain documentation. Plaintiff's counsel, after bringing

13

claims against DNS in the Second Consolidate Amended Complaint and when preparing for depositions of DNS employees in early November, also took a closer look at various iterations of the DNS Operating Agreement that had been produced by Dr. Harris or Bob Eaton and found that previous versions of the operating agreements barred the transfer of any membership interest without the selling member first providing notice to the other members and giving them a 30-day purchase option, among other requirements. Furthermore, although DNS was served with the Second Amended Complaint at the beginning of September, it only secured litigation counsel last week, and therefore Plaintiffs' counsel has not yet received discovery responses or documents from DNS to know what the current governing documents require for the transfer of a membership interest.

Given such complicating factors, Plaintiffs' counsel has yet to conclude if and how the transfer of the 11% DNS interest could be correctly effectuated. While the Plaintiffs' counsel does not believe that the Cooperation Agreement warrants scrutiny pursuant to Rule 23 because it does not finally bind the Class, if it does, the Plaintiffs' counsel believes that the Cooperation Agreement would only be ripe for presentation once the transfer process is understood concretely, which may require consultation with counsel specializing in corporate transfers.

D. **Concluding Points**

Finally, to address an allegation that Plaintiffs wrongfully withheld the Cooperation Agreement from production in the MDL, the Cooperation Agreement was not responsive to Symetra's unreasonably broad Request for Production No. 21 to Plaintiffs, which requested "All Documents relating to Jarrod Erwin, Randall Erwin, and the Motorskill Entities".[5] As Symetra

---

[5] Plaintiffs included similar broad requests in their Requests for Production to Symetra and Symetra objected accordingly and refused to produce documents on that basis. For example, Plaintiffs' RFP No. 9 to Symetra asked for "All Documents and Communications concerning fees

14

well knows, its Request for Production No. 19 to Plaintiffs sought "All contracts and agreements between Your attorneys and counsel for AMEC, Defendant Harris, and Defendant Eaton." Had Symetra included such a request for agreements between Plaintiffs' counsel and counsel for Jarrod Erwin, Doc Erwin, and the Motorskill Entities, the Cooperation Agreement would have been responsive to such a request and Plaintiffs would have produced it. But they did not make such a request, and it is disingenuous for Symetra to suggest that the Cooperation Agreement would be responsive to RFP No. 21 when, by virtue of their own Requests for Production, Symetra made it clear that the Cooperation Agreement would not fall within the imagined scope of RFP No. 21.

Plaintiffs' counsel has been strategic about their interactions with Jarrod Erwin and Ryan Erwin, as they have every right to be in litigation, but they have not tried to hide their interactions with the Erwins. Plaintiffs' litigation efforts in the Bankruptcy are well-documented on the dockets of each relevant proceeding (the MDL, the Bankruptcy, and the Adversary Proceeding), including their resolution discussions with Jarrod in the Adversary Proceeding. Plaintiffs' decision to drop Jarrod from the Second Consolidated Amended Complaint has been apparent to all defendants since Plaintiffs first circulated a draft of the SCAC to the parties back in June of 2024, and no party, including Symetra, objected to the exclusion of Jarrod Erwin. Plaintiffs even emailed Symetra exact instructions of how to obtain the Rule 2004 examination transcript of Jarrod Erwin that they took in the Bankruptcy on July 19, 2023.

All defendants, and in particular Symetra who engaged in the Bankruptcy itself, have had ample notice, time, and opportunity to inquire about Plaintiffs' interactions and agreements with

---

and deductions assessed by you to the Plan." Symetra responded "Symetra objects that this Request is unreasonably broad, unduly burdensome, unduly invasive of its privacy, and not relevant to any party's claims or defenses in violation of Federal Rule of Civil Procedure 26(b)(1). Pursuant to this objection, Symetra is not producing documents in response to this Request." Plaintiffs had the right to assert and stand on similar objections to Symetra's RFP No. 21.

