# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### EASTERN DIVISION

|  |  |
|---|---|
| IN RE:  AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION | MDL Docket No. 1:22-md-03035-STA-jay<br><br>ALL CASES |

---

## SYMETRA LIFE INSURANCE COMPANY'S
## MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE
## THE OPINIONS AND TESTIMONY OF J. LESTER ALEXANDER

---

Markham R. Leventhal
Benjamin M. Stoll
Scott Abeles
CARLTON FIELDS, P.A.
1625 Eye Street, NW, Suite 800
Washington, DC 20006
Telephone:  (202) 965-8189
Facsimile:  (202) 965-8104

Rachel A. Oostendorp
CARLTON FIELDS, P.A.
2 MiamiCentral, Suite 1200
700 NW 1st Avenue
Miami, Florida 33136
Telephone:  (305) 530-0050
roostendorp@carltonfields.com

*Attorneys for Defendant*
*Symetra Life Insurance Company*

## <u>TABLE OF CONTENTS</u>

*Page*

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ...................................................................................................... 1

SUMMARY OF ALEXANDER'S OPINIONS ......................................................... 2

LEGAL STANDARD ................................................................................................ 6

I.    ALEXANDER'S FAILURE TO EVALUATE CAUSATION RENDERS HIS
      OPINIONS SPECULATIVE, UNCONNECTED TO THE FACTS, AND
      UNRELIABLE ............................................................................................... 8

II.   ALEXANDER'S METHODOLOGICAL FLAWS RENDER HIS OPINIONS
      SPECULATIVE, DISCONNECTED FROM THE FACTS, AND UNRELIABLE ........ 12

      A.    Alexander's Unimpaired Valuation Is Unreliable ............................... 13

      B.    Alexander's Impaired Valuation Is Unreliable .................................... 15

III.  CONCLUSION ............................................................................................... 19

CERTIFICATE OF SERVICE .................................................................................. 21

# **TABLE OF AUTHORITIES**

*Page*

**Cases**

*Baker v. Blackhawk Mining, LLC*,
    141 F.4th 760 (6th Cir. 2025) ...................................................................13, 14

*Buck v. Ford Motor Co.*,
    810 F. Supp. 2d 815 (N.D. Ohio 2011).........................................................14, 15

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)...............................................................................................10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)............................................................................................1, 7

*Davis v. Sig Sauer, Inc.*,
    126 F.4th 1213 (6th Cir. 2025) .............................................................10, 11, 12

*Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*,
    2017 WL 3592775 (N.D. Ill. Aug. 21, 2017) ...................................................10

*Endless River Technologies, LLC v. TransUnion, LLC*,
    2025 WL 233659 (6th Cir. Jan. 17, 2025) .................................................1, 6, 7

*Florida Virtual School v. K12, Inc.*,
    2023 WL 6294214 (M.D. Fla. Aug. 25, 2023) .................................................12

*Frazier v. Breville USA, Inc.*,
    2025 WL 2088915 (M.D. Tenn. July 24, 2025) .................................................7

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997)................................................................................................2

*Hill v. Medical Device Business Services, Inc.*,
    2025 WL 1950300 (6th Cir. July 16, 2025).....................................................15

*In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Products
    Liability Litigation*,
    93 F.4th 339 (6th Cir. 2024) ...............................................................................6

*In re Paoli Railroad Yard PCB Litigation*,
    35 F.3d 717 (3d Cir. 1994)..................................................................................15

*In re Scrap Metal Antitrust Litigation*,
    527 F.3d 517 (6th Cir. 2008) ..........................................................................7, 19

## <u>TABLE OF AUTHORITIES</u>
(continued)

<u>*Page*</u>

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)...................................................................................1

*MicroStrategy Inc. v. Business Objects, S.A.*,
  429 F.3d 1344 (Fed. Cir. 2005)...............................................................12

*Nelson v. Tennessee Gas Pipeline Co.*,
  243 F.3d 244 (6th Cir. 2001) ....................................................................12

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
  676 F.3d 521 (6th Cir. 2012) ..............................................................14, 16

*Pride v. BIC Corp.*,
  218 F.3d 566 (6th Cir. 2000) ....................................................................15

*Trout v. Garrett*,
  1990 WL 96640 (D.D.C. Mar. 30, 1990)..................................................14

*United States v. Cunningham*,
  679 F.3d 355 (6th Cir. 2012) ..................................................................6, 7

*Williams v. Syphan*,
  2023 WL 1305084 (6th Cir. Jan. 31, 2023) ...............................................7

*Wind Logistics Professional, LLC v. Universal Truckload, Inc.*,
  2020 WL 3411037 (N.D. Ga. June 22, 2020)...........................................10

*Zimmer, Inc. v. Stryker Corp.*,
  2018 WL 276324 (N.D. Ind. Jan. 3, 2018) .........................................10, 11

## <u>Rules</u>

Federal Rule of Evidence 702.........................................................................6

Federal Rule of Evidence 702 Advisory Committee Notes – 2023 Amendments .....................6, 7

Pursuant to Federal Rule of Evidence 702, Defendant Symetra Life Insurance Company ("Symetra") moves to exclude the opinions and testimony of AMEC's damages expert, J. Lester Alexander, for the reasons set forth below.

