# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION** | **MDL Case No. 1:22-md-03035-STA-jay ALL CASES** |
| | **Honorable S. Thomas Anderson** |

## MEMORANDUM OF LAW IN SUPPORT OF AMEC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO SYMETRA'S CROSS-COMPLAINT

Cross-Defendants African Methodist Episcopal Church ("AMEC"), the AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, and the AMEC Ministerial Retirement Annuity Plan, (collectively, "AMEC Defendants") submit this Memorandum of Law in Support of their Motion for Summary Judgment as to Cross-Plaintiff Symetra Life Insurance Company's ("Symetra") Amended Cross-Complaint (the "Cross-Complaint") (ECF No. 794).[1]

## I.    **INTRODUCTION**

This dispute is about Symetra, a sophisticated financial institution, trying to shift blame for its own malfeasance to AMEC, an unincorporated nonprofit religious organization, for Symetra's involvement in a lengthy financial scheme which harmed AMEC's members and AMEC itself. Most of Symetra's claims hinge on its baseless theory that Jerome Harris ("Harris"), the former Executive Director of the AMEC Department of Retirement Services, had authority from AMEC to consummate numerous financial transactions and agreements, without any oversight or other verification from AMEC. Based on the undisputed record and facts in this case, however, Symetra cannot establish that AMEC ever vested him with such authority or otherwise acquiesced to his conduct. Indeed, Symetra, as a sophisticated financial institution that handles billions of dollars of funds belonging to large and small corporations, most certainly understands the importance of written confirmation detailing corporate action and authority, such as properly executed board resolutions to demonstrate authority for certain transactions.

In September 2021, AMEC discovered that Harris engaged in a conspiracy with several individuals and/or entities to embezzle funds and defraud AMEC, the sponsor of the African

---

[1] Symetra's Cross Complaint was filed in conjunction with its Answer to Plaintiffs' Second Amended Complaint. The Cross-Complaint begins on page 47 of the filing. (ECF No. 794, PageID 12601.)

Methodist Episcopal Church Ministerial Retirement Annuity Plan (the "Annuity Plan") by, among other things, providing AMEC with deceptive, false, and grossly inflated financial statements for the Annuity Plan, all the while making unauthorized, illegal, or prohibited transactions with funds of the Annuity Plan. Harris was aided and abetted by service providers, such as Symetra, whose professional statuses and reputation helped Harris and others conceal this wrongful conduct. As a result, the AMEC Defendants find themselves in this lawsuit alongside the individuals and entities, like Symetra, who truly facilitated Harris's scheme.

Symetra, by filing the Cross-Complaint against the AMEC Defendants, downplays its role in Harris's scheme and attempts to shift its liability to the AMEC Defendants. The underlying litigation in this case has lasted years, and discovery has produced countless documents, correspondence, and testimony related to the Annuity Plan and the many individuals and entities impacted by Harris's scheme. Despite all the information uncovered in discovery throughout the pendency of this case, there is simply no evidence that supports Symetra's baseless claims against the AMEC Defendants. As a result, AMEC Defendants are entitled to summary judgment with respect to all of Symetra's crossclaims against them.

## II.    <u>BACKGROUND</u>

The African Methodist Episcopal Church ("AMEC") is an unincorporated nonprofit religious association organized under the laws of Pennsylvania. (SUMF, ¶ 1.) The AMEC Council of Bishops serves as the executive branch of the Church, overseeing the Church between General Conferences. (SUMF, ¶ 2.) The AMEC General Board acts as the administrative body, comprising various departmental commissions, executive directors, the General Secretary, the Chief Financial Officer, commission members, and bishops. (SUMF, ¶ 3.) The Department of Retirement Services (the "Department") (previously known as the Department of Employee Security), is one of many

3

Connectional Departments of AMEC and is responsible for directing the AMEC Ministerial Retirement Annuity Plan as instructed by the General Board (SUMF, ¶¶ 4–5.).

AMEC is the sponsor of the Ministerial Retirement Annuity Plan.  (SUMF, ¶ 6.)  The AMEC Doctrine and Discipline, the Church's governing and organizational document, established the Commission of Retirement Services to serve as the trust committee for annuity coverage within the Church.  (SUMF, ¶ 7.)  The Department is administered by an Executive Director, an elected General Officer who oversees retirement security programs for salaried Church personnel, including the Annuity Plan.  (SUMF, ¶ 8.)  The Doctrine and Discipline empowers the Executive Director to hire a financial management specialist to maximize employee benefits from investments, but it does not give the Executive Director the authority to make investments or direct third-party vendors to invest Plan funds.  (SUMF, ¶¶ 9–10.)

In July 2000, Dr. Jerome Harris ("Harris") was first elected Executive Director of the Department and served sequential four-year terms in that role until 2021.  (SUMF, ¶¶ 11–12.)  On December 19, 2001, the General Board, by resolution (the "2001 General Board Resolution") resolved to withdraw, transfer, and reinvest all Annuity Plan funds held by American General Insurance Company into a new contract with SafeCo Life Insurance Company.[2]  (SUMF, ¶ 16.)  The 2001 General Board Resolution gave the Executive Director specific authority to acquire a Symetra annuity contract.  (SUMF, ¶ 17.)  Pursuant to this resolution, Harris transferred approximately $49 million into a Group Variable Annuity issued by Symetra ("2001 Annuity Contract").  (SUMF, ¶ 18.)

---

[2] It is undisputed that SafeCo Life Insurance Company is a predecessor to Symetra Life Insurance Company.  (Cross-Complaint, ¶ 91.)

4

Beyond depositing Plan funds into the 2001 Annuity Contract, Harris was not authorized to make unilateral investment decisions regarding Plan funds. (SUMF, ¶ 19.) His role was limited to administering the Plan, collecting contributions, depositing them into the Symetra account, and coordinating lawful distributions to participants in conjunction with Newport Group, Inc., ("Newport"), the third-party Administrator for the Plan. (SUMF, ¶ 20.) No documents or records generated by the AMEC General Board, Council of Bishops, or Commission on Retirement Services granted Harris sole authority to direct investments of Plan funds and assets. (SUMF, ¶ 21.)

Any document that designated Harris as "Trustee of the Plan" or otherwise indicated Harris had full authority and discretion to direct Plan funds was generated by Harris or a third party outside of AMEC. (SUMF, ¶ 22.) For example, Newport drafted a Plan document in 2006 naming Harris as Trustee (the "2006 Plan Document"). (SUMF, ¶ 24.) AMEC did not sign or execute this document. (SUMF, ¶ 25.) AMEC did not provide Symetra with a signed or otherwise executed certificate of corporate resolution accompanying the 2006 Plan Document confirming Harris had authority to enter such an agreement with Symetra. (SUMF, ¶ 26.) Symetra accepted the unsigned 2006 Plan Document without confirmation from any AMEC body that AMEC had appointed Harris as sole Trustee with investment authority. (SUMF, ¶ 25.) Only after Newport's request in August of **2019** did Harris provide Newport with a signature page of what appeared to be the last page of the 2006 Plan Document and an accompanying certificate of corporate resolution. (SUMF, ¶¶ 34–35.)

Not only was Symetra aware that it did not have a signed version of the 2006 Plan Document, in July of 2008, it accepted a clearly fraudulent set of documents from Harris where he signed as "Plan Trustee," "Plan Administrator," the "Employer," the "Executive Director" or the

5

"President or Vice President" of the Church, **and** the "Secretary" of the Church. (SUMF, ¶¶ 27–28.) Symetra's policy required an executed custody agreement for an annuity plan to participate in Symetra's mutual fund program, which permitted Symetra to receive and follow investment instructions from a designated custodian of the plan. (SUMF, ¶ 29.) On January 1, 2008, Bob Follette, Symetra's project manager for group retirement plans at the time, made a request to Mark Yahoudy of Newport to provide a copy of the 2006 Plan document so that he could use it to prepare a custody agreement. (SUMF, ¶ 30.) Nonetheless, in early 2008, Follette represented to another financial institution that the unsigned version of the 2006 Plan document that Symetra had in its records was indeed the governing Plan document. (SUMF, ¶ 31.) Symetra never did receive a version of the 2006 Plan Document that was signed by anyone at AMEC until at least September 17, 2019. (SUMF, ¶ 32.) Instead, in July of 2008, Symetra received a set of documents that had clearly been signed only by Harris. (SUMF, ¶ 27.)

