**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION** | **MDL Docket No. 1:22-md-03035-STA-jay**<br><br>**ALL CASES** |

---

**SYMETRA LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
WITH RESPECT TO CROSS-CLAIMS BETWEEN SYMETRA AND
THE AFRICAN METHODIST EPISCOPAL CHURCH**

---

Markham R. Leventhal
Benjamin M. Stoll
Scott M. Abeles
CARLTON FIELDS, P.A.
1625 Eye Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 965-8100
Facsimile: (202) 965-8104

Rachel A. Oostendorp
CARLTON FIELDS, P.A.
2 MiamiCentral, Suite 1200
700 NW 1st Avenue
Miami, Florida 33136
Telephone: (305) 530-0050

*Attorneys for Defendant
Symetra Life Insurance Company*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

FACTS ................................................................................................................................1

LEGAL STANDARD .........................................................................................................1

ARGUMENT ......................................................................................................................2

I.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON
    FOUR KEY ISSUES .................................................................................................2

    A.  Harris Was A Representative Of AMEC And The Plan With Authority to
        Direct Symetra .................................................................................................3

        1.  Harris Had Actual Authority to Direct Symetra ..................................... 3

        2.  Harris Had Apparent Authority to Direct Symetra ................................. 6

    B.  The Court Should Grant Summary Judgment Establishing As An
        Undisputed Fact That AMEC Was A Fiduciary Of The Plan ...........................8

    C.  The 2006 Plan Document Governed The Plan Since March 2006 And Is
        Binding On AMEC ........................................................................................10

    D.  Symetra Is Not Liable For Transfers It Made Out Of The Annuity And
        Guaranteed Interest Contracts At Harris's Direction ......................................13

        1.  Symetra Is Not Liable for the $10 Million Transfer in 2008 Under
            the Terms of the GIC ........................................................................... 15

        2.  Symetra Is Not Liable for Other Transfers from the Annuity and
            Guaranteed Interest Contracts ............................................................... 16

II.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON
     AMEC'S AND THE PLAN'S LIABILITY FOR BREACH OF CONTRACT ...............16

III.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON
      ITS NEGLIGENT MISREPRESENTATION CLAIM AGAINST AMEC ....................18

IV.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON
     ITS CROSS-CLAIM FOR INDEMNIFICATION FROM AMEC .................................20

V.  AMEC'S CROSS-CLAIMS ARE BARRED BY THE STATUTE OF
    LIMITATIONS ........................................................................................................21

## TABLE OF CONTENTS
(continued)

*Page*

A.  The Statute Of Limitations Began To Run On All Alleged Wrongful Acts
At The Time They Occurred .................................................................22

B.  There Is No Evidence To Support Fraudulent Concealment and Therefore
No Issue of Material Fact ...................................................................26

VI.  SYMETRA IS ENTITLED TO SUMMARY JUDGMENT ON ALL AMEC'S
CROSS-CLAIMS BECAUSE AMEC HAS PROFFERED NO ADMISSIBLE
EVIDENCE OF CAUSATION OR DAMAGES ...............................................28

A.  AMEC Has No Data, Documents, or Testimony Supporting its Allegation
of Damages Caused by Symetra ...........................................................29

B.  Mr. Alexander's Opinions Do Not Fill the Evidentiary Gaps in the
Summary Judgment Record, and Are Otherwise Inadmissible ...........................29

VII.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON
AMEC'S CROSS-CLAIM FOR BREACH OF FIDUCIARY DUTY ...........................31

A.  Symetra Owes No Fiduciary Duty to AMEC .........................................31

B.  Symetra Breached No Fiduciary Duty to AMEC .....................................35

VIII.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON
AMEC'S CLAIM FOR NEGLIGENCE ........................................................37

IX.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON
AMEC'S FRAUDULENT CONCEALMENT CROSS-CLAIM.................................38

X.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON
AMEC'S CIVIL CONSPIRACY CROSS-CLAIM............................................41

A.  There Is No Record Evidence Establishing A Conspiracy ...........................41

B.  AMEC Cannot Sue Over A Conspiracy Involving Itself..............................46

XI.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON
AMEC'S AIDING AND ABETTING CROSS-CLAIM .......................................47

A.  AMEC Cannot Show Symetra Had Actual Knowledge of Any Breach of
Duty...............................................................................................48

# **TABLE OF CONTENTS**
(continued)

*Page*

B.    AMEC Cannot Establish Symetra Substantially Assisted with Any Breach of Fiduciary Duty ................................................................................................. 49

CERTIFICATE OF SERVICE ........................................................................................... 52

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Symetra Life Insurance Company ("Symetra") moves for partial summary judgment in its favor with respect to certain cross-claims between Symetra, the African Methodist Episcopal Church ("AMEC"), and the AMEC Ministerial Retirement Annuity Plan (the "Plan"). Specifically, Symetra moves (i) for summary judgment on certain claims for declaratory relief and to establish certain facts, (ii) for summary judgment on AMEC's and the Plan's liability for certain cross-claims, and (iii) for summary judgment on all cross-claims asserted by AMEC against Symetra.[1]

## FACTS

Symetra incorporates its Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment with Respect to Cross-Claims Between Symetra and AMEC (cited as "Facts"), a copy of which is being filed along with this memorandum. These Facts are identical to the statement of facts Symetra previously filed at ECF No. 982-1.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment should be granted if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute "is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *McClanahan v. State Farm Life Ins. Co.*, 660 F. Supp. 3d 728, 735 (W.D. Tenn. 2023). "Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to

---

[1] AMEC, acting on behalf of the Plan, previously moved to dismiss the Plan's cross-claims against Symetra (ECF No. 839), which motion was granted by the Court. ECF No. 925.

that party's case, and on which that party will bear the burden of proof at trial." *Id.*

To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

Rule 56 authorizes the court to grant partial summary judgment to establish particular facts or resolve particular issues on which there is no genuine dispute. *Salerno v. Family Heritage Life Ins. Co.*, 2025 WL 844682, at *2 (N.D. Ohio Mar. 18, 2025) (partial summary judgment "allows a court to establish facts prior to trial over which there is no 'substantial controversy,'" and "is an appropriate mechanism for resolving core, undisputed issues to bring about more efficient and focused trials"); *Holt v. Nw. Mut. Life. Ins. Co.*, 2005 WL 2405958, at *6 (W.D. Mich. Sept. 29, 2005) ("Indeed, the purpose of motions for partial summary judgment is to 'speed[] up litigation by eliminating before trial matters wherein there is no genuine issue of fact.'").

## **ARGUMENT**

## I.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON FOUR KEY ISSUES

Symetra seeks summary judgment on the following issues: (1) Harris was authorized by AMEC and the Plan to direct Symetra as to the annuity contracts and guaranteed interest contracts ("GICs"); (2) AMEC was a Plan fiduciary; (3) the 2006 Plan Document is the sole governing Plan document since 2006; and (4) Symetra is not liable for transfers it made from the annuity contracts and GICs at Harris's direction. Resolving these issues now will result in a more efficient trial.

-2-

A. **Harris Was A Representative Of AMEC And The Plan With Authority to Direct Symetra**

Harris was authorized by AMEC to direct Symetra with respect to the annuity contracts and GICs. This fact was undisputed for 20 years and remains genuinely undisputed today. However, given recent efforts by AMEC to deny or confuse the issue, Symetra moves for summary judgment to streamline this litigation and eliminate this issue from the case. As the current Executive Director of AMEC's Department of Retirement Services ("DRS") testified:

> Q.    … To the best of your knowledge, did the Church authorize anyone other than Dr. Harris to give directions to Symetra with respect to the annuity contract? [Objection]
>
> A.    To the best of my knowledge, Dr. Harris was the authorized person to communicate with Symetra.
>
> Q.    Was there anybody else authorized to communicate with Symetra? A. To the best of my knowledge, no.

Facts ¶ 71 (citing Symetra Exhibit 2, AMEC 30(b)(6) Dep. at 83:2-15).[2] Aside from this uncontroverted testimony, other overwhelming evidence confirms that Harris had both actual and apparent authority to direct Symetra with respect to the annuity contracts and GICs.

1. **Harris Had Actual Authority to Direct Symetra**

The undisputed facts show Harris had *actual* authority to direct Symetra under the contracts, regardless of whether he was formally a Plan trustee. The Annual Reports cited above, which were all submitted to *and formally approved by* AMEC's General Board (Facts ¶ 44), are evidence that Harris had actual authority to act as the authorized agent of AMEC and the Plan.

---

[2] The exhibits to the statement of facts (cited as "Symetra Exhibit") were previously filed as follows: Exhibits 1-194 were attached to the Declaration of Benjamin M. Stoll, filed in four parts at ECF Nos. 983-986; Exhibit 195 was filed at ECF No. 1048-2; and Exhibits 196-198 were filed at ECF Nos. 1063-2 to 1063-4. Exhibits 199-205 are being filed with the Declaration of Benjamin M. Stoll, which is attached hereto.

Actual authority "consists of the powers which a principal directly confers upon an agent *or causes or permits him to believe himself to possess*." *Savage v. City of Memphis*, 464 S.W.3d 326, 333 (Tenn. Ct. App. 2015).[3]  Given AMEC's conduct, Harris clearly believed himself to possess the authority of the Plan trustee, as documented by his repeated references to himself as Plan "Trustee and Fiduciary" in his Annual Reports and other memos. *See, e.g.*, Facts ¶¶ 41, 51, 52, 65.

Harris also had actual authority to direct Symetra (and all other Plan investments) under both the 1997 Plan Document and the 2006 Plan Document, which govern the Plan.  AMEC admits that the 1997 Plan Document governed the Plan as of 2000 when Harris became Executive Director of the Department.[4]  The 1997 Plan Document defines the trustees as "Members of the Pension Commission, Pension Department of the A.M.E. Church."  Symetra Exhibit 1, at PageID 29858. The Pension Department was the prior name for DRS, so as the duly elected Executive Director and head of DRS, Harris was a trustee of the Plan under the 1997 Plan Document.

In addition, although AMEC is apparently disputing the validity of the 2006 Plan Document, the 2006 Plan Document is binding on AMEC.  *See infra* Section I.C; Facts ¶¶ 56–69. The 2006 Plan Document formally names Harris as the Plan trustee.  ECF No. 74-1, at PageID 916.  Both the 1997 and 2006 Plan Documents give the trustee power and authority to direct and manage the Plan's investments.  ECF No. 74–1 §§ 7.1–7.2; Symetra Exhibit 1 §§ 7.1–7.2.  Thus, regardless of which Plan Document controls, Harris had actual authority to direct Symetra with respect to the Plan's investments in Symetra's annuity contracts and GICs.

---

[3] Unless otherwise indicated in this memorandum, all emphasis is added and internal citations and quotation marks are omitted.

[4] *See* AMEC Partial Answer to Plaintiffs' Second Amended Complaint and Amended Cross-Complaint, ECF No. 570 ¶ 112, at PageID 9282 (alleging "that the operative plan is the [AMEC] Retirement Plan, effective January 1, 1997, which is a 401(a) Plan"); *id*. at ¶ 36, PageID 9387.  A copy of the 1997 Plan Document is Symetra Exhibit 1; *see also* Facts ¶ 2.

Moreover, regardless of whether Harris was a formal Plan trustee, he was undeniably the *de facto* trustee. Even where an individual is not validly or formally appointed trustee, that individual is still legally considered a trustee if (1) he assumed the position of trustee under color of right or title, and (2) he exercises the duties of the office. *Haynes, on behalf of Ins. Tr. of Trustee Unger v. Transamerica Corp.*, 2018 WL 487841, at *6 (D. Colo. Jan. 18, 2018); *see also Burton v. Dolph*, 89 Va. Cir. 101, 2015 WL 5231306, at *3 (Feb. 24, 2015); *In re Bankers Tr.*, 403 F.2d 16, 20 (7th Cir. 1968); 2 Fletcher Cyc. Corp. § 374. "Color of right or title merely means 'authority derived from an election or appointment, however irregular or informal, so that the incumbent be not a mere volunteer." *Haynes*, 2018 WL 487841, at *6. There is no genuine dispute that Harris meets both criteria for *de facto* trustee status.

Color of Title or Right. Harris began administering the Plan after being elected Executive Director of DRS, and he was re-elected to that position every four years between 2000 and July 2021. Facts ¶¶ 11, 49. These elections give him color of right and title, especially since the 1997 Plan Document (which all parties agree was valid and effective in 2000) lists DRS as a Plan trustee. Symetra Exhibit 1 at PageID 29858. Harris referred to himself as Plan trustee repeatedly in Annual Reports to the AMEC General Board and Commission and in memos to Church leadership. Facts ¶¶ 41–42, 51, ¶ 65, ¶ 107. Harris's Annual Reports—including his 2003 recommendation that he be directed by the Commission, as "Trustee and Fiduciary of the Plan," to invest 30% of the Plan's assets outside of annuity contracts, Facts ¶ 42—were adopted and approved by the Commission and General Board, and no one ever objected to his repeated references to himself as trustee. Facts ¶¶ 43, 44, 66. Thus, Harris was indisputably acting as Plan trustee under color of title and right.