15

Jarrod in the last year, but they did not and have not. But Symetra has been able to leverage Plaintiffs' counsel's significant efforts to its own benefit, including early access to Erwin deposition transcripts and a road map to all of their discoverable documents. Now, Symetra has mischaracterized to the Court the nature of Plaintiffs' agreement with Jarrod and Ryan and in doing so implied that the Plaintiffs' counsel acted wrongly by not presenting the Cooperation Agreement to the Court.[6] Plaintiffs' counsel takes their responsibility to the named Plaintiffs and the unnamed Class Members extremely seriously and have been focused on diligently safeguarding the rights of all Class Members while trying to obtain the maximum amount of recovery from all defendants. If there came a time when Plaintiffs had reached a viable settlement with Jarrod Erwin individually, that included actual and realized monetary relief and a release of claims and consequently required presentation to the Court because it was binding on the Class, Plaintiffs' counsel would have done so promptly by filing for preliminary approval of such a settlement; indeed, it still may when the issue is ripe.

Plaintiffs' counsel are able and willing to provide any additional information or explanation about the Cooperation Agreement to the Court and looks forward to addressing the Court's concerns and questions about these agreements at the status conference.

---

[6] As discussed above, the Agreement between Plaintiffs' counsel and the Erwins is not a settlement agreement that requires judicial approval under Rule 23. But even if Plaintiffs' counsel had struck a settlement, Symetra would not have standing to challenge it. *See Feder v. Elec. Data Sys. Corp.*, 248 Fed. Appx. 579, 580 (5th Cir. 2007); ("only class members have standing to object to a settlement"); *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals"); *Waller v. Financial Corp. of America*, 828 F.2d 579, 582-83 (9th Cir. 1987) ("The view of other courts is that a non-settling defendant, in general, lacks standing to object to a partial settlement").

Respectfully submitted, this the 18th day of December 2024.

| *Interim Co-Lead Counsel* ||
|---|---|
| */s/ Matthew E. Lee*<br>Matthew E. Lee<br>**MILBERG COLEMAN BRYSON**<br>**PHILLIPS GROSSMAN, PLLC**<br>900 W. Morgan Street<br>Raleigh, NC 27603<br>919-600-5000<br>Fax: 919-600-5035<br>mlee@milberg.com | */s/ Gregorio A. Francis*<br>Gregorio A. Francis<br>**OSBORNE & FRANCIS**<br>**LAW FIRM, PLLC**<br>2707 E. Jefferson Street<br>Orlando, FL 32803<br>(561) 293-2600<br>Fax: (561) 923-8100<br>gfrancis@realtoughlawyers.com |
| *Liaison Counsel* ||
| J. Gerard Stranch, IV<br>**STRANCH, JENNINGS**<br>**& GARVEY, PLLC**<br>223 Rosa L. Parks Avenue, Suite 200<br>Nashville, Tennessee 37203<br>(615) 254-8801<br>Fax: (615) 255-5419<br>gstranch@stranchlaw.com ||
| *Plaintiff's Steering Committee* ||
| Susan L. Meter<br>**KANTOR & KANTOR LLP**<br>19839 Nordhoff Street<br>Northridge, CA 91324<br>818-886-2525<br>Fax: 818-350-6274<br>smeter@kantorlaw.net | Kenneth S. Byrd<br>**LIEFF CABRASER**<br>**HEIMANN & BERNSTEIN, LLP**<br>222 2nd Ave S<br>Nashville, TN 37210<br>615-313-9000<br>Fax: 615-313-9965<br>kbyrd@lchb.com |
| Dhamian Blue<br>**BLUE LLP**<br>P.O. Box 1730 | Richard Schulte<br>**WRIGHT & SCHULTE LLC**<br>865 S. Dixie Dr. |

| | |
|---|---|
| Raleigh, NC 27602<br>919-833-1931<br>Fax: 919-833-8009<br>dab@bluellp.com | Vandalia, OH 45377<br>937-435-9999<br>Fax: 937-435-7511<br>rschulte@yourlegalhelp.com |
| Julie Nepveu<br>**AARP Foundation**<br>601 E Street, NW<br>Washington, DC 20049<br>(202) 434-2075<br>Fax: (202) 434-6424<br>jnepveu@aarp.org | |