## **INTRODUCTION**

Because "[e]xpert evidence can be both powerful and quite misleading," district courts must "exercise[ ] more control over experts than over lay witnesses." *Endless River Techs., LLC v. TransUnion, LLC*, 2025 WL 233659, at *5 (6th Cir. Jan. 17, 2025) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993)). Consequently, Rule 702 "imposes a special obligation upon a trial judge to ensure that any and all scientific testimony ... is not only relevant, but reliable." *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

The Court should exercise its gatekeeping role and exclude the opinions of J. Lester Alexander, AMEC's damages expert. Alexander opines that the "fair value" of the African Methodist Episcopal Church ("AMEC" or the "Church") was diminished by $20.6 million—from $28.2 million to $7.6 million, a loss of nearly three quarters of its value. **Exhibit 1**, Expert Report of J. Lester Alexander, III, January 31, 2025 ("Alexander Report") ¶¶ 8–9. Alexander attributes this "diminution in fair value" to certain "actions, events, and related risks" relating to the Plan's loss of retirement funds, Alexander Report ¶ 8, and to purported reputational harm caused by disclosure of this loss, which he blames exclusively on Symetra and Newport, without having studied their duties. *See* **Exhibit 2**, Video Deposition of Julian Lester Alexander, III, July 7, 2025 ("Alexander Dep.") at 21 ("What the duties are or are not is outside the scope of what I was asked to do."). Alexander seeks to opine on this loss despite *not* finding (or even considering): (i) whether AMEC's reputation has in fact been harmed, or how it has been harmed; (ii) whether AMEC's revenues, income, or profits have been reduced; (iii) whether AMEC's membership has

fallen; (iv) whether member tithing has decreased; (v) whether AMEC's costs or debts have increased; or (vi) whether AMEC's recruiting of clergy or staff has been impaired. As he explains it, "I'm not calculating the actual impact."  Alexander Dep. at 69; *id.* at 144 (no opinion about causation, or the ways, if any, that "the alleged wrongful acts harmed the ability of AMEC to carry out its mission").

Besides the complete disconnect between the "diminution in fair value" that he calculates and any evidence of causation or impact on AMEC, Alexander's calculations depend entirely on two variables he ports into his model from outside the record.  He takes one variable from an unpublished 1999 paper evaluating the sale of just four church *properties* (not organizations) in Minneapolis, and plugs it into his model without a single adjustment.  He draws the other variable from a paper designed to capture risk to *real estate* value caused by *environmental contamination*. Accordingly, in addition to the analytical errors he makes by offering a damages calculation in a vacuum—*i.e.,* without having investigated whether the alleged wrongful acts could or did cause irreparable reputational impairment—the facts of this case are wholly divorced from the data Alexander relies on for his calculations, rendering them fundamentally unreliable.

The Supreme Court's observation that "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" has seldom been more appropriately invoked than here.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Alexander's opinions should be excluded.

## SUMMARY OF ALEXANDER'S OPINIONS

Alexander limits his opinions to the alleged diminution of value of AMEC's enterprise caused by the alleged "wrongful acts of the Plan Asset Custodian and Plan Administrator," who he defines, without basis, as Symetra and Newport, respectively.  Alexander Report ¶¶ 1, 7.  He

assumes Symetra and Newport "abdicated their duties by allowing [Plan] assets … to be diverted and invested in more risky investment vehicles," by allowing the Plan to be charged "improper fees," and by failing to establish or adhere to "customary internal controls" in ways that "harmed the ability of the AMEC to carry out its mission." *Id.* ¶¶ 6–7.

Alexander concedes he is not offering opinions on what either Defendant's "duties" actually were; how those two Defendants "abdicated" or breached their duties; what "internal controls" were lacking or violated; or how, if at all, the alleged "wrongful acts" harmed AMEC's ability to "carry out its mission." *See* Alexander Dep. at 13-14, 21, 27 (not offering opinions regarding alleged abdication of duties); *id.* at 144 (not offering opinion about how "the alleged wrongful acts harmed the ability of the AMEC to carry out its mission").

Alexander disclaims reaching any opinions on liability and causation, focusing on damages alone. *Id.* at 8, 11–12, 112–14, 143–44. But as to damages, he never investigates or reaches any conclusions regarding whether the alleged wrongful acts caused AMEC's revenues or tithing to drop, its costs or debt to rise, or its recruiting of clergy or staff to grow more difficult. *Id.* at 115–18. As he explained it, "I'm not calculating the actual impact. That would be an additional damage. I'm only calculating the reputational loss." *Id.* at 69.