As another example, Harris signed a Recordkeeping Services Agreement in 2003 (the "2003 RSA") that was authored by Symetra's predecessor, Safeco Life Insurance Company. (SUMF, ¶ 36.) Yet no authorized representative from Safeco, Symetra, or any AMEC body signed the 2003 RSA. (SUMF, ¶¶ 36–38.) In 2008, Harris signed another Recordkeeping Services Agreement (the "2008 RSA"). (SUMF, ¶ 40.) Both the 2003 and 2008 RSAs included an indemnity provision stating that AMEC would indemnify Symetra from claims arising out of those agreements. (SUMF, ¶¶ 39, 43.) Relevant to this proceeding, an American Arbitration Association Commercial Tribunal ruled that the 2003 and 2008 RSAs did not grant Symetra a contractual right to arbitrate disputes with AMEC because Symetra never executed those agreements. (SUMF, ¶ 44.).

6

On or around March 6, 2007, Symetra issued a second Annuity Contract, in which Harris made an initial $10 million deposit (the "2007 Annuity Contract"). (SUMF, ¶ 45.) Under the terms of the 2007 Annuity Contract, Symetra may rely on the written directive of AMEC as the "contract" holder to issue annuities or make cash distributions to Plan participants. (SUMF, ¶ 47.) While the 2007 Annuity Contract contains an exculpatory provision providing that Symetra will not be liable for failing to question or challenge a proper written directive from the contract holder to issue annuities or make cash distributions to Plan participants, it does not limit Symetra's liability for investing Plan funds outside of the Annuity Contract or for blindly following directives from the Executive Director. (SUMF, ¶¶ 47–49.)

In connection with the 2007 Annuity Contract, Symetra issued Guaranteed Interest Contracts in 2007 (the "2007 GIC") and 2008 (the "2008 GIC"), both of which were signed by Harris and not by an authorized representative of AMEC. (SUMF, ¶¶ 50–52, 62–63.) The 2007 GIC had a one-year term and terminated upon completion of Symetra's duties. (SUMF, ¶ 53.) The 2008 GIC had a three-year term and terminated upon completion. (SUMF, ¶ 64.) Like the 2007 Annuity Contract, both the 2007 GIC and the 2008 GIC contained exculpatory provision providing that Symetra will not be liable for failing to question or challenge a proper written directive from the contract holder to issue annuities or make cash distributions to Plan participants, but they do not limit Symetra's liability for investing Plan funds outside its scope or for following directives from the Executive Director. (SUMF, ¶¶ 55–57, 65–67.) Following the maturity and termination of the 2007 and 2008 GICs, the 2007 Annuity Contract remains the only document that has not terminated or expired under its own terms. (SUMF, ¶ 69.)

On February 28, 2008, Harris instructed Bob Follette of Symetra to transfer $10 million dollars to Financial Freedom Funds, an LLC created by Harris that listed Robert Eaton ("Eaton")

7

as a consultant.  (SUMF, ¶ 58.)  Harris originally engaged with Eaton, who was also an agent of Symetra, to serve as AMEC's broker and investment advisor to AMEC and the Plan.  (SUMF, ¶ 59.)  Based on internal discussions internal discussions between Follette and other Symetra officials, Symetra knew Financial Freedom Funds was connected to Eaton.  (SUMF, ¶ 60.)  Nevertheless, on March 4, 2008, Follette emailed Harris informing him Symetra was "prepared to wire $10 million of the proceeds" of the 2007 GIC to an account owned by Financial Freedom Funds account and recommended that Harris have an ERISA attorney review the transfer requests to ensure the transaction was not prohibited.  (SUMF, ¶ 61.)

In September 2021, AMEC discovered that Harris had conspired with others to embezzle funds and defraud AMEC and the Plan.  (SUMF, ¶ 13.)  Harris misrepresented the value of the Annuity Plan as $126,800,000 in a July 2021 report, which was later found to be deceptive and grossly inflated.  (SUMF, ¶ 14.)   The actual value of the Plan was approximately $37 million.  (SUMF, ¶ 15.)  Throughout his tenure, Harris actively concealed and failed to disclose to AMEC information about unauthorized investments.  (SUMF, ¶ 23.)

The present multi-district litigation is part of the fallout of Harris and his co-conspirators' wrongful scheme, including Symetra's crossclaims against the AMEC Defendants.  Symetra filed its Answer to Plaintiff's Second Amended Complaint and Amended Cross-Complaint (the "Cross-Complaint") on April 28, 2025.  (*See* ECF No. 794.)  Symetra asserts the following legal claims against the AMEC Defendants in the Cross-Complaint: Count I – Breach of Contract (against AMEC and the Annuity Plan); Count II – Common Law Indemnification (against AMEC); Count III – Negligent Misrepresentation (against AMEC and the Plan); Count IV – Contribution (against all Defendants); Count V – Contractual Indemnification (Against AMEC); and Count VI –

Declaratory Relief (against AMEC).  As set forth in detail below, all of Symetra's claims have no merit and should be dismissed.

## III.   <u>LEGAL STANDARD</u>

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is 'an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action' rather than a 'disfavored procedural shortcut.'" *FDIC v. Jeff Miller Stables*, 573 F.3d 289, 294 (6th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  The moving party can prove the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the nonmoving party's case.  *Id.* at 325.  A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has met the initial burden of showing the absence of a genuine dispute of material fact, the nonmoving party must then come forward with specific facts showing that there is a genuine issue for trial*." Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts*."  Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

9

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Further, the non-moving party may not rest upon mere allegations or denials in the pleadings but must present evidence setting forth specific facts showing a genuine issue for trial. *Ford v. General Motors Corp.*, 305 F.3d 545, 552 (6th Cir. 2002), *abr. on other grounds*, 548 U.S. 53 (2006).

Here, there are no genuine issues of material fact in dispute, and the Court should grant summary judgment to the AMEC Defendants on Symetra's crossclaims.

## IV.    LAW AND ARGUMENT

As an initial matter, AMEC Defendants move to dismiss Cross-Defendants AMEC Department of Retirement, the AMEC General Board, and the AMEC Council of Bishops, which Symetra purportedly named only out of "an abundance of caution" while acknowledging that these departments and/or subdivisions are not separate legal entities. (Cross-Complaint, ¶¶ 28-30.) There is no evidence in the record that any of these subdivisions acted or failed to act <u>independently</u> of Cross-Defendant AME Church. Indeed, Symetra does not even name these subdivisions in any of the Counts enumerated in the Cross-Complaint. Accordingly, these Cross-Defendants should be dismissed.

### A.    Summary Judgment is Appropriate on Symetra's Breach of Contract Claim

In Count I of the Cross-Complaint, Symetra claims that AMEC and the Annuity Plan are liable for breach of contract. (Cross-Complaint, ¶¶ 144-156.) Specifically, Symetra alleges AMEC and the Annuity Plan breached three enforceable contracts created between them and Symetra: (1) a 2007 Annuity Contract, (2) a 2007 Guaranteed Interest Contract (the "2007 GIC"), and (3) a 2008 Guaranteed Interest Contract (the "2008 GIC"). (*Id.*, ¶ 146.) To be clear, the 2007 Annuity

Contract is between AMEC and Symetra and the 2007 and 2008 GICs were contracts owned by the Plan.

To establish its claim for breach of contract, Symetra must prove: (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach. *Clippinger v. State Farm Mut. Auto. Ins. Co.*, 630 F. Supp. 3d 947, 953 (W.D. Tenn. 2022) (quoting *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011)). Despite the long years this litigation has spanned, the dozens of depositions taken, or the thousands of documents produced, Symetra still cannot present any evidence on which a reasonable jury could find that AMEC Defendants breached any alleged contract.

1. There Is Insufficient Evidence to Establish the Existence of a Valid, Enforceable Agreement Shielding Symetra from Liability.

   a. Symetra's breach of contract claim is based on an unenforceable exculpatory provision.

As a threshold issue, Symetra's breach of contract claim fails because it is based on an unenforceable exculpatory provision. While exculpatory provisions are generally enforceable under Tennessee law, they are subject to closer scrutiny than other traditional agreements. *Copeland v. Healthsouth/Methodist Rehab. Hosp., LP*, 565 S.W.3d 260, 273 (Tenn. 2018). Tennessee courts consider three factors to determine the enforceability of an exculpatory agreement: "(1) relative bargaining power of the parties; (2) clarity of the exculpatory language, which should be clear, unambiguous, and unmistakable about what the party who signs the agreement is giving up; and (3) public policy and public interest implications." *Id.* at 274. For example, in *Copeland*, the Tennessee Supreme Court held that all three factors weighed against enforcing an exculpatory clause in a transportation services agreement releasing a hospital

11

transportation provider from all liability arising from transportation services it provided.[3]  *Id.* at 278–79.