Exercising Duties of Trustee. There is not any genuine dispute that Harris was exercising the duties of Plan trustee. Section VII of both the 1997 and 2006 Plan Documents assign the Plan

trustee the power and duty to: (1) maintain records of disbursements; (2) prepare and submit Annual Reports to the Employer; (3) invest, manage, and control Plan assets; (4) purchase annuity contracts from an insurer; and (5) execute contracts necessary to carry out the Plan's investments. Symetra Exhibit 1 §§ 7.1–7.3, 7.6; ECF No. 74-1 §§ 7.1–7.3, 7.6.   Harris, and only Harris, performed all of these functions for the Plan for twenty years.[5]  Facts ¶¶ 17, 26, 28, 32, 55, 74, 75, 98.  He did so publicly and without objection from anyone at AMEC.  Facts ¶¶ 43, 44, 46, 74, 87, 107, 165, 169, 173, 175.  As a result, it was clear to AMEC and Symetra for twenty years that Harris exercised the duties of the Plan trustee, leaving no doubt he was, at minimum, a *de facto* trustee with actual authority to direct Symetra.

### 2.    Harris Had Apparent Authority to Direct Symetra

A principal is also bound by the acts of its agent if the agent has apparent authority to act for the principal.  *Savage*, 464 S.W.3d at 333.  "The liability of the principal is determined in any particular case, however, not merely by what was the apparent authority of the agent, but by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by his acts under the circumstances conferred upon his agent."  *Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 433 (Tenn. 2008).    Apparent authority "is such authority as a principal intentionally or by lack of ordinary care causes or allows a third person to believe the agent possesses."  *Intersparex Leddin KG v. Al-Haddad*, 852 S.W.2d 245, 247 (Tenn. Ct. App. 1992).  A principal can—and often does—confer apparent authority on an agent by its inaction in the face of that agent presenting himself to the public as the principal's representative.  *See, e.g.*, *Darling Stores v. Fid.-Bankers Tr. Co.*, 156 S.W.2d 419, 422 (Tenn. 1941) (agent had apparent

---

[5] AMEC's contention that the Commission was the sole trustee of the Plan is frivolous given that the Commission never performed any of these trustee duties for the Plan, and there is no testimony from any Commission member that they were a trustee.

authority where defendant was silent in the face of the transactions taking place); *Forrest Tr. v. Fid. Title Agency of Nev., Inc.*, 2009 WL 3190357, at *1 (Nev. Sept. 28, 2009) (agent had apparent authority where he handled "every aspect of the [trust's] financial dealings" over the course of several years); *Berti v. UBS Fin.*, 2012 WL 5381969, at *5 (M.D. Fla. Nov. 1, 2012) ("Berti I had the apparent authority to encumber the Trust as he had been acting as Trustee for over ten years without [beneficiary] raising any objections.").

AMEC cloaked Harris in apparent authority by allowing him to hold himself out as the Plan trustee and unilaterally run all aspects of the Plan for twenty years. From the beginning, Harris acted as the Plan's representative with AMEC's full knowledge and approval. AMEC's General Board authorized him to contract with Symetra for a fixed annuity. Symetra Exhibit 199 (Harris recommending he be allowed to contract with new annuity provider); Symetra Exhibit 200 at AME_CHURCH-0029041 (General Board approving recommendation). In addition:

- Harris was introduced to Symetra as the Plan trustee at Symetra's initial meeting with Harris, Eaton, and the Chairman of the Commission on Retirement Services ("Commission"), Bishop Adams. Facts ¶ 15.

- With AMEC's knowledge, Harris executed the application for the 2001 Annuity Contract, and when the 2001 Annuity Contract was issued, Harris effectuated the transfer of $48 million into the contract on behalf of the Plan. Facts ¶¶ 16, 17, 21.

This process alone established Harris as the authorized signor and clearly communicated to Symetra that Harris was the Plan's authorized representative.

Harris's apparent authority to direct Symetra was further corroborated by virtually every transaction over two decades including the following (which are undisputed facts):

- From 2001 onward, Harris was the only person from AMEC who made investment decisions for the Plan and directed Symetra. Facts ¶ 71. For example, Harris directed all contributions into the annuity contracts and managed every distribution—for death, retirement, hardship, etc.—from the annuity contracts for every Plan participant.

- Harris applied to Symetra for a second annuity and two GICs in 2007 and a third GIC in 2008. Facts ¶¶ 72–76; Symetra Exhibit 201. He then effectuated the transfer of Plan

funds into those contracts on behalf of the Plan.  Facts ¶¶ 75, 77; Symetra Exhibit 202.

- No one from AMEC ever objected to this practice or communicated to Symetra that Harris lacked authority to direct Symetra or that anyone else from AMEC had such authority.  Facts ¶¶ 87, 88, 169, 170, 175

- AMEC formally took the position in other litigation in 2019 (in which Symetra was a party) that Harris was the Plan Trustee.  Facts ¶ 67.

This conduct by Harris and AMEC further established Harris as the individual given authority by the Plan to direct Symetra on the Plan's behalf.  Moreover, AMEC had actual knowledge that Harris was acting as trustee and authorized representative of the Plan:

- Harris repeatedly stated in his Annual Reports to AMEC's governing bodies that he was the Plan trustee and administrator.  Facts ¶¶ 41–43, 65–66; Symetra Exhibit 203.

- Harris referred to himself as Plan trustee and administrator in memos he wrote to Commission Chairmen and Church leadership.  Facts ¶¶ 51, 74, 107.

- Harris is listed as Plan trustee in a Plan summary that was distributed to Plan participants.  Facts ¶ 64.

- Multiple Church leaders—Dr. Miller, Bishop Green, Bishop Fugh, Bishop Davis, and Reverand Blackwell—testified to believing Harris was Plan trustee and had authority to direct Symetra.  Symetra Exhibit 22 at 624:4–7; Facts ¶¶ 11, 70–71.

In sum, it is undisputed that, for 20 years during Harris's entire tenure as Executive Director of AMEC's Department of Retirement Services, no one else was ever put forward as the Plan's authorized representative to direct Symetra, and no one from AMEC ever communicated to Symetra that Harris was not so authorized.  There is no _genuine_ dispute he had apparent authority to direct Symetra with respect to these contracts.

**B.    The Court Should Grant Summary Judgment Establishing As An Undisputed Fact That AMEC Was A Fiduciary Of The Plan**

During all material times, AMEC exercised dominion and control over administration and management of the Plan, and the Plan's assets, making AMEC a fiduciary as a matter of law.  For twenty years, Harris was an agent, employee, and General Officer of the Church authorized by

AMEC to administer and manage the Plan on behalf of AMEC. Through the DRS led by Harris, AMEC was the Plan administrator with ultimate control over Plan management, including choice of annuity provider and decisions regarding retirement, hardship, and other distributions to Plan participants. AMEC also exercised authority and control over all Plan assets, dictating the amount of contributions required by participants, and mandating that all Plan contributions from employees be paid from their Church Districts to AMEC's DRS and deposited into DRS's accounts in Regions Bank, which AMEC controlled and was required to hold in trust.[6]

AMEC, through its General Conference, also created the procedure by which it selected the manager of the Plan as Executive Director of DRS. As Plan administrator with the power and duty to select Plan fiduciaries and service providers, AMEC was by definition a fiduciary of the Plan. *Stockwell v. Hamilton*, 163 F. Supp. 3d 484, 490–91 (E.D. Mich. 2016) ("It is . . . well-established that the power to appoint plan trustees confers fiduciary status."); *In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, 832–33 (S.D. Ohio 2004) (similar). The power to appoint and remove fiduciaries carries with it the concomitant duty to "monitor appropriately" the performance of those fiduciaries. *Stockwell*, 163 F. Supp. 3d at 491.

AMEC's fiduciary status is also built into the 1997 and 2006 Plan Documents, which each define AMEC as the Plan "Employer," a position that is virtually always fiduciary. Symetra Exhibit 1, at PageID 29858; ECF No. 74-1 at PageID 916. Both Plan Documents assign AMEC, as Employer, the fiduciary duties to appoint, remove, and review the performance of trustees and other fiduciaries, which legally makes the Employer a fiduciary itself. Symetra Exhibit 1 § 2.1

---

[6] *See* Facts ¶ 3 & n.2 (providing that Section 401(a) states in pertinent part: "Requirements for Qualification: A *trust* created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section[.]" 26 U.S.C. § 401(a)).

(PageID 29865); ECF No. 74-1 §§ 2.1–2.3 (PageID 925–928). The 2006 Plan Document expressly designates the Employer as a named fiduciary: "The 'named Fiduciaries' of this Plan are (1) the Employer [AMEC], (2) the Administrator [DRS], (3) the Trustee [Harris] and (4) any Investment Manager appointed hereunder." ECF No. 74-1 § 9.11 (PageID 975); *see also id.* §§ 1.3, 1.17, PageID 916-919. In sum, AMEC was and is a fiduciary of the Plan as a matter of law.

### C. The 2006 Plan Document Governed The Plan Since March 2006 And Is Binding On AMEC

AMEC disputes that the 2006 Plan Document superseded the 1997 Plan Document in March 2006. But this dispute is not *genuine* because all evidence indicates the 2006 Plan Document governed the Plan. Moreover, the validity and interpretation of the 2006 Plan Document are questions of law for the Court. *Pharma Conf. Educ., Inc. v. State*, 703 S.W.3d 305, 311 (Tenn. 2024) ("Whether a valid contract exists is a question of law. Interpretation of a contract and a determination of the parties' intentions related to the contract are also questions of law."). Summary judgment is the appropriate place to do that. *Watson v. Fogolin*, 2010 WL 1293797, at *3 (Tenn. Ct. App. Apr. 1, 2010). It is indisputable that the 2006 Plan Document is valid and superseded the 1997 Plan Document for the following reasons:

First, the 2006 Plan Document's purpose was to merge the Church's 1997 401(a) plan with its 2000 403(b) plan. Facts ¶ 57; ECF No. 74-1 at PageID 916 (WHEREAS clauses). This merger occurred and the 403(b) plan funds held by Kemper were consolidated into the Symetra annuity contract at the end of 2006, as shown in Newport's statements. Symetra Exhibit 204. Given the undisputed fact of this consolidation, the 2006 Plan Document must have superseded the 1997 one.

Second, Harris described the adoption of the 2006 Plan Document—and the consolidation of the 401(a) and 403(b) plans into the Plan—in his Annual Reports to the AMEC General Board and Commission in both 2006 and 2007:

> The governing Plan Document **has been revised** to consolidate this [403(b)] Plan with the other Plan(s) under the responsibility of the department and places day-to-day management and fiduciary responsibility specifically and exclusively with the Executive Director as Plan Administrator.

Symetra Exhibit 46 (2006 DRS Annual Report) at PageID 31508.

> The AMEC Retirement Plan for Pastors and Presiding Elderss (403b) – MISSION ACCOMPLISHED!  . . .  With the concurrence of the AMEC Retirement Board in July 2006, the responsibility for the day to day administration and management of this Plan now resides with the Department of Annuity Investments and Insurance. . . . In January 2007, approximately $1.8M was transferred from the Chase Insurance Company (Zurich Kemper) to the Symetra Insurance Company, the primary investment vendor for the AMEC Retirement Annuity plan.

Symetra Exhibit 73 (2007 DRS Annual Report) at PageID 32454-32455.  The Commission and General Board adopted both Annual Reports, thereby formally approving the 2006 Plan Document.  Facts ¶ 44; Symetra Exhibit 203 at AME_CHURCH-0029498 (adopting 2006 Report); Symetra Exhibit 205 at AME_CHURCH-0029661 (adopting 2007 Report).

Third, AMEC expressly _conceded_ that the 2006 Plan Document governs the Plan and should be judicially estopped from changing its position in this litigation.  AMEC formally took this position in prior litigation (in which Symetra was also a party) where it presented Harris as the Church's corporate witness to opine that the Plan was governed by the 2006 Plan Document and that Harris was the Plan trustee.  Symetra Exhibit 12 at 66:23–67:21[7]; Symetra Exhibit 57 at PageID 31805 (AMEC legal briefing in _Glover_ litigation where AMEC expressly takes position that 2006 Plan Document governs Plan).  This admission is telling because AMEC and its own legal team agreed the 2006 Plan Document was valid and governed the Plan.