Before getting to "reputational loss," he *presumes* AMEC will establish that its reputation was harmed; that only Symetra and Newport are responsible for that harm; and that the reputational harm caused material reduction in AMEC's value. *Id.* at 119 ("I'm assuming there will be a finding that there was reputational harm. I'm not trying to resolve the ultimate issue of whether there was or wasn't."); *id.* at 144; *id.* at 164–65 (he has not "quantified the loss of support from membership, if any, caused by the acts at issue in this case"). If those conditions are met, Alexander purports to calculate the diminution of AMEC's value, or "the added risk for the unknown, the things that

-3-

might happen in the future." *Id.* at 82.  He ultimately opines that "the fair value of the AMEC has been diminished by $20.6 million as of January 31, 2025."  Alexander Report ¶ 9.

Alexander arrived at this figure through the following steps.  He starts with the AMEC Financial Department's gross revenues for fiscal year 2022 ($16,782,038) because, according to him, that is the last full year not impacted by the alleged wrongful acts.  **Exhibit 3**, Supplemental Report of J. Lester Alexander, III, May 23, 2025 ("Alexander Rebuttal") at ¶ 4.  Next, Alexander borrows a "revenue capitalization rate," or risk multiple, from an unpublished 1999 paper, not subject to peer review, that derived this rate from an evaluation of the sales of *four* church properties in Minneapolis more than 25 years ago.  Alexander Report App. 1 & 2; **Exhibit 4**, J. Schmick, *Adapting Old Theories for New Applications: A New Approach to Church Valuation* (1999) (unpublished) ("Schmick"));  Alexander Dep. at 76–77.

Alexander then multiplies AMEC's financial department's 2022 gross revenue ($16,782,038) by the borrowed revenue capitalization rate (1.68) to obtain an "unimpaired" value of $28.2 million, the supposed value of AMEC prior to disclosure of the alleged wrongful acts involving the Plan.  Alexander Report ¶¶ 8–9 and App. 1 & 2.[1]  This is AMEC's "before" value as an enterprise for purposes of a "before-and-after" damages analysis, and it is derived entirely by the multiplication of one year of the finance department's revenues by a figure derived from the sale of *four properties* (not organizations) decades ago in Minnesota.

To calculate AMEC's "impaired" value, Alexander begins by combining a net income capitalization rate of 3.27% for religious institutions (not AMEC specifically, and regardless of whether the institution is Christian, Hindu, Muslim, etc.) drawn from an industry publication (*see*

---

[1] Alexander testified that "[i]n order for this kind of [reputational] harm to manifest [] other people need to know that the harm happened."  Alexander Dep. at 56.

Alexander Dep. at 129–30, 136–37) with a "risk premium" of 9% he derives from a thirty-year-old paper analyzing the risk premium for real estate properties subject to environmental contamination.  Alexander Report ¶ 8 and App. 1 & 2; **Exhibit 5**, J. Chalmers and T. Jackson, *Risk Factors in the Appraisal of Contaminated Property*, The Appraisal Journal (1996) ("Chalmers")).  Alexander says this combination generates an "impaired revenue multiple" of .45, which he then multiplies by the same 2022 revenue he used for the unimpaired value ($16,782,038) to get an "impaired" value of $7.6 million. Alexander Report ¶¶ 8–9 and App. 1 & 2.

Alexander then subtracts his impaired value from his unimpaired value and gets $20.6 million as purported damages.  *Id.*  To be clear, this figure does not reflect any reduction in revenues as between the before and after periods, as Alexander holds revenues constant.  Alexander Dep. at 51, 146 ("I'm not assuming any decrease in revenue").  It does not reflect any loss in Church membership, reduction in donations, increased costs, or any other actual (or paper) financial loss.  The $20.6 million figure is a function, solely, of "the perception of increased risk" supposedly imposed by the disclosure of the alleged wrongful acts.  *Id.* at 52; 83, 98–99; 104; 118–19; 146–47.

In short, Alexander purports to calculate the unimpaired and impaired value of AMEC as an enterprise in a single paragraph using just four numbers, only one of which (2022 fiscal year revenue) actually comes from AMEC.  The other numbers come from decades-old papers that have nothing to do with the types of harms alleged in this case or the valuation of non-profit religious institutions.  Alexander wants to tell the jury that AMEC lost almost ***three quarters*** of its value (20.6/28.2 x 100 = 73%) despite the lack of any evidence in the record supporting such loss, including any evidence consistent with an impairment to AMEC's reputation or loss of support by AMEC's membership.  To put it mildly, Alexander's proposed testimony is preposterous.

## LEGAL STANDARD

Expert testimony is only admissible under Federal Rule of Evidence 702 if:

> the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case

Fed. R. Evid. 702. The party proffering the expert testimony has the burden to "establish each requirement by a preponderance of the evidence." *Endless River Techs*, 2025 WL 233659, at *5.

Under the Rule 702 framework, "the district court acts in the role of gatekeeper and must evaluat[e] the relevance and reliability of proffered expert testimony with heightened care." *United States v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012). Rule 702 was amended in 2023 to clarify this gatekeeping standard, which had often been misunderstood by courts that applied a more lenient presumption of admissibility that did not comport with the requirements of Rule 702:

> many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a).