Here, Symetra alleges that AMEC and the Plan breached the 2007 Annuity Contract, 2007 GIC, and the 2008 GIC by filing crossclaims against Symetra that are "directly contrary" to the exculpatory provisions of those agreements.  (Cross-Complaint, ¶ 150.)  The 2007 Annuity Contract's exculpatory provision states, "Symetra may rely on the written direction of AMEC or authorized Plan representative and will not be liable for any failure to question of challenge such direction and certification regarding the issuance of an annuity or payment of a cash distribution." (SUMF, Ex. T, at 5.)  Similarly, the exculpatory provisions of the 2007 GIC and the 2008 GIC state, "Symetra Life may rely on the written directive and shall not be liable because of any failure to question or challenge such directive regarding the issuance of an annuity or payment of a cash distribution."  (SUMF, Exs. U and X, art. IV.2(a).)  All three of the *Copeland* factors weigh against enforcing these exculpatory provisions.

Symetra had significantly more bargaining power than AMEC in negotiating these agreements.  "Although there is no precise rule by which to define sufficient disparity in bargaining

---

[3] Specifically, the court in *Copeland* held that the following exculpatory agreements were unenforceable:

> Client does hereby release and forever discharge MedicOne ... from any and all claims, suits, rights, interests, demands, actions, causes of action, liabilities, accident, injury (including death), costs, fees, expenses and any and all other damages or losses of any kind whatsoever, whether to person or property ... arising out of, incidental to, associated with, or in any way related to any transportation services provided to Client by MedicOne.

> CLIENT WILL INDEMNIFY, DEFEND AND HOLD HARMLESS MEDICONE RELATED PARTIES FROM AND AGAINST ANY AND ALL CLAIMS ASSERTED BY CLIENT, ANY PERSON OR ENTITY RELATED TO CLIENT OR ASSERTING A CLAIM BY OR THROUGH CLIENT, OR ANY OTHER THIRD PARTIES OR ENTITIES WHICH, IN ANY WAY, ARISE OUT OF, ARE INCIDENTAL TO, ASSOCIATED WITH, OR IN ANY WAY RELATED TO ANY TRANSPORTATION SERVICES PROVIDED TO CLIENT BY MEDICONE.

*Id.* at 277.

power between the parties to invalidate an exculpatory agreement, two key criteria are the importance of the service at issue for the physical or economic well-being of the party signing the agreement and the amount of free choice that party has in seeking alternate services." *Copeland*, 565 S.W.3d at 274. Unlike AMEC, which is an unincorporated nonprofit religious association, Symetra is a sophisticated financial institution with in-depth knowledge of retirement plans and investments of retirement funds. (SUMF, ¶ 1.) Additionally, these agreements could only be formed through completion of an application form drafted by Symetra. (SUMF, ¶ 51.) Further, there is no evidence that Symetra presented the applications to anyone associated with AMEC other than Harris, who signed as "Trustee of the Plan" despite lacking that title or the authority to enter the agreement on behalf of AMEC. (SUMF, ¶ 51.) In short, there is no evidence that AMEC had an opportunity to negotiate the terms of these agreements.

The second factor— clarity of the exculpatory language—also weighs against enforcing the exculpatory provision. To be enforceable, the language of an exculpatory provision must be clear and unequivocal such that an ordinary person would know he or she is surrendering a substantial right. *Copeland*, 565 S.W.3d at 274–75. Neither can the language be so broad as to relieve the exculpated party from liability for any injury for any reason. *Id.* at 275. Here, Symetra asserts an overly broad scope of the relevant exculpatory provisions, such that it would be effectively shielded from any liability related to transfer, distribution, or investment of Plan funds as long as it was acting pursuant to Harris's direction. (*See* Cross-Complaint, ¶ 167.) But it is hardly clear that the exculpatory provisions at issue provide such broad protection from liability. For instance, it is unclear whether the exculpatory provisions only apply to movement of Plan funds made pursuant to the 2007 Annuity Contract, 2007 GIC, and the 2008 GIC or whether it extends to directives made pursuant to another agreement. The language and context of these

13

exculpatory provisions also suggest that an "issuance of an annuity or payment of a cash distribution" does not include an investment of Plan funds in entities outside of Symetra contracts as Symetra suggests. (SUMF, Exs. T, at 5; U, art IV.2(a); X, art IV.2(a).) These questions surrounding the scope and applicability of these exculpatory provisions weigh against enforcing these provisions.

Last, public policy also weighs against enforcement of the exculpatory provisions. Retirement plans are essential to an individual's finances, particularly when individuals are no longer able to work. "A private contract violates public policy if it conflicts with the constitution, statutes, or judicial decisions of this state or tends to be harmful to the public good, public interest, or public welfare." *Copeland*, 565 S.W.3d at 275. Enforcing exculpatory provisions such as these, that arguably shield powerful financial institutions like Symetra from any accountability for mismanaging retirement funds of people who depend on them, would leave countless individuals vulnerable to the whims of those powerful financial institutions. Additionally, enforcing these exculpatory provisions would remove any incentive for them to carefully and prudently manage such funds. They would have carte blanch to gamble with proverbial "house money."

In the alternative, even if the court finds the exculpatory language is enforceable, it is at most a waiver of the covenant not to sue and not a contractual duty that can serve as the basis of a breach of contract claim. While Tennessee law recognizes an exculpatory clause as an affirmative defense, AMEC Defendants are not aware of any available Tennessee cases recognizing an affirmative breach of contract claim based on a mere exculpatory provision. *See Stewart v. Chalet Village Props., Inc.*, No. E2007–01499–SC–R11–CV, 2009 WL 3616611, at *2 (Tenn. Nov. 3, 2009) (describing an exculpatory clause as an affirmative defense to a negligence claim). Additionally, a covenant not to sue involves an explicit agreement by a party to dismiss an existing

14

lawsuit or refrain from initiating legal action against another party and is distinct from a mere release of liability. *See Summers v. Bond-Chadwell Co.*, 24 Tenn. App. 357, 145 S.W.2d 7, 15 (1939) ("[T]he 'contract' was a covenant not to sue, and not a release and discharge amounting to an accord and satisfaction."). The exculpatory language of the 2007 Annuity Contract, 2007 GIC, and the 2008 GIC—which simply states that Symetra may not be liable for relying on the written directive of AMEC in issuing an annuity or payment of a cash distribution—does not constitute either a contractual right or a covenant not to sue. (SUMF, Exs. U and X, art IV.2(a).) This language alone is insufficient to conclude that Symetra and AMEC intended to create a contractual duty upon AMEC to not bring any action against Symetra based, in part, on Symetra blindly following Harris' instructions to invest Plan funds.

As a matter of law, the exculpatory provisions on which Symetra bases its breach of contract claim are unenforceable and cannot serve as the basis for Symetra's breach of contract claim.

### 2. Symetra Cannot Establish that AMEC Defendants Breached any Contract with Symetra.

Notwithstanding whether the exculpatory language at issue is enforceable as a matter of public policy, Symetra cannot establish that AMEC breached these agreements. To begin, Symetra has not established that Tennessee law recognizes a breach of contract claim based on a breach of an exculpatory clause or based on a breach of an implied covenant not to sue. In its Cross-Complaint, Symetra asserts that AMEC and the Plan breached the exculpatory provisions of the 2007 Annuity Contract, 2007 GIC, and the 2008 GIC by "filing cross-claims against Symetra asserting—directly contrary to the contracts—that Symetra was liable for relying on, and had a duty to question and challenge, written directives by Harris to transfer funds from the contracts."

15

(Cross-Complaint, ¶ 150.)  In particular, Symetra claims that AMEC and the Plan's crossclaims breached the 2007 GIC because they assert "that Symetra was liable for relying on Harris's clear written directive in 2008 to transfer $10 million from a maturing GIC to a Bear Stearns account at Citibank for the benefit of Financial Freedom Funds, LLC." (*Id.* ¶ 150.)  Symetra also claims that the AMEC Defendants breached these agreements by asserting crossclaims against Symetra for breaching of fiduciary duty after promising that Symetra was not a fiduciary of the Plan.  (*Id.* ¶ 153.)   As an initial matter, the Plan has voluntarily non-suited its crossclaims against Symetra (ECF No. 839), so there can be no breach of any contract to which the Plan is a party because the Plan is no longer asserting any crossclaims against Symetra.  In any event, neither AMEC nor the Plan's crossclaims against Symetra would constitute breaches of these agreements for two principal reasons: (1) the 2007 GIC and the 2008 GIC (to which AMEC is not a party) terminated and ceased to be of any force or effect on their maturity date, and (2) none of the alleged agreements shield Symetra from liability for transferring funds to non-annuity investments.