Fourth, both AMEC's corporate representative and Plaintiffs' proffered retirement plan expert _conceded_ the 2006 Plan Document governed the Plan.  Facts ¶ 58; Symetra Exhibit 15 at

---

[7] Deposition Exhibit 37 is the 2006 Plan Document.

34:20–37:7.  While argument by AMEC's attorneys is not evidence, the admissions of AMEC's corporate representative and Plaintiff's expert are.  Plaintiffs' expert even opined in his own report that the 2006 Plan Document governed the Plan.  Symetra Exhibit 16 ¶ 65.

In response to all this, AMEC proffers only one argument: the copy of the 2006 Plan Document first filed in the record is not fully executed.[8]  But signatures are not required to make a legal document binding if there was mutual assent to be bound.  *T.R. Mills Contractors, Inc. v. WRH Enters., LLC,* 93 S.W.3d 861, 865 (Tenn. Ct. App. 2002) ("A written contract does not have to be signed to be binding on the parties.").  Such assent can be established by course of dealings. *Id.* at 866.  Especially where the party denying validity relies solely on the lack of evidence of a signed copy, courts can consider "whether the parties performed."  *Id.*  Here, AMEC knew Harris was administering the Plan pursuant to the 2006 Plan Document—he disclosed as much in both the 2006 and 2007 Annual Reports—and AMEC never objected to it.  That establishes mutual assent and makes the 2006 Plan Document binding through performance.  *R.J. Betteron Mgmt. Servs., Inc. v. Whittemore*, 769 S.W.2d 214, 216 (Tenn. Ct. App. 1988) (performance of terms for extended period of time constitutes requisite meeting of minds).  If such assent were not clear through performance, it is clear from AMEC's express reliance on the 2006 Plan Document in the prior *Glover* litigation.  Symetra Exhibit 12 at 66:23–67:21; Symetra Exhibit 57.

Moreover, any defect in the original execution of the 2006 Plan Document was cured when AMEC ratified it in 2019, when AMEC's General Secretary (Brian Cooper) executed the Corporate Resolution and AMEC's Treasurer and CFO (Richard Allen Lewis, Jr.) executed the

---

[8] Notably, there is no evidence the 2006 Plan Document was *not* fully executed in 2006. The Bishops and General Officers of AMEC in 2006 are either deceased or lack memory of what happened twenty years ago.  There is no testimony about *whether or not* the 2006 Plan Document was fully executed in 2006.  Statute of limitations were created specifically for such situations.

Plan Document itself on behalf of AMEC. Facts ¶¶ 68–69. Ratification fixes any flaw in the original execution of a document, making its validity retroactive to its original date. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 270 (Tenn. 2001) ("Although an unauthorized contract is generally voidable by the principal, a principal who ratifies that contract is bound by its terms as if he or she had executed it originally. . . . [R]atification by a principal relates back and supplies original authority to execute the contract.").

And there is no *evidence* supporting AMEC's contention that the 2006 Plan Document never took effect. No fact witness or expert testified that the 1997 Plan Document still governs. No post-2006 document references the 1997 Plan Document as the governing document. And while the 1997 Plan Document names the Commission as a Plan trustee, none of the Commission Chairmen since 2006 testified to believing the Commission was a Plan trustee. Facts ¶ 169. It is nonsensical to claim the Commission was a trustee of the Plan under the 1997 Plan Document for the fifteen years between 2006 and 2021 without anyone ever knowing it.

The Court should grant summary judgment to Symetra on this key issue and hold that the 2006 Plan Document is binding on AMEC and the Plan. *See In re Est. of Bone*, 677 S.W.3d 644, 650 (Tenn. Ct. App. 2023) ("The legal effect of a written contract or other written instruments is a question of law. This same standard applies to trust instruments.").

### D.    Symetra Is Not Liable For Transfers It Made Out Of The Annuity And Guaranteed Interest Contracts At Harris's Direction

Symetra entered into two annuity contracts and three GICs with AMEC. Each included an exculpatory provision authorizing Symetra to rely on directions received from agents of the contract owner and disclaiming any obligation by Symetra to challenge those directions:

> 2001 Annuity Contract:   "[Symetra] may rely on the written direction of the Contractholder and shall not be liable because of any failure to question or challenge such direction and certification regarding the issuance of an Annuity or payment of a cash distribution."  Symetra Exhibit 13 at E101 (PageID 30457).

<u>2007 Annuity Contract</u>:  "[Symetra] will accept Transfer requests . . . made by . . . the Contractholder . . . or other authorized person designated to Symetra in writing by the Contractholder . . .  Symetra will not be liable for any failure to question or challenge such request for Transfer as long as there is a valid signed authorization on record at Symetra."  Symetra Exhibit 70 at PageID 32276.

<u>2007 and 2008 GICs</u>:  "Symetra Life shall not be obligated to issue an annuity or to make a cash distribution until it receives a written directive containing the terms and conditions, manner and amounts of such annuity or cash distribution.  . . .  Symetra may rely on the written directive and shall not be liable because of any failure to question or challenge such directive regarding the issuance of an annuity or payment of a cash distribution."  Symetra Exhibit 69 at IV.2 (PageID 32258); Symetra Exhibit 202 at IV.2 (same).

AMEC does not dispute that these four agreements are valid and binding.  Its only argument has been that each expired when the relevant funds were fully paid.  This Court already rejected that argument, ruling "if AMEC can hold Symetra liable for actions undertaken pursuant to the 2007 GIC or the 2008 GIC, then Symetra should be able to invoke the exculpatory clauses found in those agreements, even though the contracts matured over a decade ago."  ECF No. 929, at PageID 15968.  In violation of these exculpatory provisions, AMEC and the Plan are attempting to hold Symetra liable for transfers made pursuant to written directions from Harris—such as the $10 million transfer made in 2008 out of the maturing 2007 GIC.

These exculpatory clauses are enforceable under Tennessee's non-exclusive three-factor test.  *Copeland v. Healthsouth/Methodist Rehab. Hosp., LP*, 565 S.W.3d 260, 274 (Tenn. 2018).  <u>First</u>, there is no disparity in bargaining power between the Plan and Symetra.  If anything, the Plan had substantially more bargaining power than Symetra: there are many insurance companies offering fixed annuity contracts, and many specifically offered to sell annuities to the Plan, while the Plan was a large retirement plan and one of Symetra's largest clients.  <u>Second</u>, the exculpatory language in the clauses is express and clear: their entire purpose is to disclaim Symetra's responsibility to determine whether instructions it receives from authorized representatives of the

contract owner are prudent or appropriate.  These clauses are not ambiguous, there is no other way to read them, and they serve no  purpose other than to make it administratively feasible for Symetra to perform under the contracts (without running down rabbit holes every time a transfer is made) and to protect Symetra from liability when it follows directions.  Third, these exculpatory clauses violate no public policy or interest.  Indeed, like all insurance products, the form and provisions of these annuity products are expressly approved by state insurance regulators before they are sold. Tenn. Code Ann. § 56-7-2311.  These exculpatory clauses further the public interest in allowing sophisticated parties to define the scope of their relationship and in allowing annuity providers to pay their highest rates without risk of inadvertently assuming responsibility as private investigators or investment advisors.  All three *Copeland* factors favor enforcing the exculpatory clauses.

1.  **Symetra Is Not Liable for the $10 Million Transfer in 2008 Under the Terms of the GIC**

Perhaps the most important transaction in this case is the $10 million transfer Symetra made at Harris's direction in March 2008 from a maturing 2007 GIC to a Bear Stearns Account for the benefit of Financial Freedom Funds, LLC ("FFF").  Facts ¶ 93.  Symetra cannot be liable for this transaction because the 2007 GIC expressly states that "Symetra Life may rely on the written directive *and shall not be liable* because of any *failure to question or challenge* such directive regarding the issuance of an annuity or payment of a cash distribution."  Symetra Exhibit 69 at IV.2 (PageID 32258).  In executing the $10 million transfer, Symetra relied on Harris' written directive.  Facts ¶¶ 97–98.  The 2007 GIC's exculpatory clause requires that Symetra not be liable for executing, versus challenging, this directive.  AMEC's (and Plaintiffs') entire claim against Symetra as to this transaction is that Symetra had a duty to challenge Harris's directive and report it to (unnamed) others at AMEC.  That theory of liability is incompatible with the exculpatory clause and should be rejected.  Symetra is entitled to summary judgment that it cannot be liable

for executing the $10 million transfer in March 2008 to FFF.

> **2.    Symetra Is Not Liable for Other Transfers from the Annuity and Guaranteed Interest Contracts**

The same reasoning applies to the rest of the transfers Symetra made from the annuity contracts and GICs to FFF and Motorskill between 2008 and 2013. Facts ¶ 146 (listing all transfers). Each was made at Harris's direction in his capacity as a representative of AMEC, the contractholder. And each of the four governing contracts includes an exculpatory provision that permits Symetra to rely conclusively on those directions and releases Symetra from any obligation to question or challenge those directions. Thus, Symetra was entitled to rely on Harris's directives without fear of liability. The same is true of the administrative fees Symetra paid DRS at Harris's direction, as they were also made via written directive of Harris as representative and agent of AMEC. Facts ¶¶ 28–30. Accordingly, the Court should grant summary judgment to Symetra on its claim for declaratory relief that it is not liable for any transfers made out of the annuity contracts or GICs at the direction of Harris.

## II.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON AMEC'S AND THE PLAN'S LIABILITY FOR BREACH OF CONTRACT

Symetra is entitled to summary judgment on its claim that AMEC breached the 2001 Annuity Contract (Symetra Exhibit 13), 2007 Annuity Contract (Symetra Exhibit 70), 2007 GIC (Symetra Exhibit 69), 2008 GIC (Symetra Exhibit 202), and 2006 Plan Document (ECF No. 74-1) (collectively "five relevant contracts"). ECF No. 794 ¶¶ 144–156. Breach of contract requires (1) an enforceable contract, (2) a breach, and (3) damages caused by that breach. *McClanahan*, 660 F. Supp. 3d at 737. "Tennessee law allows a party to sue for the breach of a covenant not to sue," whether express or implied. *Trinity Faire, LLC v. Am.'s Collectibles Network, Inc.*, 2023 WL 6064297, at *4 (E.D .Tenn. Feb. 15, 2023). A contract's validity and the enforceability of an exculpatory clause are questions of law appropriate for summary judgment. *Id.*

Symetra is a party to the annuity contracts and GICs, and may sue under the 2006 Plan

Document as a third-party beneficiary. *E.O. Bailey & Co. v. Union Planters Title Guar. Co.*, 232

S.W.2d 309, 318 (Tenn. Ct. App. 1949) ("[I]t is a settled rule … that a contract for the benefit of

a third party may be enforced by the latter."). AMEC has never disputed the validity of any of the

annuity contracts and GICs. *Pharma Conf.*, 703 S.W.3d at 311 ("Whether a valid contract exists

is a question of law."). Harris, as an agent of AMEC, applied for each contract, and Symetra

accepted each offer and issued the contracts. All four are signed by both Harris (on the

applications, which are considered part of the contracts) and Symetra (via its President and

Secretary). Symetra Exhibit 13 at PageID 30454, 30464; Symetra Exhibits 66–70, 201–202. Both

AMEC and Symetra fully performed under these contracts (besides the exculpatory provisions,

which AMEC is breaching). *Whittemore*, 769 S.W.2d at 216 (performance under agreement for

extended period of time constitutes meeting of minds necessary to bind parties).

Symetra is a third-party beneficiary of the 2006 Plan Document. To establish third-party

beneficiary status, a party must show: "(1) a valid contract made upon sufficient consideration

between the principal parties and (2) the clear intent to have the contract operate for the benefit of

a third party." *TIG Ins. Co. & Fairmont Specialty Grp. v. Titan Underwriting Managers, LLC*,

2008 WL 4853081, at *2 (Tenn. Ct. App. Nov. 7, 2008). The 2006 Plan Document contains the

following exculpatory and indemnification provision:

> INSURER'S PROTECTIVE CLAUSE: Except as otherwise agreed
> upon in writing between the Employer and the insurer, an insurer which
> issues any Contracts hereunder shall not have any responsibility for the
> validity of this Plan or for the tax or legal aspects of the Plan. The
> insurer shall be protected and held harmless in acting in accordance with
> any written direction of the Trustee, and shall have no duty to see to the
> application of any funds paid to the Trustee, nor be required to question
> any actions directed by the Trustee. Regardless of any provision of this
> Plan, the insurer shall not be required to take or permit any action or

> allow any benefit or privilege contrary to the terms of any Contract
> which it issues hereunder, or the rules of the insurer.