Fed. R. Evid. 702 Advisory Committee Notes—2023 Amendments; *see also In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 348 n.7 (6th Cir. 2024) (recognizing amendments were drafted to correct such decisions). As a result, Rule 702 was "amended to clarify and emphasize that expert testimony *may not be admitted* unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 Advisory Committee

Notes—2023 Amendments.[2]

To be admissible, expert testimony must be both reliable and helpful to the jury. *Id.*; *see also Cunningham*, 679 F.3d at 380 (in its Rule 702 gatekeeping role, district court "must evaluat[e] the relevance and reliability of proffered expert testimony with heightened care"); *Williams v. Syphan*, 2023 WL 1305084, at *2 (6th Cir. Jan. 31, 2023) (district court must ensure "only reliable expert evidence makes it to the jury"). The court's gatekeeping role is essential because jurors may "lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." Fed. R. Evid. 702, Advisory Committee Notes—2023 Amendments.

For expert testimony to be relevant, the proffering party must establish "a valid scientific connection to the pertinent inquiry as a precondition for admissibility." *Endless*, 2025 WL 233659, at *5 (quoting *Daubert*, 509 U.S. at 592). That is, "relevant evidence is 'sufficiently tied to the facts of the case' such that it will 'aid the jury in resolving a factual dispute.'" *Id.* For expert testimony to be reliable, it must be based upon "sufficient facts or data," and the "product of reliable principles and methods," and the party must show the expert 'has applied the principles and methods reliably to the facts of the case.'" *Id.* (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008)).

---

[2] Unless otherwise indicated, all emphasis in this memorandum is added, and all internal quotations and citations are omitted. *See also id.* ("The amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000."); *Frazier v. Breville USA, Inc.*, 2025 WL 2088915, at *6 (M.D. Tenn. July 24, 2025) ("Notably, Rule 702 was amended in 2023 to emphasize that the _court_ is entrusted with determining whether the admissibility criteria have been established, rather than treating them as questions of weight to be determined by the factfinder.").

I.    **ALEXANDER'S FAILURE TO EVALUATE CAUSATION RENDERS HIS OPINIONS SPECULATIVE, UNCONNECTED TO THE FACTS, AND UNRELIABLE**

While it is common and acceptable for damages experts to assume liability, as Alexander does here, damages experts may not similarly assume _causation_, because that leads to a damages calculation entirely untethered to the facts.  Alexander disclaims any intention to testify about causation, a subject he did not study in this case.  Stated plainly, he has no opinion about the ways, if any, that "the alleged wrongful acts harmed the ability of the AMEC to carry out its mission." Alexander Dep. at 143–44.  Nor has he formulated an opinion as to whether the alleged wrongful acts actually caused reputational harm to AMEC, let alone whether the Defendants he solely focuses on, Symetra and Newport, caused such harm.  _Id._ at 119 ("I'm assuming there will be a finding that there was reputational harm.  I'm not trying to resolve the ultimate issue of whether there was or wasn't."); _id._ at 69–70 ("I'm not calculating the actual impact.").  Though he suggested he had seen "documentation" of reputational harm in the record, he did not include it in his reports and could not "point to any documents that reflect the reputational harm AMEC has suffered" at his deposition.  _Id._ at 102–03.  This is a fatal defect: if Alexander does not know the extent of the harm or whether there even was any harm at all, then how can he possibly know whether there are damages or calculate their amount?  Indeed, identifying causation is fundamentally _part_ of calculating damages.  Even assuming liability, if the wrongful acts assumed did not cause any harm, then there are no damages.

Alexander did not analyze whether any of the hypothetical harm associated with the alleged reputational injury actually impacted AMEC, financially or otherwise.  _Id._ at 69–70 ("I'm not calculating the actual impact."); _id._ at 69 ("The reputational loss" he purported to estimate "is based on perceptions and increased risk," while the "actual damage" he did _not_ calculate "is the actual loss").  That is, in conducting his inquiry following disclosure of the alleged wrongful acts,

he did not evaluate (and thus does not opine on) whether:

- AMEC's "district churches have actually suffered a reduction in membership," *id.* at 115–16;

- AMEC's "district churches suffered a reduction in tithing," *id.* at 115–16, and therefore revenue;

- AMEC's district churches, or AMEC, suffered impairment to "recruiting of new clergy," or "employees" or "support staff," *id.* at 142–43;

- "AMEC actually suffered a decrease in gross revenues," "net income," or "cash flow," *id.* at 117–18, 108;

- "AMEC actually suffered an increase in cost of debt capital," or in "direct costs," *id.* at 117, 108–09, 137;

- Budget assessments imposed by AMEC on district churches were "higher or lower in the … after period versus the before period," *id.* at 50–51; or

- AMEC currently has "access to the bond market," *id.* at 127 or its "ability to issue bonds has been impacted." *Id.* at 127, 164.