First, Symetra cannot hold AMEC liable for breaching the 2007 GIC and the 2008 GIC – AMEC is not a party to either agreement.  In any event, both agreements terminated on their maturity date and no longer have any effect.  A contractual right generally only survives termination of the contract if the contract explicitly provides for the survivability of such a right or if the contractual right is accrued or vested under the contract.  *See Stevens-Bratton v. TruGreen, Inc*, 675 F. App'x 563, 569 (6th Cir. 2017).  Both the 2007 GIC and the 2008 GIC have the same termination clause: "This contract shall terminate and cease to be of any further force or effect at the close of the first day upon which Symetra Life has completed all of the duties and obligations which have arisen under this contract."  (SUMF, Exs. U, art. II.11; X, art. II.11.)  The 2007 GIC had a contract period of one year, and the 2008 GIC had a contract period of three years.  (SUMF,

Exs. U, at Contract Data Page; X, at Preamble.)  And neither agreement indicates that any of its provisions survive termination.  (SUMF, Exs. U; X.)  Thus, by June 2011, both agreements had terminated and ceased to be of any force or effect.  AMEC Defendants subsequently asserted their crossclaims against Symetra on November 11, 2024.  (AMEC Cross-Complaint, ECF No. 570, PageID# 9380.)  Because AMEC Defendants filed their crossclaims against Symetra well after the 2007 GIC and the 2008 GIC terminated and no longer had any "force or effect," those agreements cannot serve as the basis for Symetra's breach of contract claim.  *See Stevens-Bratton v. TruGreen, Inc*, 675 F. App'x at 569 (holding a disputed right to call the plaintiff for future services did not survive expiration under the contract under normal principles of contract interpretation).

Even if the 2007 GIC and the 2008 GIC survive, Symetra cannot establish that AMEC Defendants' crossclaims against Symetra constitute a breach of those agreements or the 2007 Annuity Contract.  As noted above, the exculpatory provisions in these agreements, on which Symetra bases its breach of contract claim, remove Symetra's liability for failing to question or challenge a written directive from the "contract holder" to "issue an annuity or make a cash distribution to the contract holder, a Participant, or to any other person who is entitled to such benefits hereunder on the Maturity Date of the contract."  (SUMF, Exs. T, art. IV.1; U, art. IV.1; X, art. IV.1.)  AMEC is the identified "contract holder" in these agreements.  (SUMF, Exs. T, at Contract Data Page; X, at Preamble.)  Additionally, based on the context and surrounding provisions, "issue an annuity or make a cash distribution" refers to making retirement payments to entitled Plan participants from Annuity Plan funds.  For instance, the exculpatory provision is part of the section titled "Retirement and Supplemental Benefits."  (SUMF, Exs. T, art. IV; U, art. IV; X, art. IV.)  That section also provides various monthly payment options for Symetra to issue annuities to Plan participants. (SUMF, Exs. T, art. IV.3; U, art. IV.3; X, art. IV.3.)  In other words,

the exculpatory provision only removes Symetra's liability for failing to question or challenge proper written directives from AMEC to issue annuity payments to entitled plan participants.

In its Cross-Complaint against Symetra (the "AMEC Cross-Complaint"), the AMEC Defendants allege that Symetra transferred $10 million to Financial Freedom Funds, LLC pursuant to a request made by Robert Eaton and later confirmed by Harris. (AMEC Cross-Complaint, ¶¶ 106–110, 224, 233, 343.) As AMEC alleges, the transfer to Financial Freedom Funds, LLC, is a non-annuity investment because it is a transfer of Plan funds to an outside entity rather than a cash distribution or issuance of an annuity to qualifying Plan participants. (*Id.* ¶¶ 109, 233, 343.) Symetra's transfer to Financial Freedom Funds, LLC facilitated Harris's conversion of Plan funds. (*Id.* ¶¶ 233, 343.)

AMEC Defendants' crossclaims against Symetra do not constitute a breach under the 2007 Annuity Contract, 2007 GIC, and the 2008 GIC for multiple reasons. First, the transfer was requested by Harris per Robert Eaton's instruction. (*Id.* ¶¶ 106–107.) The agreements only protect Symetra from following written directives made by AMEC as the contract holder (SUMF, Exs. T, art. IV.1; U, art. IV.1; X, art. IV.1), and Harris lacked authority to act on behalf of AMEC to make transfers out of the Annuity funds to non-annuity investments. Tennessee law recognizes two bases under which an agent can bind a principal: actual authority and apparent authority. *Savage v. City of Memphis*, 464 S.W.3d 326, 333 (Tenn. Ct. App. 2015). An agent's actual authority consists of the powers which a principal confers upon an agent based on manifestations made by the principal to the agent. *Id.* Apparent authority is the agent's power to legally act on behalf of the principal when a third party reasonably believes the agent has authority to do so based on manifestations made by the principal to the third party. *Id.* A party claiming an agent had apparent authority must establish three elements: "(1) the principal knew or negligently acquiesced in the

18

agent's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment." *Id.* at 334.

As Executive Director of the Department, Harris did not have actual authority to make transfers out of the Annuity Contract to non-annuity investments. The AMEC Doctrine and Discipline empowers the Executive Director of the Department to hire a specialist in financial management to see that employees of the Church receive maximum benefits to which they are entitled from said investments. (SUMF, ¶ 9.) Connected with this authority, in 2001, the General Board gave the Executive Director specific authority to purchase an annuity contract with Symetra and deposit AMEC's contributions to the Plan into said contract. (SUMF, ¶¶ 16–17.) Harris exercised this authority when he transferred $49 million of Plan funds into the 2001 Annuity Contract. (SUMF, ¶ 18.) However, the Doctrine and Discipline and the 2001 General Board resolution did not grant Harris the authority to additional investments with Symetra or otherwise. (SUMF, ¶¶ 10, 19–20.)

Harris also lacked apparent authority to direct investments of Plan funds in whatever manner he chose. In its Cross-Complaint, Symetra alleges that AMEC designated Harris as "Trustee of the Plan" with full authority to direct investment of Plan funds. However, there is no evidence showing that the AMEC General Board, the AMEC Commission on Retirement Services, the AMEC Council of Bishops or any other AMEC authority made manifestations to Symetra that designate Harris as a "Trustee of the Plan" or otherwise grant Harris full authority to transfer or invest Plan funds. (SUMF, ¶ 21.) In fact, all documents, records, or representations identifying Harris as "Trustee" were generated by Symetra or another third party, and there is no properly executed document from AMEC that gives Harris the authority to invest Plan funds in whatever

manner he chooses.  (SUMF, ¶ 22.)  Without manifestations made *by AMEC* to Symetra by which

Symetra could reasonably conclude that AMEC granted Harris full authority to direct and invest

Plan funds, Harris lacked apparent authority.  *See Savage*, 464 S.W.3d at 334, 337 (holding the

City Attorney lacked apparent authority to enter a settlement agreement exceeding $500.00 on

behalf of the City of Memphis).

Nor did AMEC acquiesce to or otherwise ratify Harris's actions in acting as "Trustee of

the Plan" regarding investment decisions.  A principal is not bound to the actions of an agent

through acquiescence if the principal is unaware of the agent's actions exceeding the scope of the

agent's actual authority.  *See Durham v. Waddell & Reed, Inc.*, 723 S.W.2d 129, 130-31 (Tenn.

Ct. App. 1986) (declining to recognize an agency relationship where the principal had no actual

knowledge that the agent exceeded the scope of his authority); *In re Jones*, 585 B.R. 465, 513

(Bankr. E.D. Tenn. 2018) ("A principal is not responsible for a putative agent's actions when 'only

the agent's own conduct has created the appearance of agency.'" (quoting *Dexter Ridge Shopping*

*Ctr., LLC v. Little*, 358 S.W.3d 597, 609 (Tenn. Ct. App. 2010)).  Here, Harris actively concealed

his actions from AMEC such that AMEC was unaware that Harris was misappropriating Plan

funds (SUMF, ¶ 23.)  For example, Harris did not disclose the unauthorized investments in his

annual annuity reports to the AMEC General Board.  (SUMF, ¶ 23.)  In July 2021, Harris also

misrepresented the value of the Plan as having a value of false and grossly inflated value of

$126,800,000.00 when its true value was approximately $37 million.  (SUMF, ¶¶ 14–15.)  It wasn't

until several months later, after AMEC appointed a new Executive Director of the Department,

that AMEC discovered Harris's scheme.  (SUMF, ¶ 13.)  Because AMEC had no knowledge of

Harris's wrongdoing due to Harris's efforts to conceal his actions, it could not have acquiesced to

his actions such that Harris had apparent authority to transfer funds out of the Annuity Contract.

Second, it would defy all reason to interpret Eaton and Harris's request to transfer Plan funds to a non-annuity investment as a request to "issue an annuity or make a cash distribution to the contract holder, a Participant, or to any other person who is entitled to such benefits." (SUMF, Exs. T, art. IV.1; U, art. IV.1; X, art. IV.1.) Eaton and Harris were not directing Symetra to issue annuities or distributions *to* retired participants as contemplated by the agreements. Rather, they were requesting Symetra to transfer Plan funds to non-annuity entities created by Eaton and Harris, which they in turn used to pay other entities they owned and controlled. (AMEC Cross-Complaint, ¶¶ 213–215; SUMF, ¶¶ 56–57.) The 2007 Annuity Contract, 2007 GIC, and the 2008 GIC do not shield Symetra from liability for blindly following such requests.