ECF No.74-1 § 9.8 (PageID 974). This provision unambiguously operates for the benefit of third-party insurance companies, like Symetra, that issue contracts to the Plan. Indeed, the provision does nothing else. The 2006 Plan Document is valid for the reasons described above in Section I.C. Thus, Symetra can enforce this provision against AMEC and the Plan (which are both parties to the 2006 Plan Document).

The five relevant contracts' exculpatory clauses are enforceable under Tennessee's three-factor test described in Section I.D. AMEC and the Plan breached these clauses—which provide that Symetra will not be held liable for following Harris's orders—when they sued Symetra for precisely that. The gravamen of both the Plan's (via Plaintiffs' derivative claims) and AMEC's claims against Symetra is that Symetra should have challenged, not executed, the transfer and disbursement orders it was given by Harris. Those claims directly contradict the promise AMEC made (for itself and the Plan) in each of the five relevant contracts. Thus, AMEC and the Plan have breached these contracts.

That breach undeniably harmed Symetra by imposing the enormous costs of defending itself in this lawsuit, including years of attorney fees, expert fees, discovery costs, and data storage. Symetra is incurring these costs as a direct and proximate result of being sued by the Plan and AMEC in this lawsuit. All four elements of Symetra's breach of contract claim are satisfied, so Symetra is entitled to Summary Judgment that AMEC breached its contracts with Symetra.

## III.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON ITS NEGLIGENT MISREPRESENTATION CLAIM AGAINST AMEC

Summary judgment in Symetra's favor is also warranted on its negligent misrepresentation claims against AMEC and the Plan based on the representations made to Symetra in the five relevant contracts.

Establishing this claim requires showing that AMEC and the Plan: (1) acted in a transaction in which they had a pecuniary interest, (2) supplied false information meant to guide Symetra in its transactions with the Plan, and (3) failed to exercise reasonable care in communicating the false information, along with (4) justifiable reliance on the false information. *See John Martin Co. v. Morese/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991); Restatement (Second) of Torts § 552.

First, all of the five relevant contracts relate to *financial* transactions between Symetra on the one hand and AMEC and the Plan on the other (*i.e.*, transactions in which AMEC and the Plan had a pecuniary interest). Second, the exculpatory provisions in the five relevant contracts all contain clear representations meant to guide Symetra in the way it interacted with AMEC and the Plan. The provisions unambiguously represent that Symetra was not a fiduciary and that the scope of Symetra's involvement with the Plan did not include vetting or challenging transfer and disbursement orders received from representatives of AMEC and the Plan. Having sued Symetra for precisely this, AMEC and the Plan have rendered these representations false.

Third, if Plaintiffs and AMEC are allowed to proceed on their claims that Symetra was required to challenge and vet Harris's directives, then AMEC and the Plan failed to exercise reasonable care when falsely representing to the contrary. Indeed, a basic premise of AMEC's and Plaintiffs' claims is that Symetra was a fiduciary of the Plan and had a duty to vet Harris's directives. AMEC and the Plan could not simultaneously intend for Symetra to be a fiduciary (or to otherwise have a duty to challenge Harris's orders) and also execute contracts with written representations to the contrary without those representations being at least negligently false, if not recklessly or even intentionally false. Fourth, Symetra justifiably relied on the representations when it executed Harris's directives without vetting or challenging them. There can be no genuine dispute that Symetra was justified in relying on exculpatory provisions as clear and straightforward as those

-19-

in the five relevant contracts.

Because all four elements of the claim are met, the Court should grant summary judgment to Symetra on its negligent misrepresentation claims against AMEC and the Plan.

## IV. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON ITS CROSS-CLAIM FOR INDEMNIFICATION FROM AMEC

The 2003 RSA is not the only written document in which AMEC and the Plan promised to indemnify Symetra for any liability incurred as a result of following Harris's orders. Both the 1997 Plan Document and the 2006 Plan Document include exculpatory provisions that hold harmless Symetra, as an insurer issuing contracts to the Plan, for following Harris's directions. As discussed in Section I.C, Harris is defined as the Plan trustee under the 2006 Plan Documents. As the Executive Director of DRS, Harris is the agent of the Plan under the 1997 Plan Document.

AMEC is a party to both Plan Documents, and in each Document AMEC promises and represents that Symetra "shall be protected and held harmless in acting in accordance with any written direction of the Trustee, and shall have no duty to see to the application of any funds paid to the Trustee, nor be required to question any actions directed by the Trustee." Symetra Exhibit 1 § 9.7 (PageID 29898); ECF No. 74-1 § 9.8 (PageID 974). As the express third-party beneficiary of these clauses, *see supra* Section II, Symetra may enforce them against AMEC.

The hold harmless provisions of the 1997 and 2006 Plan Documents are clear and unambiguous, so their meaning must be determined by the Court as a matter of law. *Pharma Conf.*, 703 S.W.3d at 311. Where the meaning of a provision, like the insurer protection clauses in the 1997 and 2006 Plan Documents, is "plain, complete, and unambiguous, the intention of the parties must be gathered from that language, and from that language alone." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 891 (Tenn. 2002). There is nothing unclear or the least bit ambiguous about the promises at issue in the 1997 and 2006 Plan Documents, so the

Court should enforce them on summary judgment.

A hold harmless provision includes a promise to indemnify. "The term 'hold harmless' is synonymous with the word 'indemnify.'" *Long v. McAllister-Long*, 221 S.W.3d 1, 10 (Tenn. Ct. App. 2006). "An agreement to 'hold harmless' is a contract of indemnity, which requires the indemnitor to prevent loss to the indemnitee or to reimburse the indemnitee for all losses suffered from the designated peril." *Pinney v. Tarpley*, 686 S.W.2d 574, 579 (Tenn. Ct. App. 1984). A hold harmless agreement is a promise to prevent liability all together, so the right of action accrues as soon as the promise is subject to litigation costs. *Long*, 221 S.W.3d at 10. Thus, AMEC is liable to Symetra _now_ because Symetra has been sued—by both the Plan and AMEC—and has already started generating damages in the form of litigation costs and attorneys' fees.

Symetra's entitlement to summary judgment on its contractual indemnification claim is straightforward and simple. First, the Court should rule that the 2006 Plan Document is a valid contract between Harris and AMEC and governs the Plan. *See supra* Section I.C. But even if the Court does not make that ruling, all the parties agree the 1997 Plan Document is a valid contract and governs the Plan. Second, both Plan Documents name Harris as a trustee. *See supra* Section I.A.2. Third, both Plan Documents contain clear unambiguous insurer protection clauses requiring AMEC to hold harmless—and therefore indemnify and defend—insurers that issue contracts to the Plan. Symetra is an insurer that issued contracts to the Plan, so it is a third-party beneficiary of those clauses. None of this is even remotely disputed, so Symetra is entitled to enforce the Plan Document (whichever one the Court rules is applicable) against AMEC, and AMEC is required to hold harmless and indemnify Symetra.

## V.    AMEC'S CROSS-CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

"Defenses based on a statute of limitations are particularly amenable to summary judgment motions." *Cherry v. Williams*, 36 S.W.3d 78, 83 (Tenn. Ct. App. 2000). When a party seeks

judgment as a matter of law on a statute of limitations, the Court must decide two questions: "whether (1) the statute of limitations has run and (2) whether there exists a genuine issue of material fact as to when the plaintiff's cause of action accrued." *Henry v. Norfolk S. Ry. Co.*, 605 F. App'x 508, 510 (6th Cir. 2015). Because the statute of limitations is an affirmative defense, "the burden is on the defendant to show that the statute of limitations has run. . . . If the defendant satisfies this requirement, then the *burden shifts to the plaintiff* to establish an exception." *Id.* Here, because all of AMEC's claims accrued long before March 4, 2019,[9] they are time-barred.

### A.    The Statute Of Limitations Began To Run On All Alleged Wrongful Acts At The Time They Occurred

The statute of limitations for breach of fiduciary duty, negligence, and fraudulent concealment is three years. Tenn. Code § 28–3–105 (breach of fiduciary duty); *Tip's Package Store, Inc. v. Com. Ins. Managers, Inc.*, 86 S.W.3d 543, 550–52 (Tenn. Ct. App. 2001) (negligence); *Roane Cnty., Tenn. v. Jacobs Eng'g Grp., Inc.*, 2020 WL 5836553, at *3–4 (E.D. Tenn. Sept. 30, 2020) (fraudulent concealment). All of AMEC's principal tort claims are subject to a three-year limitations period. AMEC's claims are barred by the applicable statutes of limitations for the same reasons that Plaintiffs' claims are barred, as described in Symetra's motion for summary judgment against Plaintiffs. *See* ECF No. 982-2 at PageID 29783–29795.

AMEC's claims are based on the same multiple discrete alleged acts alleged by Plaintiffs in their Complaint, all of which occurred long before suit was first filed and well outside the limitations period. First, AMEC complains about transfers directed by Harris out of the annuity contracts and GICs to FFF and Motorskill, all of which occurred prior to 2014. ECF No. 570 ("Cross-Compl.") ¶¶ 104, 110, 229-30; Facts ¶¶ 55, 98, 141. Second, AMEC complains that

---

[9] The first-filed action consolidated into this MDL proceeding was *Ewing v. Newport Group*, Case No. 2:22-cv-02136 (W.D. Tenn), which was filed on March 4, 2022.

Symetra followed Harris's directives to disburse allegedly excessive administrative fees back to DRS on a quarterly basis starting in 2002. Cross-Compl. ¶¶ 172-73, 200.[10]  Third, AMEC complains that Symetra paid ongoing trail commissions to Eaton since 2002 for brokering the annuity contracts and GICs. *See* Cross-Compl. ¶¶ 52-60.[11]  Fourth, AMEC complains that Symetra lacked "due diligence" and internal "controls" for these acts, all based on activity that occurred far outside the limitations period. Cross-Compl. ¶¶ 34 (alleging that *in 2008*, when Symetra allegedly had notice of suspicious activity, Symetra helped Harris with his reelection campaign); 81 ("Not long after AMEC purchased its Group Variable Annuity from Symetra *in 2001*, Symetra similarly began treating Harris as the sole decision maker"), 177-81, 184, 194.

The statute of limitations begins to run "when a plaintiff discovers, or in the exercise of reasonable care and diligence, should have discovered his injury and the cause thereof." *Roane Cnty.*, 2020 WL 5836553, at *4. This "discovery rule" has a duty to investigate built into it, which includes a duty to "discover pertinent facts through the exercise of reasonable care and due diligence." *Smith v. Amazon Fulfillment Servs., Inc.*, 2021 WL 4693522, at *3–4 (E.D. Tenn. Oct. 7, 2021). If a "lack of knowledge was due to a lack of due diligence, [plaintiffs] will not be allowed to plead ignorance and effectively extend the statute of limitations, . . . simply because they later discovered new information that they reasonably should have discovered much earlier." *Id.* The statute of limitations on AMEC's claims began to run when the Plan and AMEC knew or should have known of Symetra's allegedly wrongful acts.

---

[10] As discussed *infra*, there was nothing unlawful about these fees. They were paid to DRS. Indeed, when Dr. Miller replaced Harris as Executive Director, he reinstated the fees. Facts ¶ 31.

[11] AMEC wrongly implies these commissions came from Plan assets, when in reality they are paid by Symetra out of Symetra's own general funds, not out of Plan assets. *Compare id.* ¶ 52 *with* Facts ¶ 18. Consequently, these commissions did not cause any loss to the Plan.

There can be no dispute that the Plan and AMEC had actual knowledge of the conduct of which AMEC complains. AMEC does not dispute that Harris knew about this conduct. And between 2001 and 2021 Harris was a duly elected General Officer of AMEC and the Executive Director of DRS. Under both the 1997 and 2006 Plan Documents, Harris was also a trustee of the Plan. Thus, Harris's knowledge is imputed to the Plan and AMEC, giving them real time knowledge of all the conduct about which they complain. Moreover, AMEC had both a Commission and a General Board that were supposed to be supervising Harris, but failed to do so. Had AMEC engaged in any such supervision between 2001 and 2018, it would have immediately discovered all the conduct at issue, just as Miller did when he took over for Harris with a 5-minute phone call to Symetra and a few weeks of investigation. Facts ¶ 176.