Though his calculations purport to quantify in dollar terms the size of AMEC's reputational harm, he did no work to determine whether AMEC's reputation has *in fact* been harmed. He did not "conduct a survey of AMEC parishioners' views on its reputation" at any time. *Id.* at 134. Nor has not seen "even anecdotal sort of studies or reports on the perceptions of AMEC parishioners' views of AMEC." *Id.* at 134. Nor has he "quantified the loss of support from membership, if any, caused by the acts at issue in this case." *Id.* at 164-65. Nor does the loss he calculates "tak[e] into account reduced contributions," if any, by parishioners. *Id.* at 70-71. For that matter, Alexander does not know whether "AMEC's injury is permanent." *Id.* at 132.

Ultimately, Alexander's calculations are so divorced from the facts of the case that the size of the Plan's loss does not bear whatsoever on the size of his alleged diminution in AMEC's value. Alexander Dep. at 145 ("But whether [the loss is] ten million or 100 million doesn't affect the loss you calculated, correct? A. Correct. My loss is in addition to any loss suffered by the plan.").

As the Supreme Court has noted, "[t]he first step in a damages study is the translation of a

legal theory of the harmful event into an analysis of the *economic impact* of that event." *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013). Unless he considers causation, the damages expert's analysis necessarily stumbles on this first step, and the resulting opinions are not reliable. *See Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1225 (6th Cir. 2025) (excluding opinions of damages expert who "testified at his deposition that he had no opinion on what" caused the accident); *Wind Logistics Prof'l, LLC v. Universal Truckload, Inc.*, 2020 WL 3411037, at *4 (N.D. Ga. June 22, 2020) ("Expert testimony that merely assumes [] causation without doing any such analysis would not assist the trier of fact in calculating recoverable damages (if any).").

It does not matter that the damages expert disclaims reaching opinions on causation and claims others will plug those holes. *See, e.g., Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, 2017 WL 3592775, at *16 n.6 (N.D. Ill. Aug. 21, 2017) (excluding expert who stated he only sought to offer "damages," not "causation," opinion). This is because when a damages expert fails to opine on causation, he cannot reliably testify that the damages figure he has calculated flows from the wrongful conduct of the defendant at issue, let alone that it flows exclusively from that conduct. "[A]ny opinion that purports to measure damages without making a judgment as to which effects stem from the breach and which do not is useless." *Id.* Even if AMEC did suffer some reputational harm (of which there is no evidence), Alexander fails to show why this reputational harm was not caused entirely (or in large part) by AMEC's own gross negligence.

Alexander has not linked any alleged misconduct by Symetra (or Newport) to harm AMEC suffered, a fatal deficiency. And *See Zimmer, Inc. v. Stryker Corp.*, 2018 WL 276324, at *4 (N.D. Ind. Jan. 3, 2018) (expert's "failure to link the alleged misconduct to any damages is itself fatal"). *Zimmer* is instructive. Like Alexander, the expert in *Zimmer* "rest[ed] on the notion that damages experts may presume causation and that [he] may therefore assume Zimmer will prevail at trial on

the issues of liability and causation with respect to the four physicians for which Zimmer is seeking damages." *Id.* at 3. The district court "acknowledge[d] [the expert] has been proffered as a damages expert" only, and that the proffering party "intends to prove causation of damages through other evidence at trial." *Id.* But the court still excluded the expert because he "must still establish that it is reasonably certain that the damages it seeks are a consequence of the breach, not some other factor." *Id.* Like Alexander here, the expert in *Zimmer* "confuse[d] the question of whether Defendants may have caused a violation of law" with "whether Defendants' violations of" law caused the alleged damages. *Id.* An expert "can assume the first kind of causation, but not the second." *Id.* By presuming that the alleged wrongful acts could and did permanently impair AMEC's reputation which, in turn, has permanently reduced AMEC's enterprise value, Alexander has improperly presumed the second kind of causation.

The need to establish causation through expert testimony is plainly present here. Alexander agrees that damages do not flow automatically from public controversy; rather "a finding of stigma" is required before there is an impairment of reputation and damages traceable to wrongful acts. Alexander Dep. at 112; *id.* at 112–13 (agreeing "if there is no stigma" then "there is no impairment and the [risk variable in his model] should remain unchanged"). But he does not "plan to issue" a threshold finding of "stigma" here. *Id.* at 113, 114 (Q. … [Y]ou do not intend to offer an opinion that the alleged wrongful acts created a stigma associated with the AMEC connectional church; is that right? A. I believe that's a fact witness issue.").

Under Sixth Circuit law, when an expert opines that damages may accrue subject to proof of "certain factual predicates," the expert's failure to "opine[] on whether those factual predicates exist" renders his damages calculation unreliable. *Davis*, 126 F.4th at 1225–26. Alexander declined to investigate changes in AMEC's revenue, income, profits, costs, debt, tithing,

membership, or any other metric that might be consistent with a finding that AMEC has suffered reputational harm or economic loss. *Id.* at 1225 (excluding opinions of expert who did "no testing" of actual record evidence "to determine whether [Davis's] testimony is plausible or possible"). Like the opinions of the expert in *Davis* who did "no testing," Alexander's opinions should be excluded. *See Fla. Virtual Sch. v. K12, Inc.*, 2023 WL 6294214, at *2-3 (M.D. Fla. Aug. 25, 2023) (excluding damages opinion that was just "simple math" that "ignore[d] the critical element of causation"); *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1356 (Fed. Cir. 2005) (affirming exclusion of expert report that "did not link a single loss to a specific misconduct").