Symetra's claim that AMEC and the Plan breached agreements with Symetra by asserting crossclaims for breach of fiduciary duty likewise fails. There is no evidence that AMEC or the Plan ever made a contractual promise to Symetra to not bring claims against it as a fiduciary of the Plan. Indeed, neither the 2007 Annuity Contract, 2007 GIC, nor the 2008 GIC contain any terms suggesting Symetra cannot be held liable as a fiduciary of the Plan. (SUMF, Exs. T; U; X.) The statement in these agreements that Symetra "is not a party to nor bound by any trust or Plan" is part of a provision merely clarifying the agreements' relation to any unidentified retirement plan or trust that may also impact the parties. (SUMF, Exs. T, art. II.1; U, art. II.1; X, art. II.1.) That same provision goes on to state that the terms of these agreements "are subject to the qualifying provisions of any Plan under which this contract is issued." (SUMF, Exs. T, art. II.1; U, art. II.1; X, art. II.1.) The AMEC Defendants' claim against Symetra for breach of fiduciary duty could not possibly constitute a breach of that particular provision or these agreements in general.

Because AMEC's crossclaims are well beyond the scope of the exculpatory provisions of the 2007 Annuity Contract, 2007 GIC, and the 2008 GIC, Symetra cannot establish that AMEC or the Plan breached these agreements.

**B.    AMEC Defendants Are Entitled to Summary Judgment as to Symetra's Claim for Contractual Indemnification**

In Count V of the Cross-Complaint, Symetra seeks recovery against AMEC for contractual indemnification. (Cross-Complaint, ¶¶ 187-193.)  Symetra bases its contractual indemnification claim on provisions within a 2003 Recordkeeping Services Agreement ("2003 RSA") and a 2008 Recordkeeping Services Agreement (the "2008 RSA," and collectively with the 2003 RSA, the "RSAs").

"In Tennessee, indemnification requires the complete shifting of liability for loss from one party to another and rests on two principles: persons should be responsible for their own wrongdoing and wrongdoers should be liable to persons required to pay damages that the wrongdoers should have paid." *AutoZone, Inc. v. Glidden Co.*, 737 F.Supp.2d 936, 943 (W.D. Tenn. 2010) (quoting *Winter v. Smith*, 914 S.W.2d 527, 541 (Tenn. Ct. App. 1995) (cleaned up)). When a claim for indemnity is based on a contract, the Court must first determine whether a valid contract exists. *See Fid. & Guar. Ins. Co. v. S. Mech. Serv. Corp.*, No. 3:02-CV-137, 2005 WL 2417050, at *5 (E.D. Tenn. Sept. 30, 2005).  Partes may agree to indemnify each other by contract, as long as the contract contains "a clear and unequivocal expression of an intention to indemnify." *First Am. Bank of Nashville, N.A. v. Woods*, 734 S.W.2d 622, 632 (Tenn. Ct. App. 1987).

Here, the AMEC Defendants are entitled to summary judgment on Symetra's contractual indemnification claim for three principal reasons: (1) the doctrine of collateral estoppel precludes Symetra from enforcing the RSAs against the AMEC Defendants;  (2) there is no evidence that

either party expressed assent to the RSA sufficient to form an enforceable contract; and (3) even if the agreements are enforceable, the claims against Symetra do not fall within the scope of the RSAs' indemnity provisions.

1.    Symetra Cannot Enforce the RSAs against AMEC under the Doctrine of Collateral Estoppel.

The enforceability of the 2003 RSA and the 2008 RSA has already been the subject of robust briefing and argument because those RSAs contain mandatory arbitration provisions. (SUMF, ¶ 44.)  The claims made by Symetra against AMEC were in fact stayed by this Court while an arbitration decided the "gateway issues of arbitrability," *i.e.*, "(1) whether a contract binds the Church and Symetra Life to arbitrate their dispute, and (2) if so, the scope of the issues and claims between the Church and Symetra Life subject to arbitration."  (ECF No. 346, PageID 5365.) The answer to the first question has been resolved definitively in AMEC's favor—the 2003 RSA and 2008 RSA are not binding contracts.

The central issue before the arbitrator was whether Symetra and the AMEC Defendants' crossclaims against one another were subject to arbitration under a valid and enforceable contract. (SUMF, Ex. S, at 1.)  The arbitrator ruled that there was no contractual right to arbitrate the disputes because the 2003 RSA and 2008 RSA were never executed by both parties under their own terms such that they became enforceable against the parties.  (SUMF, Ex. S, at 14–16.)  The arbitrator noted that while Harris signed the RSAs on behalf of AMEC, there was no evidence on the record indicating Symetra signed the RSAs.  (SUMF, Ex. S, at 15.)  Accordingly, the arbitrator ruled that there was no jurisdiction for the parties to proceed in arbitration, as no enforceable arbitration agreement existed between the parties.  (SUMF, Ex. S, at 16.)

Under Tennessee law, collateral estoppel "bars the same parties or their privies from relitigating in a later proceeding legal or factual issues that were actually raised and necessarily determined in an earlier proceeding" such that the ruling in the earlier proceeding "is conclusive against the parties in subsequent proceedings." *Mullins v. State*, 294 S.W.3d 529, 534 (Tenn. 2009). It is well settled that "an arbitrator's decision can have preclusive effect in federal court." *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 367 (6th Cir. 2009) (citing *Cent. Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 257 (6th Cir.1991)). The party invoking collateral estoppel must establish five elements:

> (1) that the issue to be precluded is identical to an issue decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded.

*Mullins*, 294 S.W.3d at 535. Here, the arbitration decision regarding the enforceability of the RSAs satisfies all five elements.

Although Symetra is now seeking to enforce the RSAs' indemnification provision in this proceeding, whereas in the arbitration it sought to enforce the RSAs' arbitration provision, the gateway issue in the two proceedings is identical—whether the RSAs were properly executed such that they are enforceable upon the parties. (SUMF, Ex. S, at 1.) Symetra and the AMEC Defendants raised these issues before the arbitrator, who issued a final ruling finding there was no contractual right to arbitrate the disputes between the parties. (SUMF, Ex. S, at 10–11 (summarizing the parties' arguments), 14–16 (explaining its ruling on the enforceability of the RSAs.) Accordingly, the first two elements are satisfied.

24

Additionally, the arbitrator's ruling was final, and the parties have since litigated their claims in this Court. (SUMF, Ex. S, at 16.) The AMEC Defendants are also asserting collateral estoppel against Symetra, who was also a party in the arbitration. (SUMF, Ex. S, at 1.) Last, Symetra had a full and fair opportunity to contest the issue of enforceability of the RSAs in the arbitration, as evidenced by the host of documents and testimony presented by the parties and cited by the arbitrator in its ruling. (*See* ECF No. 699 (providing a status update on the arbitration).) Indeed, the arbitrator's decision depended primarily on the fact that despite all the discovery between the parties, Symetra was unable to produce evidence that it signed the RSAs as required by their terms. (SUMF, Ex. S, at 13–16.) As the arbitrator noted, "The fact that both the 2003 RSA and 2008 agreements drafted entirely by Symetra, were drafted expressly to become effective only when executed by both parties' 'duly authorized officers', supports a more reasonable inference that a fully executed agreement would have been the version preserved by Symetra had it existed." (SUMF, Ex. S, at 14.)

Thus, all the elements for collateral estoppel are met, and Symetra cannot enforce the 2003 RSA and the 2008 RSA in this proceeding.

2.    Symetra Cannot Establish That the 2003 RSA and the 2008 RSA Are Valid and Enforceable Agreements.

Even if the Court finds that collateral estoppel does not apply, there is still insufficient evidence for Symetra to establish that the RSAs are valid and enforceable agreements. In other words, the arbitrator's reasoning with respect to the enforceability of the RSAs' arbitration provisions applies equally to the RSAs' indemnity provision. Specifically, there is insufficient evidence for a reasonable jury to conclude that the parties expressed assent to the RSAs sufficient to form a valid contract.

Neither the 2003 RSA nor the 2008 RSA contain signatures by both parties and are, thus, not enforceable agreements. For an indemnity agreement to be enforceable, both parties must express consent to the agreement's terms. *See Fid. & Guar. Ins. Co.*, No. 3:02-CV-137, 2005 WL 2417050, at *7 (holding that an indemnity agreement was not binding on a party where there was no evidence that the indemnifying party assented to the agreement). Here, both RSAs contain an identical provision titled "Effective Date" which provides, "This Agreement shall be effective as of the date of the signatures below and shall continue in full force until terminated." (SUMF, Exs. R, at 6; N, at 6.) Thus, for the RSAs to become enforceable against the parties, both Symetra and AMEC were required to provide a valid signature as provided in these agreements.