Transfers and Administrative Fees. Harris had actual knowledge of transfers from Symetra annuities to non-annuity investments, like FFF and Motorskill (the last of which occurred in August 2013), and repeatedly notified the Commission and General Board of his efforts to "diversify" the Plan's investments and his ability to obtain above-market returns. Facts ¶¶ 74, 123, 136, 149, 166, 174. Harris also knew about the DRS administrative fees, since he was the one who directed them and then received from on behalf of DRS. Facts ¶ 28. And the evidence shows that AMEC (and Plan participants) were very much aware of these fees, as they were a topic of "ongoing conversations." *Id*. Moreover, the Commission and General Board had the duty and opportunity to ask questions and seek additional information from Harris for two decades, including each year when he presented his Annual Report. Neither body ever did. Facts ¶¶ 132-34, 150, 165-66, 168, 172-74, 176. Had they done so—or had they ever asked Newport for any information on the Plan's investments and fee payments—they would have discovered all of the transfers Harris made with Plan money.

-24-

Eaton Commissions.  AMEC alleges: "Unbeknownst to the AMEC General Board, the AMEC Commission on Retirement Services, or any other AMEC bodies or officers, Eaton received a commission from Symetra" for brokering the initial 2001 transaction.  Cross-Compl. ¶ 52.  But even if the Plan and AMEC did not know that Eaton would be paid a commission in 2001, Eaton's commissions became expressly known to AMEC and the Plan in 2004 when Eaton requested that Symetra assign his commissions to AMEC Financial Services, LLC, an entity Harris created with the authority of the AMEC General Board.  Facts ¶ 50; Cross-Compl. ¶¶ 56-58.

AMEC cannot invoke the "adverse interest exception" here (just as Plaintiffs cannot) for the reasons explained in Symetra's reply brief in support of its motion for summary judgment against Plaintiffs.  ECF No. 1063 at PageID 40716–40717.  Namely, the doctrine does not apply to constructive notice or relieve a plaintiff of its duty to investigate and to supervise its agents.  Moreover, the adverse-interest exception has its own exception, the "sole representative doctrine," which holds that the "adverse interest exception does not apply where the transaction on behalf of the [entity], to which notice is sought to be imputed, is entrusted solely to the officer or agent having the knowledge."  3 Fletcher Cyc. Corp. § 827; *accord* Restatement (Third) of Agency § 5.04 (2006) cmt. d (where agent controls principal's decision-making, the two actors are treated as one even when agent is engaged in wrongdoing).  To the extent AMEC did not know about Harris's activities, it was only because they allowed him to be the sole representative of the Plan and then failed to make a reasonable effort to supervise him.  That failure means AMEC was on constructive notice of all the conduct about which they complain long before 2019.

Similarly, AMEC (like Plaintiffs) cannot extend the statute of limitations with its conspiracy and aiding-and-abetting claims.  As described in Symetra's motion for summary judgment against Plaintiffs, conspiracy and aiding-and-abetting claims use the same statute of

limitations as the underlying torts and limitations on these claims expires when the limitations

period would expire on the underlying torts. *Swafford v. Memphis Individual Prac. Ass'n*, 1998

WL 281935, at *11–12 (Tenn. Ct. Capp. June 2, 1998); *Coll Nat'l Ass'n of Christian Athletes*,

2023 WL 128275, at *5 (Tenn. Ct. App. Jan. 9, 2023); ECF No. 982-2 at PageID 29794–29795.

**B.      There Is No Evidence To Support Fraudulent Concealment and Therefore No Issue of Material Fact**

In Tennessee, the statute of limitations "may be tolled for a period of time where the

defendant has taken actions to fraudulently conceal a cause of action." *In re Estate of Davis*, 308

S.W.3d 832, 841 (Tenn. 2010). The "doctrine of fraudulent concealment is aligned with the

discovery rule." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 462 (Tenn.

2012). As a result, fraudulent concealment tolling overlaps with the discovery rule such that there

is no tolling once a claim has accrued. *See Smith v. Hilliard*, 578 F. App'x 556, 562–64 (6th Cir.

2014) (fraudulent concealment did not apply for same reason discovery rule did not render claims

timely, namely because plaintiffs lacked "reasonable care and diligence").

Regardless, AMEC cannot satisfy the test for fraudulent concealment. To do so, a plaintiff

must present evidence to support and must ultimately prove: "(1) the defendant affirmatively

concealed the plaintiff's injury or failed to disclose material facts regarding the injury despite a

duty to do so; (2) the plaintiff could not have discovered the injury despite reasonable care and

diligence; (3) the defendant knew the plaintiff had been injured; and (4) the defendant concealed

material information from the plaintiff by withholding information making use of some device to

mislead the plaintiff in order to exclude suspicion or prevent injury." *McClanahan*, 660 F. Supp.

3d at 748. The burden is on AMEC to prove fraudulent concealment for purposes of tolling. *Id.*;

*Redwing*, 363 S.W.3d at 464.

AMEC cannot satisfy any, let alone all four of the elements required for fraudulent

concealment tolling.  <u>First</u>, Symetra disclosed all of its actions to the Plan's designated agent, Harris, and there is no evidence Symetra in any way concealed its actions from anyone at the Church.  Church leadership consistently testified that they did not request or expect to receive any reports or communications from Symetra and instead expected Symetra would communicate solely with Harris.  Facts ¶ 87.  <u>Second</u>, if it was not already aware, AMEC could have easily and readily learned about all the conduct at issue by asking Symetra and Newport for documentation of the Plan's investments and fees.  AMEC did nothing to monitor Harris or his investments and fees, even though Harris repeatedly reported for years that he was actively managing the Plan's funds, diversifying investments into real estate and non-annuity assets, and beating the market.  Facts ¶¶ 41, 89, 132-34, 149-50, 165-66, 168, 172-74.  This type of willful ignorance fails the second requirement for fraudulent concealment.

Third, there is no evidence Symetra had any "actual knowledge" Harris was causing injury to the Plan.  There is no evidence Symetra knew or believed the Plan was being harmed, that the investments in FFF or Motorskill were going to lose money, that Harris was requesting improperly large administrative fees, or that Harris misappropriated money from checks Symetra issued.  Facts ¶ 147.  AMEC's conclusory allegation that Symetra had such knowledge is not evidence and cannot create a genuine dispute of fact.

Fourth, there is no evidence that Symetra withheld any information from the Plan or AMEC or ever used any device to mislead anyone.  The evidence is undisputed that all of Symetra's statements provided to AMEC were accurate and that Symetra never refused to provide information that was requested.  Facts ¶ 25.

For these reasons, AMEC cannot possibly establish fraudulent concealment tolling.

## VI.    SYMETRA IS ENTITLED TO SUMMARY JUDGMENT ON ALL AMEC'S CROSS-CLAIMS BECAUSE AMEC HAS PROFERRED NO ADMISSIBLE EVIDENCE OF CAUSATION OR DAMAGES

Each of AMEC's cross-claims requires causation and damages.  *White v. Miller*, 2018 WL 4847109, at *3 (Tenn. Ct. App. Oct. 5, 2018) (elements of fiduciary duty claim); *Tenn-Fla Partners v. Shelton*, 233 S.W.3d 825, 830 (Tenn. Ct. App. 2007) (elements of negligence claim); *Vic Davis Constr., Inc. v. Lauren Eng'rs & Constructors, Inc.*, 2019 WL 1300935, at *7 (Tenn. Ct. App. Mar. 20, 2019) (elements of fraudulent concealment); *Lawyers Title Co., LLC v. Kingdom Title Sols., Inc.*, 592 F. App'x. 345, 355 (6th Cir. 2014) (causation and damages required for civil conspiracy); *Williams v. Lasik Inst., LLC*, 2021 WL 4482968, at *12 (W.D. Tenn. Sept. 29, 2021) (causation and damages required for aiding and abetting claim).

AMEC alleges that it "has suffered significant reputational and structural harm as a result of Symetra and Newport's participation in Harris and Eaton's scheme" resulting in damages in the form of  "reduced tithing, shrinking membership, and the resignation of clergy."  Cross-Compl. ¶ 195.  But, despite Symetra's repeated requests for data and information supporting these purported damages, AMEC has produced none.  Indeed, Symetra won a motion to compel this information from AMEC, and it has a pending motion for sanctions against AMEC for still failing to produce it.  *See* ECF Nos. 944, 1064-1.  To be clear:  AMEC has produced no data or documents or admissible evidence of any kind supporting its claims for lost tithing, lost membership, lost clergy, lost reputation, or lost institutional value.  It is now too late and Symetra it entitled to summary judgment on all of AMEC's cross-claims for lack of evidence of quantifiable damages.

AMEC will inevitably point to the report of its damages expert, J. Lester Alexander, as a supposed cure-all for its complete lack of damages evidence.  But Alexander expressly disclaimed opining on causation, and his damages analysis does not utilize or cite any data or documents on tithing, membership, clergy, reputation, assets, or institutional value.  In fact, Alexander's entire

report uses only a single number from AMEC: the 2002 revenue number reported by the Church's department of Finance.  As described in Symetra's *Daubert* motion, Alexander's report is so untethered from any actual analysis of AMEC and so plainly unreliable and nonsensical that it must be excluded.  ECF No. 940.

**A.    AMEC Has No Data, Documents, or Testimony Supporting its Allegation of Damages Caused by Symetra**

AMEC alleges it suffered reduced tithing, loss of membership and clergy, reputational harm, and loss of institutional value as a result of Symetra's actions related to the Plan, but AMEC has produced no evidence supporting any of this.  ECF No. 1064-1, at PageID 40804–40808. There is no need to wait for the disposition of Symetra's Sanctions Motion to resolve this aspect of summary judgment.  The discovery record is closed, and no document or information produced by AMEC, or any other party, to date supports in any way AMEC's claim that Symetra's actions materially injured AMEC's reputation, and/or that this alleged loss of reputation reduced AMEC's organizational value or led to reduced tithing, asset values, membership, or clergy.

Reasonably concrete and quantifiable damages are an element of all AMEC's cross-claims and AMEC cannot possibly carry the burden of establishing this element. By itself, this requires summary judgment in Symetra's favor on all AMEC's cross-claims.

**B.    Mr. Alexander's Opinions Do Not Fill the Evidentiary Gaps in the Summary Judgment Record, and Are Otherwise Inadmissible**

Because the factual record is barren of damages evidence, Symetra predicts AMEC will attempt to rest on the shoulders of its designated damages expert, Alexander.  But Alexander's report and opinions cannot bear this burden.  Alexander disclaims offering opinions on causation, including whether Symetra's acts were related in any way to the alleged lost value being calculated. Alexander does purport to measure damages, but Symetra's *Daubert* Motion explains in detail why his methodology and opinions are unreliable and therefore inadmissible.

First, Alexander disclaims any opinion about causation, a subject he did not study in this case. Stated plainly, he has no opinion about the ways, if any, that "the alleged wrongful acts harmed the ability of the AMEC to carry out its mission." ECF No. 940 at PageID 20020 (citing Alexander Dep. at 143–44). Alexander also disclaims reaching conclusions regarding the "actual impact" of disclosure of the Plan's losses on the Church's finances, value, or long-term viability as a going concern. As he explained it, "I'm not calculating the actual impact. That would be an additional damage. I'm only calculating the reputational loss." *Id.* (citing Alexander Dep. at 69). The "reputational loss" he purported to estimate "is based on perceptions and increased risk," while the "actual damage" he did *not* calculate "is the actual loss." *Id.* at PageID 20020 (citing Alexander Dep. at 69).

These gaps are fatal to the reliability of Alexander's report. Alexander never explains—let alone proves with evidence—what harm AMEC suffered. And since Alexander provides no explanation—let alone evidence—of what harm AMEC suffered, he cannot possibly reliably quantify that harm. Similarly, Alexander's report is completely bereft of any discussion of any of the Defendants' conduct and any attempt to tie that conduct to any injury. As result, there is no evidentiary support for any connection between the conduct alleged in this case and whatever damages Alexander is purporting to measure. Alexander's entire damages analysis is as untethered to this case as it is inscrutable.

Though his calculations purport to quantify in dollar terms the size of AMEC's reputational harm, Alexander did not determine whether AMEC's reputation has *in fact* been harmed, let alone by any of the Defendants' conduct. He did not "conduct a survey of AMEC parishioners' views on its reputation" at any time. *Id.* (citing Alexander Dep. at 134). Nor has he seen "even anecdotal sort of studies or reports on the perceptions of AMEC parishioners' views of AMEC." *Id.* Nor

has he "quantified the loss of support from membership, if any, caused by the acts at issue in this case." *Id.* (citing Alexander Dep. at 164-65). Nor does the loss he calculates "tak[e] into account reduced contributions," if any, by parishioners. *Id.* (citing Alexander Dep. at 70-71). Alexander does not even know whether or to what extent "AMEC's injury is permanent." *Id.* (citing Alexander Dep. at 132). Alexander cannot possibly reliably measure damages if he does not know whether or how AMEC was harmed or whether any such harm was permanent.