## II.  ALEXANDER'S METHODOLOGICAL FLAWS RENDER HIS OPINIONS SPECULATIVE, DISCONNECTED FROM THE FACTS, AND UNRELIABLE

Alexander's failure to consider causation renders his damages calculations too speculative to permit their consideration by the jury.  But even if Alexander had properly analyzed causation, his opinions are still unreliable because his damages model is fatally flawed.

The only data used in Alexander's model actually drawn from the Church is the 2022 revenue figure Alexander takes from AMEC's financial statements.  Alexander Dep. at 38  ("Q. This [FY 2022 revenue figure] is the only financial data from AMEC that you used in your model; is that correct? A.  Correct.").  Alexander borrows all of his other data from outside of the record. The reliability of any damages calculation turns on the reliability and applicability of the inputs. Because the actual data and proxies utilized in Alexander's models are incomplete, inaccurate, and completely inapposite, the damages figure he derived from them is unreliable and inadmissible. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (expert testimony should be excluded where there is "too great an analytical gap between the data and the opinion proffered").

Alexander makes three calculations.  First, he calculates AMEC's "unimpaired" value, or

value before disclosure of the alleged wrongful acts.  Alexander Dep. at 37; Alexander Report ¶ 9

& App. 1.  He does so by multiplying the Church's 2022 revenue by a revenue capitalization rate,

or expected rate of return, that he draws from an unpublished paper, discussed in more detail

below.  Alexander Dep. at 74.  This generates his purported "unimpaired" value of AMEC of $28.2

million.  Then he calculates AMEC's "impaired" value by multiplying the Church's 2022 revenue

by a factor that incorporates a large risk premium, drawing on a paper about risk premiums for real

estate subject to environmental contamination.  *Id.* at 37.  He then subtracts the impaired value

from the unimpaired value to get his diminution in value damages.  *Id.*  If either imported variable

in the model is unreliable, Alexander's opinions are unreliable.  *Id.* at 74–75; 93–94 (conceding

these points).

### A.    Alexander's Unimpaired Valuation Is Unreliable

Alexander draws his unimpaired revenue capitalization rate, or risk multiple, from a 1999

paper by John T. Schmick entitled "Adapting Old Theories For New Applications, A New

Approach to Church Valuation." *See* Schmick.  In his paper, Schmick examined the sales of four

church properties in Minneapolis and estimated the rate of return demanded by buyers.  Alexander

Dep. at 76–77.  Schmick did not purport to estimate capitalization rates, or risk premiums,

applicable to sellers or buyers of religious enterprises.  Nor did he suggest that the figures derived

in his limited study were generally applicable to church property in any geography or time period.

Schmick is unpublished and has not been peer reviewed.  Alexander Dep. at 125.

Alexander is not aware of others in the field who have used the rates Schmick derived to calculate

damages.  *Id.* at 75 ("Am I specifically aware of anyone utilizing this paper besides the fact that

it's been around for over 25 years?  No.").  Because Schmick's work and estimates are not

generally accepted in the field, or used by others working in the field, Alexander's reliance on

Schmick's calculations is improper.  *Baker v. Blackhawk Mining, LLC*, 141 F.4th 760, 767 (6th

Cir. 2025) (part of gatekeeping role is asking: "Is the technique generally accepted in the relevant scientific community?"); *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 833 (N.D. Ohio 2011) (while "lack of peer review is not dispositive of reliability, the fact that Sero, who has worked in this field for decades, has never had this theory reviewed weighs heavily against admitting his testimony"). Alexander concedes that if use of Schmick's estimates is improper, then his calculations are unreliable. Alexander Dep. at 74–75.

Alexander's reliance on Schmick is also improper because he offers no analysis to establish that Schmick's work, and the data he borrows from Schmick, "fit" the facts here. See *Trout v. Garrett*, 1990 WL 96640, at *13 (D.D.C. Mar. 30, 1990) ("If a proxy measure is used in place of a direct measure of the variable, the proxy is judged on the basis of how closely it is related to the variable" it replaces). As noted, Schmick's capitalization rates apply to sales of real estate, not religious non-profit organizations, and the rates have nothing to do with reputation or revenue generation. Alexander did not evaluate whether Schmick's work retains vitality (or ever did) or if he could have identified and used more facially applicable sources. For example, Alexander "didn't conduct a survey of more recent sales of religious properties." Alexander Dep. at 76–77. Alexander is "not aware" of where AMEC owns property and did nothing to evaluate AMEC's properties or compare them to the four Minneapolis properties in Schmick. *Id.* at 77–79.