There is no available evidence in the record showing Symetra signed the RSAs as required for the agreements to become effective. As such, the RSAs, including their indemnity provisions, are not enforceable. *See Am. Bd. of Craniofacial Pain*, 633 S.W.3d at 602 (noting that mutual assent to a contract is determined by objective manifestations)

3.    The RSAs Indemnity Provision Does Not Apply to the Claims Asserted Against Symetra.

In the alternative, assuming the RSAs are enforceable, they do not require the AMEC Defendants to indemnify Symetra for the claims asserted against it. For indemnification to arise expressly by contract, "there must be a clear and unequivocal expression of an intention to indemnify." *First Am. Bank of Nashville, N.A. v. Woods*, 734 S.W.2d 622, 632 (Tenn. Ct. App. 1987). Where an indemnity provision is susceptible to more than one interpretation, courts cannot impose a duty to indemnify on a party. *Olin Corp. v. Yeargin Inc.*, 146 F.3d 398, 404 (6th Cir. 1998) (refusing to enforce an indemnity agreement where the phrase "to the extent" made it unclear if the agreement applied to indemnification for a party's own negligence).

26

Here, the RSAs' indemnification provision states as follow:

> In exchange for Symetra providing Services, the Employer agrees to indemnify, defend, and hold harmless Symetra, their parent, their affiliates, and their respective directors, employees and agents ("Indemnities") against any and all claims, losses, damages, liabilities, obligations, taxes, costs, or expenses (including reasonable attorneys' fees) ("Claims") incurred by Indemnities arising from this Agreement, except for any Claims resulting directly from Symetra's willful misconduct in the performance of Services.

(SUMF, Exs. R, at 5; N, at 5.)  Under the plain terms of the 2003 RSA and the 2008 RSA, Symetra is only eligible for indemnification for claims that arise from those agreements.  (SUMF, Exs. R, at 5; N, at 5.)  Neither Plaintiffs nor the AMEC Defendants clearly and unequivocally base their claims against Symetra on the 2003 RSA or the 2008 RSA.  In fact, neither the Plaintiffs' Second Amended Complaint nor the AMEC Cross-Complaint even mention or reference the 2003 RSA or the 2008 RSA.  (*See* ECF No. 493; ECF No. 570.)  Symetra's Cross-Complaint does not contain any factual allegations of either Symetra or AMEC performing or acting pursuant to the 2003 RSA or the 2008 RSA. (*See* Cross-Complaint, ¶¶ 100, 107, 173, 188, 189.)  Based on the allegations in these pleadings, it is unlikely, or at best, unclear whether the claims against Symetra arise from either the 2003 RSA or the 2008 RSA.

Because the RSAs' indemnity provision does not clearly and unequivocally apply to the claims against Symetra in Plaintiffs' Second Amended Complaint or AMEC's Cross-Complaint, the Court should not enforce that provision against the AMEC Defendants.  *See Olin Corp*, 146 F.3d at 404.

### C.   AMEC Defendants Are Entitled to Summary Judgment as to Symetra's Claim for Common Law Indemnification.

In Count II of the Cross-Complaint, Symetra seeks recovery against AMEC for common law indemnification (often referred to as "implied" indemnification).  (Cross-Complaint, ¶¶ 157-

171.)  Symetra bases its common law indemnification claim on the allegation that AMEC had a duty to safeguard the Annuity Plan's assets as the "employer, Plan sponsor, administrator, and named fiduciary . . . ."  (*Id.*, ¶ 158.)  According to Symetra, AMEC must indemnify it "for all losses, damages, liabilities, obligations, taxes, costs, and expenses (including reasonable attorneys' fees) that Symetra incurs in connection with Plaintiffs', AMEC's, and the Plan's claims in this litigation."  (*Id.*, ¶ 171.)  Based on the evidence in the record, Symetra's claim for common law indemnification is completely unfounded.

Under Tennessee law, an obligation to indemnify may arise expressly by contract between the parties or impliedly from the parties' relationship.  *Winter v. Smith*, 914 S.W.2d 527, 541-42 (Tenn. Ct. App. 1995).  An implied duty to indemnify is "imposed by law without the consent of the parties."  *Id.* at 542.  "Courts will impose an implied obligation to indemnify when the obligation is a necessary element of the parties' relationship, or when justice and fairness demand that the burden of paying for the loss be shifted to the party whose fault or responsibility is qualitatively different from the other parties."  *Id.* (citation omitted).

The facts of this case and the principles of justice and fairness provide no basis for AMEC Defendants to indemnify Symetra.  As sponsor of the Plan, any duty that the AMEC Defendants may have in regard to Plan assets is owed to the Plan and to participants of the Plan, not Symetra. (SUMF, ¶ 6.) Additionally, it is absurd to suggest that vague principles of fairness and justice demand that AMEC, a non-profit religious organization whose primary mission is to provide spiritual care for millions of individual members, indemnify Symetra, a financial institution entrusted with the Annuity Plan funds, for liability of mismanagement of those Plan funds.

And most of all, there is simply no evidence on the record suggesting that the relationship between the AMEC Defendants and Symetra would impose an implied duty to indemnify on the

28

Church.  AMEC depended on Symetra, as a financial specialist, to help ensure that its employees received maximum benefits from the Annuity Plan.  (SUMF, ¶¶ 9, 16–18.)  Instead, Symetra enabled Harris in his scheme that resulted in reports of Plan value that were false and grossly inflated.  (SUMF, ¶¶ 14–15.)

### D.    AMEC Defendants Are Entitled to Summary Judgment as to Symetra's Negligent Misrepresentation Claim.

In Count III of the Cross-Complaint, Symetra alleges that AMEC and the Annuity Plan are liable for negligent misrepresentation.  (Cross-Complaint, ¶¶ 172-181.)  Symetra's negligent misrepresentation claim is based on provisions of the 2003 RSA, which is a document prepared by Symetra's predecessor, Safeco Life Insurance Company ("Safeco") and signed by Harris. (SUMF, ¶ 36.)  According to Symetra, AMEC represented through the 2003 RSA that Symetra was not a fiduciary of the Annuity Plan and did not have a duty to question or challenge Harris for any investment directives.  (Cross-Complaint, ¶¶ 173–74.)  Symetra's argues that the AMEC Defendants are liable for negligent misrepresentations because, by bringing crossclaims against Symetra for breach of fiduciary duty, "AMEC now asserts that these representations are and have always been false . . . ."  (*Id.*, ¶ 179.)

A party seeking to establish a claim for negligent misrepresentation under Tennessee law must present sufficient evidence to prove four elements: "(1) the defendant was acting in the course of its business or in a transaction in which it has a pecuniary interest; (2) the defendant supplied false information meant to guide others in their business transactions; (3) the defendant did not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relied on the information."  *Beard v. Worldwide Mortg. Corp.*, 354 F. Supp. 2d 789, 813 (W.D. Tenn. 2005).  Here, Symetra cannot present evidence sufficient to establish the second,

third, and fourth element of a negligent misrepresentation claim.

Notably, the Court has ruled that Symetra's negligent misrepresentation claim is an "alternative, though inconsistent, claim for relief" in relation to its other claims against the AMEC Defendants. (Order Granting in Part and Denying in Part AMEC's Motion to Dismiss, ECF No. 929, PageID# 15976.) Symetra repeatedly asserts throughout the Cross-Complaint that it is not a fiduciary to the Plan. (Cross-Complaint, ¶¶ 95, 141, 153, 165.) Thus, Symetra's negligent misrepresentation claim can only be sustained if the Court concludes Symetra "was a fiduciary and owed AMEC some duty to monitor Harris' investment transactions" because, otherwise, AMEC's alleged representations were true and cannot serve as the basis for a negligent misrepresentation claim. (ECF No. 929, PageID# 15976.) Accordingly, AMEC Defendants assert the following arguments under the assumption that Symetra was, indeed, a fiduciary to the Plan and had a duty to monitor Harris' investment transactions.