Alexander's damages analysis is also itself completely unreliable and therefore inadmissible. His damages model does not even attempt to fit the facts of the case. As described in detail in Symetra's *Daubert* Motion, Alexander purports to calculate damage as the difference between AMEC's original "unimpaired" value as a religious enterprise and its "impaired" value as a result of the disclosure of the Plan's losses. But with the exception of one revenue number from 2022, the inputs Alexander uses in his model have nothing to do with AMEC or the facts of this case and are all facially unreliable. *Id.* at 20024-20031. Because Alexander's model and opinions are unreliable, summary judgment to Symetra on causation and damages is warranted.

## VII. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON AMEC'S CROSS-CLAIM FOR BREACH OF FIDUCIARY DUTY

To recover for breach of fiduciary duty, AMEC must establish: (1) a fiduciary relationship with Symetra, (2) breach of duty, and (3) injury (4) resulting from that breach. *Faber v. Ciox Health, LLC*, 331 F. Supp. 3d 767, 780 (W.D. Tenn. 2018). "The existence or nonexistence of a duty owed to the plaintiff by the defendant is entirely a question of law for the Court." *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993). In Tennessee, a party can be either a fiduciary per se, or a functional fiduciary. *Faber*, 331 F. Supp. 3d at 780. Symetra is neither.

### A. Symetra Owes No Fiduciary Duty to AMEC

AMEC claims Symetra owed it a duty "as the carrier of tens of millions of dollars of Plan

funds," because "it had authority and control respecting management or control of Plan assets," and "by virtue of its custom and practice of providing investment advice and compliance advice." Cross-Compl. ¶ 419; ECF No. 958, at PageID 20647-20648. In deciding Symetra's motion to dismiss, the Court concluded AMEC had not alleged anything that could establish Symetra owed a duty due to a confidential relationship (*i.e.*, a functional fiduciary). *See* ECF No. 958, at PageID 20646. The Court said AMEC's theory instead "appears to be that Symetra acted as a fiduciary *per se*" and concluded that none of its allegations regarding its relationship with Symetra fit into any of a handful of specific per se fiduciary categories. *Id.* at PageID 20646-20647. However, AMEC's claim was saved by its allegations that it entrusted Symetra to safely manage the Plan's funds, Symetra knew Harris was not the trustee or at least not the sole decisionmaker, and the transfers were a "dramatic shift away from AMEC's stated objective of investing in conservative annuities." *Id.* at 20649-20650. None of these allegations withstood discovery.

First, AMEC's assertion that Symetra was a "carrier" of Plan funds does not create a fiduciary duty. AMEC has never defined what it means by "carrier," and there is no evidence Symetra controlled or managed Plan assets. Symetra sold the Plan two group annuity contracts and GICs. Facts ¶¶ 21, 75–77. All four contracts paid fixed interest, and the premiums the Plan paid into those contracts were put in Symetra's general account, such that Symetra bore the risk associated with paying the interest. Facts ¶¶ 21, 75, 77-78. Symetra provided basic non-discretionary services pursuant to those contracts, including accepting premium payments, executing disbursement and transfer orders, and providing quarterly statements on the value of the contracts. Facts ¶¶ 38, 80, 82.

It is well established that selling annuities and GICs to a retirement plan does <u>not</u> make an insurance company a fiduciary, even under ERISA. *See Flacche v. Sun Life Assur. Co. of Canada*

*(U.S.)*, 958 F.2d 730, 734–35 (6th Cir. 1992) (insurer who sold group annuity contract to retirement plan was "not a fiduciary"; "mere payment of claims is insufficient to give [insurer] discretionary control over the management of plan assets or [its] administration."); *Thompson v. Am. Gen. Life & Accident Ins. Co.*, 404 F. Supp. 2d 1023, 1028–29 (M.D. Tenn. 2005) (insurance policies … generally do not establish a confidential relationship or a fiduciary duty under Tennessee law); *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 521–522 (6th Cir. 1999) (sale of insurance contract did not create fiduciary duty; "to hold otherwise would impose fiduciary obligations … in the vast multitude of ordinary arm's-length transactions simply on the basis that the seller possessed superior knowledge of the product being sold").

While the Plan is not governed by ERISA, it is instructive that ERISA—which imposes fiduciary duties even broader than the common law—specifically addresses this issue. ERISA defines a "guaranteed benefit policy" to include insurance contracts like the annuity contracts and GICs here. *See* 29 U.S.C. § 1101(b)(2)(B). When an insurance company issues a guaranteed benefit policy, the "plan asset" is the policy itself (which is held and managed by the plan); amounts deposited into the contract and placed in the insurer's general account become assets of the insurer and are not plan assets. Consequently, the insurer is not managing plan assets and does not become a fiduciary by issuing the contract. As the Second Circuit explained in *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*:

> As defined in ERISA, one is a fiduciary with respect to a plan to the extent ... he exercises any discretionary authority or discretionary control respecting management ... or disposition of its assets ... 29 U.S.C. § 1002(21)(A). An insurance company holding a certain type of pension fund asset in its general account escapes the definition and the concomitant duties of a fiduciary in accordance with.

970 F.2d 1138, 1142–43 (2d Cir. 1992), *aff'd,* 510 U.S. 86 (1993). In light of this rule, courts routinely rule at summary judgment that insurance companies do not owe retirement plans

fiduciary duties based solely on the issuance of an annuity contract paying fixed interest where the deposits are put into the company's general account and the insurer guarantees payment and bears the risk of that payment. *See* ECF No. 958, at PageID 20647-20648 (citing cases).

In sum, Symetra is not managing Plan assets and did not become AMEC's fiduciary by issuing annuity contracts and GICs. Symetra indisputably guaranteed to pay the promised interest rate and bore the risk of doing so. That the Plan may have been entirely invested in a Symetra annuity contract in 2001 is not material and does not change the fact that the 2001 Annuity Contract paid a guaranteed rate of interest, and Symetra was not a fiduciary by virtue of this or its other contracts with AMEC and the Plan.

Second, AMEC's claim that Symetra "had authority and control respecting management or control of Plan assets" is groundless. There is no evidence Symetra ever engaged in any type of discretionary, managerial, or advisory conduct that would make Symetra a functional fiduciary separate from the annuity contracts and GICs. "Generally, parties dealing at arm's length lack the sort of relationship of trust and confidence that gives rise to a fiduciary relationship." *Grant v. Tucker*, 57 F. Supp. 3d 852, 859 (M.D. Tenn. 2014). "[A]n insurance company does not exercise 'discretionary control over the management of plan assets or the administration of the plan' simply by selling an annuity contract," ECF No. 958, at PageID 20648, or performing ministerial acts. *Flacche*, 958 F.2d at 734–35 (insurance company providing ministerial services to retirement plan was not a fiduciary); *Trs. of Laborers' Local No. 72*, 783 F. Supp. at 908 (similar).

The 2006 Plan Document—tracking language from ERISA—defines a fiduciary of the Plan as one who (a) exercises discretionary authority or control respecting management of the Plan or disposition of its assets, (b) renders investment advice for a fee or other compensation, or (c) has any discretionary authority or responsibility in the administration of the Plan. ECF No. 74-1,

-34-

§ 1.20, at PageID 919; *see also* 29 U.S.C. § 1002(21)(A). Symetra did none of these things. There is no evidence Symetra ever had discretion or control over how to manage or dispose of Plan assets. (As discussed above, monies deposited into the annuity are not Plan assets). Symetra could not and did not decide how or where the Plan would invest any of its assets or where to transfer any Plan assets. Instead, Symetra followed Harris's directions on how to disburse or transfer withdrawals from the annuity contracts or proceeds from a maturing GIC.

Nor did Symetra have any discretionary authority. Its role was ministerial: it accepted the premiums it was paid under its contracts and issued checks and transferred funds solely at Harris's direction under binding contractual terms. Facts ¶¶ 38, 80, 82. Similarly, AMEC's assertions that Harris was not the Plan trustee or authorized representative, that Symetra purportedly knew this, and that Symetra was therefore not entitled or required to follow his instructions are entirely unsupported by the record, as set forth in Section I(A).

Third, there is no evidence that Symetra gave investment advice to AMEC for compensation. As the Court recognized, AMEC's allegations that a Symetra employee once informally mentioned to Harris that real estate investments could not be used for personal benefit and another employee suggested to Harris that he should have an ERISA attorney review the 2008 $10 million transfer for possible conflicts (Cross-Compl. ¶¶ 100-101, 107), do not make Symetra a fiduciary or "show that Symetra had a custom or practice of giving advice on investments or compliance." ECF No. 958, at PageID 20648. Moreover, that Symetra advocated for its own products does not constitute investment advice as a matter of law. *See id.* ("selling annuity contracts is not the same things as rendering 'investment advice'") (citing cases).

## B.    Symetra Breached No Fiduciary Duty to AMEC

Even if Symetra owed a fiduciary duty or duty of care directly to AMEC (it did not), it did not breach any such duty. AMEC claims that Symetra breached a fiduciary duty by purportedly (1)

failing to establish and/or maintain controls, process, and procedures to protect the Plan; (2) failing to adequately ensure withdrawals and disbursements were made by an authorized Plan representative; (3) facilitating Dr. Harris in engaging in a long-term pattern of financial mismanagement; (4) allowing prohibited transactions to occur; and (5) paying "kickbacks" to Harris to induce him to keep Plan assets in Symetra annuities. Cross-Compl. ¶ 420. There is no genuine dispute that Symetra never breached any of these supposed duties.

First, Symetra had procedures for taking directions from the Plan, issuing checks and transferring money, and there is no evidence those procedures were lacking. For example, Symetra had a specific point person, Kathy Hastings, responsible for these ministerial tasks for almost the entire twenty years at issue. Facts ¶ 82. It also had an internal system where the Trustee (Dr. Harris) was identified. Facts ¶¶ 24, 174. At this stage of the proceedings, it is no longer sufficient for AMEC to make conclusory allegations regarding insufficient procedures. AMEC must instead articulate specifically what reasonable procedures and controls Symetra was obligated to have, and how those controls would have stopped Harris from diversifying the Plan's investments or misappropriating funds. AMEC has no such evidence.

Second, there is no evidence showing Symetra failed to ensure Harris acted within his authority when directing Symetra to make withdrawals if Symetra had a duty to do so, which it did not). Again, Harris was the sole Plan representative authorized to direct Symetra, at all times acting as authorized Plan representative. *See supra* Section I(A). Harris had actual and apparent authority to direct Symetra on the Plan's behalf, and Symetra did nothing unreasonable by following his orders. Not only did Symetra act reasonably, but Symetra could have reconfirmed and triple-checked Harris's authority and the result would have been the same, because Harris had the authority to direct Symetra and, with respect to transfers of Plan funds, Symetra had no discretion under the applicable

contracts to do anything other than carry out his directions.  Facts ¶¶ 7, 62, 76, 78.

Third, AMEC's claims that Symetra "permitted" Harris to engage in mismanagement and "allowed" prohibited transactions are unsupported.  There is no evidence Symetra knew Harris misappropriated monies or knew that any transactions were "prohibited."  The evidence that Symetra employees "suspected" Eaton may have a conflict is not enough to establish knowledge and certainly not evidence of knowledge with respect to Harris.  And under both the 1997 and 2006 Plan Documents, it was AMEC, not Symetra, who had a duty to monitor Harris.

Fourth, AMEC claims that Symetra paid administrative fees to Harris—which AMEC pejoratively calls "kickbacks"—to induce him to keep Plan assets in Symetra annuities.  But the payee on the check was the Plan (via Harris as trustee), not Harris himself, so these payments were neither "kickbacks" nor made to Harris.  Facts ¶ 182.  Nor is there any evidence that Symetra believed the fees were excessive or inappropriate or that Symetra was making the transfer to curry inappropriate favor with Harris.  Indeed, there is no evidence that Symetra even knew the total size of the Plan over time or what costs the administrative fees were intended to cover.  Symetra did not know Harris was misappropriating this money, and the evidence shows that a bank teller familiar with Harris allowed him to "cash and draw cashier's checks and credit funds to accounts of the Department and others" rather than depositing the full amount into DRS's account.  *Id.* ¶¶ 147, 182-83.  Accordingly, Symetra did not intentionally participate in any misconduct with respect to the fees paid to the Plan at Harris's direction.

Because Symetra neither owed nor breached a fiduciary duty to AMEC, summary judgment should be granted to Symetra on AMEC's breach of fiduciary duty claim.

## VIII.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON AMEC'S CLAIM FOR NEGLIGENCE

Under Tennessee law, a negligence plaintiff must prove:  "(1) a duty of care owed by the

defendant to plaintiffs; (2) breach; (3) an injury; (4) causation in fact; and (5) proximate or legal

cause." *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 286–87 (6th Cir. 2017).