The inapplicability of Schmick and Alexander's core reliance on it render Alexander's opinions unreliable. *See Baker,* 141 F.4th at 767 ("Deficiencies such as … overreliance on unhelpful studies … [have] justified excluding proposed expert opinion."). Indeed, "time and again" the Sixth Circuit has "affirmed district court exclusion decisions" rejecting similarly unwarranted extrapolations. *See id.* (citing *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 528-29 (6th Cir. 2012) (affirming exclusion of expert opinions grounded in "improper

-14-

extrapolation, failure to consider other possible causes, and, significantly, a lack of testing")).
Schmick's lack of peer review means that it is not known whether Schmick's methodologies were
acceptable when developed in 1999, let alone today, especially for a different use—valuing a
religious non-profit, rather than real estate. Because "the underlying data" in Schmick "are so
lacking in probative force and reliability that no reasonable expert could base an opinion on them,"
Alexander's damages calculation should be excluded. *In re Paoli RR. Yard PCB Litig.*, 35 F.3d
717, 748 (3d Cir. 1994).

Even if Schmick's methodology were sound (which it clearly is not), Alexander did not
establish that the *product* of the methodology (a revenue capitalization rate of 1.68) is appropriate
for valuing a large religious organization today, as opposed to church real estate in the 1990s.
Because the only connection between Schmick's study of four Minneapolis church properties and
the facts of this case is "the *ipse dixit* of the expert," its use by Alexander is unreliable. *See Hill v.
Med. Device Bus. Servs., Inc.*, 2025 WL 1950300, at *4–5 (6th Cir. July 16, 2025); *Pride v. BIC
Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) ("*Daubert* and its progeny make clear that proposed
[expert] testimony must be supported by appropriate validation."); *Buck,* 810 F. Supp. 2d at 823–
24 ("I find that Armstrong's testimony is unreliable because his theory has not been tested and it
has not been formally peer-reviewed.").

### B. Alexander's Impaired Valuation Is Unreliable

Alexander's second calculation, AMEC's impaired valuation, is also unreliable as it is
driven entirely by Alexander's selection of a 9% risk premium, which he claims to ground in the
peer-reviewed paper, "Risk Factors in the Appraisal of Contaminated Property," by Chalmers and
Jackson. *See* Chalmers; Alexander Dep. at 94 (agreeing that even if his "unimpaired valuation is
reliable, [his] impaired valuation may be unreliable if [he] selected an unreliable cap rate [from
Chalmers] in order to calculate the impaired value"); *id.* at 129 ("Q. [The] selection of the risk

premium is what drives the loss in value that you found, right? A. That is true.").

As its title indicates, Chalmers considers real estate, not organizations, and examines properties "contaminated" by toxic waste. Alexander concedes Chalmers' use of the term "contamination" means "environmental contamination," and that AMEC's property has not been subject to such hazards. *Id.* at 96, 99. Alexander nonetheless contends that harm to *property* value from *environmental contamination* is materially similar to harm to *enterprise* value from *reputational injury*. Both present risks of the unknown, he says, and thereby impact value in the same way. *Id.* at 100 (as between these types of harm, "[t]he risk of unknown bad things and the risk of how bad things might affect the future being unknown is very analogous. It's the same."). There are several problems with Alexander's logic (or lack thereof).

<u>First</u>, Alexander has not demonstrated that harm to an organization's reputation is similar in kind to environmental harm to physical real estate, or that the risks imposed by each are sufficiently alike to make reliance on Chalmers reasonable, especially where common sense suggests these two harms are completely different. The Sixth Circuit has identified "[r]ed flags that caution against certifying an expert," like "improper extrapolation" and "lack of testing." *Newell Rubbermaid*, 676 F.3d at 527.

Alexander disagrees, asserting that for either type of impairment, "the rate of return is enhanced because of the risk of an unfavorable outcome that is uncertain and cannot be reasonably predicted of how it's going to work out." Alexander Dep. at 102. That environmental contamination and reputational impairment may each present uncertainties does not mean those uncertainties are of similar kind, magnitude, duration, or cost. For example, uncertainty associated with the outcome of a company softball game is not akin to uncertainty associated with contamination of that company's groundwater—one would not borrow premiums developed to

price the risk of one to price the risk of the other.

Alexander agrees he did not "cite any authorities, any other papers, anything, indicating that a method developed for estimating value of physically contaminated property can be used for estimating value of other kinds of impaired property." *Id.* at 103. But he points to his experience as an expert witness, which has involved "evaluating the degree to which [a] business has been harmed simply because of the presence of something that they can't remediate. They can't deal with. It's an added risk that increases the risk, the operating risk, of the enterprise." *Id.* at 104–05. However, Alexander makes no showing that AMEC is operating in "the presence of something that they can't remediate." Alexander did not study remediation in this case, does not know what stage, if any, of remediation AMEC is in, or whether AMEC's supposed reputational injury is "permanent." *Id.* at 132-34.[3]

Second, Alexander's specific selection of a 9% risk premium—the variable in his model wholly responsible for the diminution in value he calculated—is independently unreliable. *Id.* at 129. Chalmers did not even use this number. Instead, Chalmers presented four types of environmental contamination scenarios against an uncontaminated baseline, and estimated risk premiums for each scenario, resulting in premiums of 3%, 7%, 15%, and 15% (again).[4] Chalmers at 55–56 & Table 2. Alexander's 9% premium was not one of the premiums presented. *Id.* Rather, Alexander chose 9% because it is the "midpoint" between 3 and 15. *Id.* at 125-26. In other words, Alexander utilizes the midpoint between two risk premiums applicable to an extreme and less

---

[3] Alexander concedes that one difference between contamination and other types of harm is "lenders are typically not going to lend to a contaminated property," and he has not concluded that AMEC's ability to borrow, or cost of debt capital, have been impaired. *Id.* at 105–06; 43, 117.