1. AMEC Defendants Did Not Supply False Information with Respect to Symetra's Duty to the Plan.

Symetra cannot present sufficient evidence to meet the second element of a negligent misrepresentation claim—the defendant supplied false information meant to guide others in their business transactions—because all representations that Harris had authority to act on behalf of the Plan in regarding to directing investment decisions and that Symetra was not a fiduciary to the Plan were not made by AMEC. Instead, they were made by Harris, Symetra, and other third parties. According to Symetra, AMEC supplied false information when Harris, acting as Trustee of the Plan, represented through the 2003 RSA and 2006 Plan document that Symetra is not a fiduciary of the Plan and cannot be held liable for following written directives to transfer Plan funds issued by Harris. (Cross-Complaint, ¶¶ 173–74.) Symetra drafted the 2003 RSA, and

30

Newport drafted the 2006 Plan document.  (SUMF, ¶¶ 24, 36.)  As such, AMEC did not make the representations in those documents.  Neither did AMEC ratify the statements in those documents such that it can be liable for negligent misrepresentation.  In fact, the 2006 Plan document that Symetra did not contain any signatures whatsoever by the Employer or on the Certificate of Corporate Resolution.

Generally, principals can be held liable for the negligent representations of their agent, where the agent is acting within the scope of his or her actual or apparent authority.  *Staggs v. Sells*, 86 S.W.3d 219, 223 (Tenn. Ct. App. 2001); *Cox v. M.A. Primary & Urgent Care Clinic*, 313 S.W.3d 240, 251 (Tenn. 2010).  For purposes of a negligence claim, apparent authority consists of "(1) such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; (2) such authority as he appears to have by reason of the actual authority which he has; (3) such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess."  *Zander v. Katz, Sapper & Miller, LLP*, 25 F. Supp. 3d 1055, 1060 (M.D. Tenn. 2014) (describing Tennessee agency law). The scope of an agent's authority is a question of fact determined by the facts and circumstances of a particular case.  *Id.*

As Executive Director of the Department, Harris did not have actual authority to submit to the representations in the 2003 RSA or the 2006 Plan documents on behalf of AMEC and the Plan. The AMEC Doctrine and Discipline empowers the Executive Director of the Department to hire a specialist in financial management to see that employees of the Church receive maximum benefits to which they are entitled from said investments.  (SUMF, ¶ 9.)  Connected with this authority, in 2001, the General Board gave the Executive Director specific authority to purchase an annuity contract with Symetra and deposit AMEC's contributions to the Plan into said contract.  (SUMF,

¶ 16.)  In sum, the scope of Harris's authority to act on behalf of AMEC with respect to the Plan was defined and limited to transferring Plan funds into an annuity account with a financial specialist and coordinating distributions of Plan funds to Plan participants.  (SUMF, ¶¶ 17–20.)

Harris also lacked apparent authority to submit to the representations in the 2003 RSA or the 2006 Plan documents on behalf of AMEC and the Plan.  There is no evidence showing that AMEC General Board, the AMEC Commission on Retirement Services, the AMEC Council of Bishops or any other AMEC Defendant knowingly permitted Harris to act as "Trustee of the Plan" or otherwise grant Harris full authority to transfer or invest Plan funds.  (SUMF, ¶ 21.)  In fact, all documents, records, or representations identifying Harris as Trustee were generated by Symetra or another third party.  (SUMF, ¶¶ 22, 24, 36, 40, 50, 51, 62.)   With respect to the 2006 Plan Document and 2003 RSA, Symetra did not have a certificate of corporate resolution or any other document authorizing Harris to act on behalf of AMEC in those agreements. (SUMF, ¶¶ 26, 28.) Because there is no evidence that the AMEC named or acted in a manner reasonably suggesting that Harris is the sole Trustee of the Plan with investment discretion, Harris lacked authority to ratify on behalf of AMEC any representations in these documents naming Harris as Trustee with investment discretion or stating Symetra is not a fiduciary to the Plan.  *See Zander*, 25 F. Supp. 3d at 1060.

Expressing assent to the 2003 RSA and 2006 Plan document on behalf of AMEC falls far outside the scope of Harris's authority as Executive Director.  The 2003 RSA stated that SafeCo, Symetra's predecessor, would provide specified recordkeeping services to AMEC in exchange for regular fee payments.  (SUMF, Ex. R, at 3.)  Harris signed the 2003 RSA on behalf of AMEC. (SUMF, Ex. R, at 6.)  The 2006 Plan Document, which was drafted by Newport, purports to be an agreement between AMEC and Harris defining Harris's powers with respect to the Plan.  (SUMF,

Ex. L, at 2–6.)    In one version, Harris signed the 2006 Plan Document in the space provided for "Trustee" but the 2006 Plan Document does not contain a signature from anyone acting on behalf of AMEC.  (SUMF, Ex. L, at 66.)  Indeed, the "Employer" signature is left blank.  (*Id.*)  None of the representations within these documents relate to the authority granted to Harris to deposit Plan funds into an annuity contract with Symetra or make retirement distributions to Plan participants. Based on the actions of the AMEC Defendants, no reasonable person could conclude that Harris had authority to direct transfers of Plan funds to non-annuity investments or otherwise affirm the representations in the 2003 RSA and the 2006 Plan document, as Symetra asserts in the Cross-Complaint.  (Cross-Complaint, ¶¶ 173–74.)

In sum, Symetra's negligent misrepresentation claim fails because there is no evidence that AMEC or the Plan either made or ratified a representation that Symetra is not a fiduciary to the Plan or that Harris is Trustee of the Plan authorized to unilaterally make investment decisions for the Plan.

2. <u>Symetra Cannot Establish That AMEC Defendants Failed to Exercise Reasonable Care in Obtaining or Communicating the Allegedly False Information.</u>

Symetra cannot present sufficient evidence to meet the third element of a negligent misrepresentation claim: that AMEC or the Plan failed to exercise reasonable care in obtaining or communicating the allegedly false information.  As noted above, any representation regarding Harris's apparent role as "Trustee of the Plan" and/or Symetra's lack of fiduciary duty to the Plan and its participants was made by Harris or another third party, not AMEC.  (SUMF, ¶ 22.) Throughout his tenure as Executive Director, in his annual reports to the General Board of AMEC, Harris actively concealed and did not disclose information related to his unauthorized investments, including the fact Harris was holding himself out as Trustee with discretionary authority over the

funds to third-party vendors like Symetra. (SUMF, ¶ 23.) Because AMEC's lack of knowledge regarding Harris's actions, including his representation to Symetra regarding his role as "Trustee" with sole investment discretion and Symetra's fiduciary responsibilities, was a result of Harris actively concealing this information, Symetra cannot present evidence that AMEC failed to exercise reasonable care in permitting Harris to make these representations. *See Alabama OB/GYN Specialists, PC v. Cynosure, Inc.*, No. 02-2608-V, 2003 WL 297560, at *3 (W.D. Tenn. Feb. 7, 2003) ("Under Tennessee law, in order to recover for negligent misrepresentation, the plaintiff must show that the defendants supplied false information . . . and that the defendants failed to exercise reasonable care or competence in obtaining or communicating the information."). As such, Symetra cannot establish the reasonable care element of its negligent misrepresentation claim.

3. <u>Symetra Cannot Present Evidence of Justifiable Reliance.</u>

Symetra's negligent misrepresentation claim also fails because Symetra cannot present evidence that it relied on any misrepresentations made by AMEC or the Plan regarding Harris acting as Trustee of the Plan with discretionary authority over investment decisions or Symetra not being a fiduciary of the Plan. And even if there is evidence Symetra relied on such representations, its reliance was not justifiable.

To recover on a negligent misrepresentation claim, a party must prove that it justifiably relied on the underlying representation supporting claim. *Beard*, 354 F. Supp. at 789. But justifiable reliance is not blind faith. *McNeil v. Nofal*, 185 S.W.3d 402, 408 (Tenn. Ct. App. 2005). A party cannot satisfy the justifiable reliance element if the party has notice of the potential falsity but fails to inquire as to its potential veracity. *Allied Sound, Inc. v. Neely*, 58 S.W.3d 119, 123 (Tenn. Ct. App. 2001) (affirming the trial court's grant of summary judgment dismissing a

34

negligent misrepresentation claim because the plaintiff had notice of a requirement to produce a letter of credit at the time of entering into a lease and failed to inquire further about the contingencies in the lease).

The United States District Court for the Eastern District of Tennessee's ruling in *Roopchan v. ADT Sec. Sys., Inc.* is instructive. In *Roopchan*, the court granted summary judgment for a security equipment and services provider with respect to a gas station owner's negligent misrepresentation claim. 781 F. Supp. 2d 636, 655 (2011). The plaintiff based his negligent misrepresentation claim on the provider's failure to include provisions regarding cellular back-up for alarm signals in a contract for security alarms. *Id.* at 645–46. The court found that the plaintiff failed to raise a genuine issue of material fact regarding whether he reasonably relied on the defendant's alleged misrepresentations. *Id.* at 655. Specifically, the court noted that any reliance by the plaintiff on alleged representations that the contract would include provisions for cellular back-up was not reasonably justified because the plaintiff, an experienced businessman, had the opportunity to read the contract but chose not to do so. *Id.* The court cited Tennessee precedent, which holds that a party with the ability and opportunity to inform themselves of the contents of a document before executing it cannot avoid the consequences of their ignorance or failure to read it. *Id.* (quoting *Solomon v. First Am. Nat. Bank of Nashville*, 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989)).