There is no affirmative duty to act for another in the absence of a "special relationship." ECF No.

197, at PageID 2527. Whether the defendant owes a duty to plaintiff is "a question of law for the

court." *Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 932 (6th Cir. 2006).

AMEC claims Symetra owed it a duty "to safeguard the funds trusted in its care" because

Symetra provided "administrations services" to the Plan. Cross-Compl. ¶ 461. But AMEC has

not defined what those services are or how they could endow Symetra with an affirmative duty to

act for the Plan's protection. Symetra owed a duty only to the extent of the products and services

it agreed contractually to provide to the Plan, because it had no special relationship with AMEC.

There is no evidence Symetra's relationship with AMEC or the Plan was ever anything other than

an arm's-length business relationship.

Even if Symetra owed such a duty of care, it did not breach it. AMEC claims Symetra did

so by failing to establish and maintain controls against unauthorized transfers and failing to use

those processes if they did exist. *Id.* ¶¶ 462-63. There is no evidence that the prevailing standard

of care for an annuity provider includes such safeguards. Nor is there evidence Symetra was bound

to provide such controls. Facts ¶¶ 7, 62, 76, 78.

Because there is no evidence of any generalized duty of care that Symetra owed to AMEC

and no evidence of any, Symetra is entitled to summary judgment on AMEC's negligence claims.

## IX.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON AMEC'S FRAUDULENT CONCEALMENT CROSS-CLAIM

Fraudulent concealment is "committed when 'a party who has a duty to disclose a known

fact or condition fails to do so, and another party reasonably relies upon the resulting

misrepresentation, thereby suffering injury." *Roane Cnty.*, 2020 WL 5836553, at *3. To establish

this claim a plaintiff must show:  (1) concealment of a material fact; (2) a duty to disclose the fact

to the plaintiff; (3) the concealment was done to deceive; (4) the plaintiff was unaware of the fact

and would have acted differently if known; and (5) the plaintiff was damaged as a result.  *Saltire*

*Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 527 (6th Cir. 2007). AMEC

claims Symetra had a duty to disclose that Harris and/or Eaton were making risky investments and

engaging in prohibited transactions.  This claim fails as a matter of law for several reasons.

First, as the Court recognized in ruling on Symetra's motion to dismiss, "'the duty to

disclose arises in only three scenarios' one of which is '[w]here there is a previous definite

fiduciary relationship between the parties.'"  ECF No. 958, at PageID 20654 (quoting *Saltire*, 491

F.3d at 528).  As proven above, Symetra was not a fiduciary as a matter of law.  AMEC's sole

basis for a disclosure duty is that Symetra "owed a duty as the carrier of tens of millions of dollars

of Plan funds."  Cross-Compl. ¶ 301.  Again, AMEC has not explained the term "carrier" or

explained how "carrier" status would create any duty of disclosure.  As the Court recognized, "the

mere payment of claims or sale of annuity contracts does not render an insurer a 'fiduciary' within

the meaning of ERISA" and "parties dealing at arm's length lack the sort of relationship of trust

and confidence that gives rise to a fiduciary relationship."  ECF No. 958, at PageID 20647.

Second, there is no evidence that Symetra knew about the information it allegedly failed to

disclose.  There is no evidence Symetra knew or believed the Plan was being harmed or the nature

or risk profile of any of the alternative investments.  Facts ¶ 147.  Symetra employees universally

testified that they did not believe Harris was engaged in any misconduct and if they had believed

otherwise, they would have reported him.  *Id.*  They also testified that it was not unusual for a

retirement plan to have a single trustee and they believed they were contractually obligated to

follow Harris's lawful instructions regarding Plan funds invested in the annuity contracts.  *Id.* at ¶

148. There is no evidence Symetra ever believed Harris was conflicted with respect to FFF, which was owned by AMEC Financial Services, LLC, which was in turn owned by the Church, not Harris or Eaton. Facts ¶¶ 50, 96. And while Symetra suspected Eaton might have had conflict, Symetra disclosed that suspicion to Harris and advised him to have a lawyer review it. *Id.* ¶ 97. Telling the Plan Trustee about a potential conflict, so he could resolve it, is the right action to take under the assumption that the Trustee had no conflict. Nor did Symetra know what FFF was investing in, and employees testified they did not know what FFF did. *Id.* ¶¶ 93-97.

Third, there is no evidence that Symetra concealed anything from AMEC. To the contrary, it is undisputed that Harris, a General Officer of AMEC, knew about all the transfers, investments, and transactions that AMEC claims should have been disclosed; indeed, they were all done at his direction. Facts ¶¶ 32, 40, 46, 120-22, 126-27, 141. Harris was AMEC's officer and employee acting at all times within the scope of his employment. *See supra* Section I(A). Therefore, his knowledge is imputed to AMEC as a matter of law. *Griffith Motors, Inc. v. Parker*, 633 S.W.2d 319, 322 (Tenn. Ct. App. 1982) (entity has constructive knowledge of all material facts its officers and agents receive notice of in the course of their employment within the scope of their authority, regardless of whether the agent communicates his knowledge). Harris also repeatedly notified the Church's governing bodies of his efforts to "diversify" the Plan's investments and ability to obtain above-market returns. Facts ¶¶ 74, 123, 136, 149, 166, 174. And these bodies had every opportunity and a fiduciary duty to question and seek additional information from Harris for two decades, including when he presented his Annual Report, yet no one ever asked where he invested the Plan's money or how he was obtaining above-market returns. *Id.* ¶¶ 132-34, 150, 165-66, 168, 172-74. This information could have been discovered with the slightest due diligence. *Id.* ¶ 176.

Having disclosed all of this information to Harris, Symetra had no duty—or reason—to

make additional disclosures to others at the Church. Indeed, had the Church exercised due diligence by monitoring and supervising Harris and the Plan's investments—in accordance with its duty—the Church would have been aware of all material information. *Id.* AMEC's failure to supervise cannot be transposed into a concealment claim against Symetra. AMEC therefore cannot satisfy multiple elements of a fraudulent concealment claim: (1) Symetra did not conceal anything from AMEC; (2) Symetra had no duty to disclose the information it is accused of concealing; (3) Symetra had no intent to deceive AMEC; and (4) AMEC (via Harris) was aware of the facts.

Accordingly, the Court should grant summary judgment to Symetra on this claim.

## X.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON AMEC'S CIVIL CONSPIRACY CROSS-CLAIM

### A.    There Is No Record Evidence Establishing A Conspiracy

Civil conspiracy is not an independent tort under Tennessee law, but a "means of extending, to a tortfeasor's co-conspirators, liability for the tortfeasor's underlying tort." *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir. 2010); ECF No. 958, at PageID 20656. To establish a civil conspiracy, a plaintiff must prove: (1) a common design; (2) an unlawful purpose; (3) an overt act in furtherance of the conspiracy; and (4) injury as a result. *Morrow v. Kroger Ltd. P'ship I*, 2025 WL 367404, at *5 (W.D. Tenn. Jan. 29, 2025).

A conspiracy's core element is an agreement. "Each conspirator must have the intent to accomplish th[e] common purpose, and each must know each other's intent." *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 395–96 (Tenn. 2015). An agreement can be tacit, but there still must be an agreement. Two parties engaged in independent, parallel conduct to further their own self-interest is not a conspiracy, even if the independent conduct generates the same results as concerted conduct. *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 259–60 (Ill. 1999) ("in cases involving the tort of conspiracy, courts … have held that proof of

mere parallel conduct is insufficient") (citing cases); *Ryan v. Romo*, 2015 WL 1221281, at *6 (S.D. Ohio Mar. 17, 2015*), aff'd in part, rev'd in part*, (6th Cir. Mar. 9, 2016).

Similarly, circumstantial evidence may be offered, but must be evidence more than parallel conduct. In other words, conduct consistent with a conspiracy is not evidence of one if it is equally consistent with independent action. *Id.* Thus, AMEC must offer evidence that tends to rule out the possibility of unilateral but parallel conduct, such as conduct Symetra would not otherwise engage in but for the alleged agreement. Were it otherwise, entities engaged in a wide range of standard self-interested business conduct would be subject to conspiracy claims simply because that conduct is *consistent* with an agreement.

The Court previously described AMEC's conspiracy claim as follows: "Harris and Eaton agreed to move $49 million in Plan assets to Symetra where they began to transfer money to other self-serving or prohibited investments while Symetra paid Eaton commissions from the Plan's purchase of Symetra annuities and Harris inflated administrative fees 'to induce him to keep Plan assets in Symetra annuities.'" ECF No. 958, at PageID 20658. AMEC alleges a conspiracy between Harris and Symetra based on (1) Symetra's disbursement of allegedly excessive administrative fees; (2) Symetra's execution of Harris's orders to transfer funds to FFF and Motorskill; and (3) Symetra's assistance with a brochure used in Harris's 2008 reelection campaign. Cross-Compl. ¶¶ 318-19, 322-23, 343, 346, 365, 370. These contentions are unsupported, or are as consistent with ordinary, independent business behavior as with conspiracy.

First, there is no evidence Symetra knew the administrative fees were excessive or allegedly unauthorized. Payment of them reduced the amount of Plan funds invested in Symetra, so did not benefit Symetra. Moreover, Harris's successor, Dr. Miller, continued to withdraw administrative fees even after the loss of funds under Harris was discovered and the Plan was under

high scrutiny by the Church and its lawyers.  Facts ¶ 31.  That strongly suggests the fees were not excessive or unauthorized, and the Church understood them to be reasonable.  Their payment is not evidence of a conspiracy because it is equally consistent with Symetra believing they were appropriate, and that Harris was authorized to request them.

Second, there is no evidence that Symetra knew or believed Harris had a conflict of interest as to the transfers Symetra made to FFF and Motorskill.  Symetra never knew who owned either FFF or Motorskill, nor was it Symetra's job to know.  And when Symetra suspected (not knew) Eaton might have a conflict, it disclosed that concern to Harris and advised him to seek legal advice.  Facts ¶¶ 93-97.  That is entirely inconsistent with the theory that Symetra was in a conspiracy or aided and abetted Harris' breach of fiduciary duties.  Instead, the reasonable and obvious explanation for the transfers is that Symetra was executing Harris's directives to make them pursuant to its contractual obligations, not a conspiracy.  *Id.* ¶¶ 7, 62, 76, 78, 82.

Third, while AMEC interprets Symetra's assistance with a 2008 reelection campaign brochure as nefarious, it was equally consistent with good customer service for a longtime client's designated agent for Plan business.  An isolated instance of a Symetra employee doing Harris a favor is not material evidence to support a claim of a multi-party, twenty-year conspiracy— especially when the election was uncontested and the brochure could have no impact on the outcome.  Facts ¶ 49.  In sum, AMEC's theory is based on conclusory allegations that are either false or not evidence of any unlawful agreement because they are equally consistent with Symetra engaging in ordinary business practices.[12]

---

[12] While commissions paid to Eaton were not an express overt act alleged by AMEC, the Court's description of AMEC's conspiracy cross-claim references such commissions.  ECF No. 958, at PageID 20658.  Such commissions, in any event, were paid out of Symetra's own funds, not from Plan's assets.  Facts ¶ 18.  As a result, the commissions did not harm the Plan, and there is no reason why the Plan's sponsor would care about them.  Paying those commissions would be

In addition to the absence of proof of any conspiracy, the record is replete with evidence that tends to refute Symetra's involvement in any conspiracy, including:

First, in the thousands of Symetra and Church documents and communications over twenty years produced in this case, none feature a Symetra employee even vaguely alluding to an agreement with Harris to engage in any unethical or illegal behavior. It is not plausible that more than a dozen Symetra employees participated in a conspiracy with Harris for twenty years and did not leave a crumb of documentary evidence behind. Notably, the point person for the Plan changed repeatedly over time. Jim Daniel and Bob Follette handled the account from 2001 to 2008, when they were both laid off and replaced with Erik Shaner, who handled the account until around 2011, when he was replaced with Chelle Chase. Facts ¶¶ 99, 111. While they managed the relationship, Kathy Hastings handled ministerial responsibilities. *Id.* ¶ 82. An ever-changing group of actuaries handled setting interest rates on the annuities. The idea that all of these individuals—most who never met or talked to Harris—conspired with him while leaving no trace of doing so is nonsense.

Second, numerous Symetra employees have been deposed, and all testified they were not part of a conspiracy with Harris, would not have participated in one, and would have reported and refused to engage in such conduct. *Id.* ¶ 147. These witnesses include Daniel and Follette who were both unceremoniously laid off by Symetra in the middle of their careers and who therefore have no loyalty to the company. *Id.* ¶¶ 99, 147.