[4] The premiums can be understood as the increased discount a buyer would require to operate on the impaired property. *See* Alexander Dep. at 120.

extreme risk of environmental contamination and claims this is the appropriate risk premium to account for the risks presented by AMEC's reputational injury.[5]

The Chalmers paper states that "[t]he actual risk premiums applied to a particular property [] should reflect the characteristics of that property, and particularly its stage in the remediation cycle." *Id.* at 130–31. Alexander asserts that if "the risk can be remediated, [he] agree[s]" with that approach. *Id.* As noted, Alexander has no opinions on whether AMEC's alleged injury has been or can be remediated. *Id.* at 132–33. Thus, he did not do the work Chalmers states is required before selecting a risk premium to value a given property or entity. He just picked the "midpoint." Alexander states that he did so "to be conservative," as he argues "it would be completely appropriate to use fifteen percent," versus nine. *Id.* at 125–26. In Chalmers, the properties associated with a 15% risk premium have either partly or entirely been foreclosed from access to debt financing. Chalmers at 55–56 & Table 2. There is no evidence, and Alexander does not cite any, that AMEC faces similar dire circumstances. *Id.* at 117, 43 (no finding regarding increase in cost of debt capital or lack of access, or borrowing costs).

Indeed, as far as Alexander's analysis is concerned, there is no difference in AMEC's finances *whatsoever* in the before and after periods. In Alexander's model, AMEC's assets, liabilities, revenues, profits, and costs, are exactly the same in both periods. AMEC has the same property, employees, clergy, and membership. The <u>only</u> difference between the value of AMEC before disclosure and after is that Alexander tacks on a 9% risk premium to account for what he calls its "impaired value." That figure is not even found in the academic paper on risks associated

---

[5] The 9% risk premium is entirely responsible for the diminution in value Alexander finds because in his model, the normal, unimpaired rate of return a buyer requires is 3.27%. Alexander adds 9% to this to get 12.27% as his impaired rate of return. Because 9 is 73% of 12.27, the result of this calculation is that Alexander finds a diminution in value of 73%, or from $28.2 million to $7.6 million. Alexander Report at ¶¶ 8-9, App. 1 & 2.

with contaminated property Alexander relies upon.

\*         \*         \*

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation." *In re: Scrap Metal*, 527 F.3d at 529–30.  Alexander's opinions are completely unreliable, both because his data comes from irrelevant sources that have nothing to do with valuing a religious non-profit and because his actual calculations are nonsensical and cannot possibly measure the harm caused by the alleged wrongdoing or the discovery of the Plan's shortfall.  Indeed, his ultimate conclusion that the discovery of the shortfall in the Plan caused a near 75% reduction in the entire Church's value is facially absurd.  And, tellingly, his calculation does not include any variable that actually attempts to track the particular harm caused or reputation lost.  As a result, his damages calculation would be identical regardless of the size or type of harm caused.  If the Plan had disclosed that Harris misappropriated only $1,000, Alexander's model would still produce damages of $20.6 million.  That's obviously ridiculous, and any model that would reach such a conclusion is patently unreliable.

## III.    CONCLUSION

For the reasons stated, the Court should grant this Motion and exclude all testimony and opinions of J. Lester Alexander.

Dated:  September 11, 2025                    Respectfully submitted,

                                          /s/  *Benjamin M. Stoll*
                                          Markham R. Leventhal
                                          Benjamin M. Stoll
                                          Scott Abeles
                                          CARLTON FIELDS, P.A.
                                          1625 Eye Street, NW, Suite 800
                                          Washington, DC 20006
                                          Telephone:  (202) 965-8189
                                          mleventhal@carltonfields.com
                                          bstoll@carltonfields.com
                                          sabeles@carltonfields.com

                                          Rachel A. Oostendorp
                                          CARLTON FIELDS, P.A.
                                          2 MiamiCentral, Suite 1200
                                          700 NW 1st Avenue
                                          Miami, Florida 33136
                                          Telephone:  (305) 530-0050
                                          roostendorp@carltonfields.com

                                          *Attorneys for Defendant*
                                          *Symetra Financial Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 11th day of September, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.  The NEF for the foregoing specifically identifies the recipients of electronic notice.


/s/ *Benjamin M. Stoll*
Benjamin M. Stoll

141550865