Similarly, Symetra's negligent misrepresentation claim fails because Symetra's reliance was not justified because it chose to blindly follow Harris's investment directives despite being aware of Harris's suspicious behavior. For instance, Symetra's project manager for group retirement plans, on multiple occasions, knew as early as 2008 that it did not have an executed copy of the 2006 Plan Document, which purportedly authorized Harris to be the sole

decisionmaker on investment decisions.  (SUMF, ¶¶ 29–31.)  Yet, Symetra continually made transfers pursuant to Harris's instructions.  (SUMF, ¶ 33.)  Moreover, when pressed, Harris presented Symetra with a set of clearly fraudulent documents where he signed as "Plan Trustee," "Plan Administrator," the "Employer," the "Executive Director" or the "President or Vice President" of the Church, **and** the "Secretary" of the Church, when Symetra knew Harris only to be the Executive Director of the Department.  (SUMF, ¶¶ 27–28.)  In another particularly egregious incident, Symetra approved a $10 million dollar transfer of Plan funds to Financial Freedom Funds, an LLC created by Harris that listed Eaton as a consultant.  (SUMF, ¶¶ 58, 61.)  Internal discussions between Symetra officials and correspondence with officials from Newport reveal that Symetra approved this transfer despite being aware that the transfer was potentially prohibited due Eaton's connections to Financial Freedom.  (SUMF, ¶¶ 60–61.)

In sum, Symetra's reliance on transfer directives was not justified because Symetra was aware that it lacked the required executed documents to confirm Harris's authority to make such requests, and Symetra was aware that Harris was requesting transfers to entities in which he and Eaton had an interest.  Symetra's negligent misrepresentation claim, therefore, fails.

### E.    AMEC Defendants Are Entitled to Summary Judgment with Respect to Symetra's Claim for Contribution.

In Count IV of the Complaint, Symetra seeks contributions from all of the defendants in this action, including the AMEC Defendants.  (Cross-Complaint, ¶¶ 182-186.)  Specifically, Symetra seeks contribution under Tenn. Code. Ann. § 29-11-102 and common law to the extent Symetra "pays more than its proportionate share of the shared liability for the same injury."  (*Id.*, ¶ 184.)  Symetra cannot establish that it is entitled to contribution.

36

Under Tennessee law, a "right of contribution exists only in favor of a tort-feasor who has paid more than the proportionate share of the shared liability between two (2) or more tort-feasors for the same injury . . . ." Tenn. Code. Ann. § 29-11-102(b). There are, however, important limits to the right of contribution. For example, contribution is only available if the party seeking contribution is "liable in tort," as opposed to a legal theory based in contract or elsewhere. *AutoZone, Inc. v. Glidden Co.*, 737 F. Supp. 2d 936, 945–46 (W.D. Tenn. 2010). Also, a party may not seek contribution if they are liable for an intentional tort or gross negligence. Tenn. Code. Ann. § 29-11-102(c). Lastly, contribution is only available in cases of joint and several liability or where, as fairness demands. *Gen. Elec. Co. v. Process Control Co.*, 969 S.W.2d 914, 916 (Tenn. 1998).

Here, Symetra has not shown that it could be liable to the MDL Plaintiffs for any tort where comparative fault principles would not apply and where joint and several liability with AMEC would apply. That being the case, Symetra cannot show that a claim for contribution, even if contingent, would be successful as against AMEC. As such, AMEC Defendants are entitled to summary judgment as to Symetra's claim for contribution.

### F.    Symetra Has No Basis for Declaratory Relief.

In Count VI of the Cross-Complaint, Symetra seeks a declaratory judgment against AMEC for the following three matters: (1) that Harris was Plan Trustee with authority to act on behalf of the Plan; (2) that AMEC is a Plan fiduciary; and (3) that Symetra has no liability to AMEC or the Plan for following the written directives of Harris to transfer Annuity Plan funds to other investments and parties as directed by Harris. (Cross-Complaint, ¶¶ 198, 199, 206.) Symetra cannot present a sufficient evidentiary basis for declaratory relief on any of these three claims.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that the federal courts "upon

the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). By its very nature, "a declaratory judgment action is a procedural device used to vindicate substantive rights" but is not itself a substantive claim for relief. *Int'l Ass'n of Machinists & Aerospace Workers v. T.V.A.*, 108 F.3d 658, 668 (6th Cir.1997); *see also Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014) (holding that "the operation of the Declaratory Judgment Act" is "procedural" only and leaves "substantive rights unchanged"). In other words, the Act "does not create an independent cause of action" that can be invoked absent some showing of an articulated legal wrong. *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007). A party's prayer for declaratory judgment "is barred to the same extent that the claim for substantive relief on which it is based would be barred." *Int'l Ass'n of Machinists & Aerospace Workers*, 108 F.3d at 668.

Symetra is not entitled to a declaration that Harris was Plan Trustee with authority to act on behalf of the Plan. As an initial matter, it is unclear whether Symetra uses the term "Plan Trustee" to mean a Plan sponsor representative with day-to-day responsibilities to interface with vendors and service providers to the Plan or whether it uses the term to mean an individual with discretionary authority over investment decisions for the Plan, which is how the term is understood in a typical retirement plan context. *See, e.g.*, 29 U.S.C. § 1103(a). To the extent it is the latter, Symetra cannot point to any evidence that any AMEC Defendant named or appointed Harris to be "Trustee of the Plan" with the sole individual authority to manage and invest the Plan's assets. (SUMF, ¶ 21.) Rather, the Doctrine and Discipline established the Commission of Retirement Services, and not the executive director of the Department, to serve as the trust committee for annuity coverage of the Church. (SUMF, ¶ 7.)

Moreover, any document or other representation identifying Harris as a "trustee" was

38

drafted by a third party or Harris himself. (SUMF, ¶ 22.) For example, Newport drafted the 2006 Plan document naming Harris as Trustee. (SUMF, ¶ 24.) Harris signed the 2006 Plan document where it provided for a signature of the Plan Trustee, but there is no evidence that any AMEC Defendant ever appointed Harris as Trustee of the Plan or authorized him to act in that capacity, as contemplated by the 2006 Plan Document. (SUMF, ¶¶ 24–30.) Symetra nevertheless accepted the 2006 Plan Document without any confirmation, written or otherwise, from the AMEC General Board, the AMEC Commission on Retirement Services, or any other AMEC bodies or officers that AMEC had named or appointed Harris to be the sole Trustee with all investment decision making authority. (SUMF, ¶ 33.)

Symetra is not entitled to a declaration that AMEC is a Plan fiduciary. Symetra does not assert a claim for breach of fiduciary duty against the AMEC Defendants, so it is unclear what purpose such a declaration would serve. (*See generally* Cross-Complaint.) Indeed, whether AMEC is a fiduciary to the Plan is not an element of any of Symetra's crossclaims against AMEC. In any event, as Plan sponsor, AMEC does not dispute that it would have fiduciary responsibilities with respect to the Plan. There is no need, then, for Symetra to seek a declaration that AMEC is a Plan fiduciary.

Finally, Symetra has no basis for seeking a declaration that it is not liable for following written directives from Harris to transfer Annuity funds to non-annuity investments. As noted above, the exculpatory provisions of the 2007 Annuity Contract, 2007 GIC, and 2008 GIC are not enforceable. *See supra*, Section A(1)(b). And even if the contracts were enforceable, the exculpatory provisions only apply to directives to issue annuities or make cash distributions to Plan participants. *Id.* As such, a declaration shielding Symetra from liability for blindly following directives from Harris is unwarranted.

39

In sum, Symetra has no evidentiary basis for the declaratory relief it seeks.

## V.    <u>**CONCLUSION**</u>

Based on the foregoing, AMEC Defendants respectfully request that the Court grant this

Motion and dismiss Symetra's Cross-Complaint its entirety with prejudice.

Dated: December 1, 2025

<div style="margin-left: 40%;">

Respectfully submitted,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.

*s/ Bruce A. McMullen*
Bruce A. McMullen (TN Bar No. 18216)
Mary Wu Tullis (TN Bar No. 31339)
Jennie V. Silk (TN Bar No. 35319)
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone:    901.526.2000
Fax:    901.577.2303
bmcmullen@bakerdonelson.com
mtullis@bakerdonelson.com
jsilk@bakerdonelson.com

***Counsel for AMEC Defendants***

</div>

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing has been served upon all counsel of record via the Court's electronic filing system on the 1st day of December, 2025.

s/ *Bruce A. McMullen*