Third, the fact Symetra paid well-above the contractually required minimum on its annuities for 17 years is flatly inconsistent with it conspiring to harm the Plan. If Symetra's motivation for participating in the conspiracy was to induce Harris into a lopsided deal, then Symetra would have paid the contractual minimum (or close to it) from the beginning. Instead,

---

an economic detriment to Symetra, so do not support a conspiracy.

Symetra paid rates that were better than other comparable financial products. *Id.* ¶ 113. Symetra did not reduce its rates to the contractual minimums until 2017, more than four years after the last transfer Harris ordered Symetra to make to Motorskill (or any other investment). *Id.* That timing makes no sense if low rates served as Symetra's motivation for participating in the transfers.

Fourth, that Eaton and Harris ran an entirely new RFP process in 2006 is irreconcilable with a conspiracy to keep the account with Symetra. *Id.* ¶¶ 72-73. If Harris and Eaton knew they were going to keep the account with Symetra, it would make no sense to go through the effort of conducting an RFP. In fact, Symetra gave the Church a better deal as a result of the 2006 RFP. In the 2007 Annuity Contract, Symetra dropped its 0.25% service fee and offered the Plan a year-long guarantee of a higher rate than Symetra had been paying in 2006. *Id.* ¶¶ 77, 111-13. These facts conflict with a conspiracy to keep the account with Symetra.

Fifth, the existence of internal emails within Symetra expressing serious concern in 2008 and 2009 that Harris might be "shopping" the Plan is inconsistent with an agreement with Harris to keep the Plan at Symetra. Indeed, Symetra had its then-CEO personally meet with Harris to try to ensure he did not move the Plan elsewhere. *Id.* ¶¶ 109-110; Ex. 109. None of this would be necessary if Symetra knew it had a lock on the Plan, and these emails expressing genuine concern about losing the Plan are evidence that no conspiracy existed.

Sixth, Symetra's internal emails discussing concerns about Eaton having a conflict of interest in the 2008 transfer to FFF are inconsistent with an unlawful agreement. *Id.* ¶¶ 95, 97. If the relevant Symetra employees, like Jim Daniel and Bob Follette, were conspiring with Harris and Eaton to enable self-serving transfers, they would not have raised concerns about those transfers internally, they would have kept quiet. The fact that concerns were raised and Symetra ultimately advised Harris to seek legal advice is direct evidence that no conspiracy existed.

Seventh, internal Symetra emails in 2012 suggest Symetra gave the Plan better interest rates than some other customers, as a result of negotiations by the Plan.  *Id.* ¶ 111.  These emails suggest Symetra and Eaton engaged in tough negotiations and that the Plan got the best deal possible from Symetra (at one point Symetra contemplates letting the Plan walk away rather than increasing its interest rate any higher), and undermines AMEC's theory that Symetra attempted to induce Harris to keep Plan assets in Symetra annuities.

### B.    AMEC Cannot Sue Over A Conspiracy Involving Itself

AMEC's civil conspiracy theory also fails because AMEC cannot bring a conspiracy claim against Symetra for conspiring with Harris, an officer of AMEC itself.  Courts have held that those who participated as a co-conspirator are barred by unclean hands and *in pari delicto* from prosecuting, and recovering from, that conspiracy.  *See In re Martin*, 2011 WL 6130422, at *4 (Bankr. E.D. Tenn. Dec. 8, 2011) (debtor "barred as an alleged co-conspirator from prosecuting a prepetition conspiracy claim against the defendants pursuant to the doctrine of *in pari delicto*"); *Brooks v. Creech*, 2003 WL 174805, at *4, 6 (Tenn. Ct. App. Jan. 28, 2003) (similar).

The Court declined to dismiss the conspiracy claim because AMEC had alleged that Harris acted outside the scope of his authority.  ECF No. 958, at PageID 20661.  But AMEC cannot rely on conclusory allegations anymore.  The record shows overwhelmingly that Harris at all times acted with the actual and apparent authority of the Church and within the scope of his authority.

As set forth in Section I(A), which asks the Court to hold as a matter of law that Harris was an authorized representative of the Plan with authority to direct Symetra and manage the Plan, the record confirms that from the inception of his tenure as Executive Director forward that Harris was the sole representative authorized to act on behalf of the Plan.  *See supra*.  Any misconduct in making investments or misappropriating Plan monies was done by Harris within his actual and apparent authority to act on the Plan's behalf, and therefore plainly within the scope of his

employment and authority. *Id.* If AMEC were correct that wrongful conduct is inherently outside the scope of one's employment or authority, every tort an agent committed would be outside this scope and respondeat superior would never apply. AMEC is therefore responsible for Harris's conduct and cannot bring a claim for conspiring with him.

For all these reasons, the claim that Symetra participated in an unlawful conspiracy is absurd, and Symetra is entitled to summary judgment on AMEC's civil conspiracy cross-claim.

## XI.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO SYMETRA ON AMEC'S AIDING AND ABETTING CROSS-CLAIM

Like civil conspiracy, aiding and abetting is a means to extend liability from the tortfeasor to others. To do so, a plaintiff must prove "the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." *Mark IV Enters., Inc. v. Bank of Am., N.A.*, 2018 WL 3146305, at *2 (Tenn. Ct. App. June 26, 2018). The claim has two elements: (1) "actual knowledge" of the companion's wrongful conduct, and (2) "substantial assistance" in support of it. *Prime Health Servs., Inc. v. Capital Bank, N.A.*, 2017 WL 1064360, at *4–5 (M.D. Tenn. Mar. 21, 2017). Mere "suspicions" of wrongful conduct is not sufficient to establish actual knowledge. *Id.* Also, the "substantial assistance" must specifically assist the wrongful conduct itself; merely providing support for lawful conduct to someone you know is also engaged in illegal conduct is not sufficient. *Id.*

AMEC contends Symetra and eight other defendants had actual knowledge Harris and Eaton were engaged in four breaches of fiduciary duty: (1) a long-term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations; (2) self-dealing with Plan assets; (3) high-risk investments with Plan assets; and (4) allowing the Plan to earn below-average returns. Cross-Compl. ¶ 435. AMEC claims Symetra gave substantial assistance to these breaches by: (1) executing transfers ordered by Harris that Symetra knew involved conflicts of interest; (2) executing Harris's

orders to disburse quarterly administrative fees back to DRS; and (3) assisting Harris with a reelection campaign brochure. *Id.* ¶ 442.

## A.    AMEC Cannot Show Symetra Had Actual Knowledge of Any Breach of Duty

The first three breaches of fiduciary duty AMEC contends Symetra knew about involve the same two core allegations: that Harris wrongfully transferred money to FFF and Motorskill and took inflated administrative fees.  Symetra did know about some of the transfers and all of the administrative fees, but there is no evidence it knew they were <u>*wrongful*</u>, as required.  There is no evidence Symetra knew who owned Motorskill or what it was, or that Harris's investment in Motorskill would breach any duty.  Symetra lacked "actual knowledge" that Motorskill was high-risk or a conflict of interest for Harris or Eaton.  The only connection between Motorskill and Harris or Eaton that AMEC ever identified was correspondence with Symetra in which Eaton emailed from an "@motorskill.com" domain.  Cross-Compl. ¶ 113.  This was not "regular correspond[ence]" as AMEC claims, but two instances (over 20 years) in which Eaton emailed two Symetra employees from an "@motorskill.com" domain.  Facts ¶ 121.  These emails did not occur in temporal proximity to any transfer orders from Harris, and there is no evidence this domain was noticed by any Symetra employee, or that they investigated Motorskill or Eaton's relationship to it.  *Id.*  Even if the domain could raise a genuine question of whether Symetra should have investigated, it cannot imply Symetra had "actual knowledge" that Motorskill was a conflict of interest for Eaton.  Since there is no evidence Symetra knew what Motorskill was, transfers to it cannot support aiding and abetting liability.

As to FFF, there was no conflict of interest.  In reality, neither Harris nor Eaton owned FFF; it was owned by AMEC Financial Services, LLC, which was owned <u>by the Church</u>.  Facts ¶¶ 50, 96.  As a result, it was not a "prohibited" investment.  There is no evidence Symetra ever believed Harris was conflicted as to FFF.  And while Symetra suspected Eaton might have had conflict, suspicion is

not "actual knowledge," and Symetra disclosed that suspicion to Harris and advised him to have a lawyer review it. Telling the Plan Trustee about a potential conflict, so he could resolve it, is the right action to take under the assumption that the Trustee had no conflict. Nor did Symetra know what FFF was investing in, so Symetra had no actual knowledge FFF was "high risk." *Id.* ¶ 95. AMEC's only evidence is that Eaton attached a subscription agreement for FFF to his initial email requesting the $10 million transfer. But there is no evidence Symetra employees read the agreement, let alone understood it or came away with the belief that FFF was risky. To the contrary, the relevant employees testified that they did not know what FFF did. *Id.*

With respect to the administrative fees, AMEC must show Symetra had "actual knowledge" they were improper, but cannot. The fees' mere size is not evidence because Symetra did not know their use, so could not have known whether their size was appropriate.

Finally, AMEC claims Symetra knew the Plan was investing in Symetra's annuity with below-average returns. This premise is false because Symetra's annuities performed well for their asset class. Facts ¶ 113. More fundamentally, Symetra cannot aid and abet a breach of fiduciary duty by selling a legal product to the Plan. If AMEC's argument prevailed, investment providers would be subject to litigation whenever a retirement plan participant believed its product was subpar. Moreover, any investment provider whose product performed "below the average rate of return for pension plans," Cross-Compl. ¶ 435, would be liable—which, by definition, would result in liability for 50% of investment products. Symetra must be allowed to sell its completely legal annuity product to retirement plans without having to stand trial for "aiding and abetting."

### B.     AMEC Cannot Establish Symetra Substantially Assisted with Any Breach of Fiduciary Duty

Symetra acknowledges that it executed Harris's transfer orders to FFF and Motorskill and Harris's orders to disburse quarterly administrative fees back to DRS, and helped create a brochure

for Harris's uncontested 2008 reelection campaign. But none of these actions constitutes "substantial assistance" with any breach of fiduciary duty by Harris. Symetra's assistance with the campaign brochure cannot be substantial assistance because Harris's reelection campaign was not a tortious act or breach of fiduciary duty, as he violated no duty to anyone for running for reelection. Thus, Symetra's assistance was not aiding and abetting any tort. AMEC may respond that assisting Harris enabled him to continue as Executive Director, and with his wrongdoing. But that is simply untrue, as the campaign was uncontested, and Harris would have continued as Executive Director regardless. Helping with a brochure is also too attenuated to constitute substantial assistance. To support an aiding and abetting claim, the act must involve substantial assistance <u>with the alleged tort</u>. Symetra's assistance with legal conduct does not qualify.

Symetra's execution of Harris's transfer and disbursement orders, likewise, cannot constitute substantial assistance because Symetra did not know they were tortious. Harris had apparent authority (and actual authority under the 2006 Plan Document) to direct Symetra to disburse funds out of the annuity contracts, and Symetra was obligated to follow his instructions. *See* Section I(A), *supra.* Otherwise, Symetra would have subjected itself to breach of contract liability. Moreover, the transfers Harris directed to FFF were not tortious. The Church owned FFF, so there was no conflict. Indeed, FFF invested in multiple legitimate investments on behalf of the Plan, such as stocks and money market accounts through Deutsche Bank and J.P. Morgan. *Id.* ¶¶ 100-104. The tortious conduct was FFF's subsequent investments in Motorskill, which Symetra was not involved with and did not know about. Symetra's assistance with appropriate, non-tortious, investments in FFF cannot constitute substantial assistance simply because that money was later used for investments in Motorskill without Symetra's knowledge.

The Court should enter summary judgment on AMEC's aiding and abetting cross-claim.

-50-

Dated:  December 1, 2025

Respectfully submitted,

/s/  *Benjamin M. Stoll*

Markham R. Leventhal
Benjamin M. Stoll
Scott M. Abeles
CARLTON FIELDS, P.A.
1625 Eye Street, NW, Suite 800
Washington, DC 20006
Telephone:  (202) 965-8189
mleventhal@carltonfields.com
bstoll@carltonfields.com
sabeles@carltonfields.com

Rachel A. Oostendorp
CARLTON FIELDS, P.A.
2 MiamiCentral, Suite 1200
700 NW 1st Avenue
Miami, Florida 33136
Telephone:  (305) 530-0050
roostendorp@carltonfields.com

*Attorneys for Defendant*
*Symetra Life Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 1st day of December, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.  The NEF for the foregoing specifically identifies the recipients of electronic notice.

/s/ *Benjamin M. Stoll*

Benjamin M. Stoll

142635287